Lee R. Feldman, Esq. (SBN 171628)
lee@leefeldmanlaw.com
Alicia Olivares, Esq. (SBN 181412)
alicia@leefeldmanlaw.com
Leonard H. Sansanowicz, Esq. (SBN 255729)
leonard@leefeldmanlaw.com
**FELDMAN BROWNE OLIVARES**
**A Professional Corporation**
10100 Santa Monica Blvd., Suite 2490
Los Angeles, California 90067
Telephone: (310) 552-7812
Facsimile: (310) 552-7814

Michael Rubin, Esq. (SBN 80618)
mrubin@altber.com
**ALTSHULER BERZON LLP**
117 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Attorneys for Plaintiff, DAVID L. TOTTEN,
and all others similarly situated

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID L. TOTTEN, an individual, and all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>KELLOGG BROWN & ROOT, LLC, a Delaware Corporation; MOLYCORP, INC., a Delaware Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO. 5:14-cv-01766-DMG-DTBx<br><br>[*Case Assigned to the Honorable Dolly M. Gee in Courtroom 7 - Spring Street*]<br><br>[San Bernardino County Superior Court Case No. CIVDS1408596]<br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Before Honorable United States District Judge Dolly M. Gee<br><br>Notice of Removal Filed: August 28, 2014 |

**TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

Plaintiff David L. Totten submits the following Notice of Supplemental Authority.

## I. PAGA Waivers in Arbitration Agreements are no Longer Enforceable in the Ninth Circuit.

Three months ago, Defendants filed a Notice of Supplemental Authority stating that Plaintiff had neglected to identify for the Court "the overwhelming majority position…on enforceable waivers of PAGA claims..." (Dkt No. 38.) Certain District Courts had ruled that the Federal Arbitration Act (FAA) preempted the California rule found in *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal.4th 348 (2014), that representative claims brought under The Labor Code Private Attorneys General Act of 2004 (PAGA) could not be waived because a PAGA action is essentially a qui tam action in which the representative plaintiff brings a proxy action on behalf of the state. Today, the Ninth Circuit definitively ruled that "the *Iskanian* rule does not stand as an obstacle to the accomplishment of the FAA's objectives, and is not preempted." *Sakkab v. Luxottica Retail N. Amer., Inc.*, No. 13-55184 (9th Cir. Sept. 28, 2015). The *Sakkab* court specifically held that the *Iskanian* rule does not conflict with the FAA because:

> The California Supreme Court's decision in *Iskanian* expresses no preference regarding whether individual PAGA claims are litigated or arbitrated. It provides only that the representative PAGA claims may not be waived outright. 59 Cal.4th at 384. The *Iskanian* rule does not prohibit the arbitration of any type of claim. (*Id.* at 17-18.)

Moreover, *Sakkab* held that "strict enforcement of all terms contained in an arbitration agreement, including terms that are unenforceable under generally applicable state law…is untenable, of course, because it would render § 2's [of the FAA] savings clause wholly 'ineffectual.' [Citations]." *Id.* at 18. Thus, even though "Sakkab and Luxottica likely expected the waiver of representative PAGA claims to be enforced [] the *Iskanian* rule prevents that expectation from being fulfilled[; a]ny generally applicable

state law that invalidates a mutually agreed upon term of an arbitration agreement will, by definition, defeat the parties' contractual expectations." *Id.* at 23. The *Sakkab* court further opined that "Both the PAGA statute and the *Iskanian* rule reflect California's judgment about how best to enforce its labor laws," and that "[t]he FAA was not intended to preclude states from authorizing qui tam actions [which predate the FAA by several centuries] to enforce state law" or "to require courts to enforce agreements that severely limit the right to recover penalties for violations that did not directly harm the party bringing the action." *Id.* at 28-29.

Attached hereto as Exhibit "A" is a true and correct copy of the *Sakkab* decision.

## II. The NLRB Has Rendered Several More Post-*Murphy Oil* Decisions Reiterating Its Position That Class Action Waivers Violate Section 8(a)(1).

The National Labor Relations Board (Board) has issued several decisions and orders in recent months affirming its decisions in *Murphy Oil USA, Inc., and Sheila M. Hobson*, 361 NLRB No. 72 (Oct. 28, 2014) and *D.R. Horton, Inc.*, 357 NLRB No. 184 (2012) that class action waivers violate Section 8(a)(1) of the National Labor Relations Act (Act) by prohibiting employees from filing class, collective or representative actions. In *Countrywide Fin. Corp., et al.*, Cases 31-CA-072916 and 31-CA-072918 (Aug. 14, 2015), the Board held that an arbitration agreement that requires employees to arbitrate their claims on an individual basis was a sufficient inhibition of the employees' right to concerted activity and therefore a Section 8(a)(1) violation even if the agreement itself was facially silent as to the issue of filing class or collective employment claims. *Id* at *3-4. In *Leslie's Poolmart, Inc. and Keith Cunningham*, Case 21-CA-102332 (Aug. 25, 2015), the Board similarly held that requiring employees, as a condition of employment, to arbitrate their employment disputes on an individual basis violated *D.R. Horton*, *Murphy Oil*, and Section 8(a)(1). In *Hoot Winc, LLC and Ontario Wings, LLC d/b/a Hooters of Ontario Mills, et al.*, Cases 31-CA-104872, 31-CA-104874, 31-CA-104877, 31-CA-104892, 31-CA-107256, and 31-CA-107259 (Sept. 1, 2015), the Board held that

an arbitration agreement that required "all claims" to be decided exclusively by arbitration, including "any claim whether arising under federal, state, or local law…including but not limited [to]…ANY CLAIM FOR WAGES" (allcaps in original), violated *D.R. Horton*, *Murphy Oil*, and Section 8(a)(1).

As set forth in Plaintiff's Opposition to Defendants' Motion to Compel Arbitration, the arbitration agreement in this case specifically provides:

> Each Dispute shall be arbitrated on an individual basis. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Plan shall have no authority to conduct the matter as a consolidated, class, or collective action. (Exhibit A to Dkt No. 22-1, KBR Dispute Resolution Plan and Rules at p.10 ¶ 4(B)(i)).

*Countrywide Financial*, *Leslie's Poolmart*, and *Hoot Winc* are attached hereto as Exhibits B, C, and D, respectively.

Dated: September 28, 2015

FELDMAN BROWNE OLIVARES, APC
ALTSHULER BERZON LLP

By: /s/ Leonard H. Sansanowicz
Attorneys for Plaintiff DAVID TOTTEN

# Exhibit A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHUKRI SAKKAB, an individual, on behalf of himself, and on behalf of all persons similarly situated,
*Plaintiff-Appellant*,

v.

LUXOTTICA RETAIL NORTH AMERICA, INC., an Ohio corporation,
*Defendant-Appellee*.

No. 13-55184

D.C. No. 3:12-cv-00436-GPC-KSC

OPINION

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted
June 3, 2015—Pasadena, California

Filed September 28, 2015

Before: Milan D. Smith, Jr., and N. Randy Smith, Circuit Judges, and Joan H. Lefkow,* Senior District Judge.

---

* The Honorable Joan Humphrey Lefkow, Senior District Judge for the United States District Court for the Northern District of Illinois, sitting by designation.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge N.R. Smith

## SUMMARY**

**Federal Arbitration Act / CA Private Attorney General Act**

The panel reversed the district court's order granting Luxottica Retail North America, Inc.'s motion to compel arbitration of claims and dismissing plaintiff's first amended complaint, in a putative class action raising class employment-related claims and a non-class representative claim for civil penalties under the Private Attorney General Act.

Luxottica sought to compel arbitration under a dispute resolution agreement contained in its Retail Associate Guide. Plaintiff argued that the portion of the alternative dispute resolution agreement prohibiting him from bringing any PAGA claims on behalf of other employees was unenforceable under California law.

After the district court entered judgment in this case, the California Supreme Court announced the rule in *Iskanian v. CLS Transportation Los Angeles*, LLC, 59 Cal. 4th 348 (2014), barring the waiver of representative claims under PAGA.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the waiver of plaintiff's representative PAGA claim could not be enforced. The panel held that the Federal Arbitration Act did not preempt the California rule announced in *Iskanian*. Specifically, the panel held that following the logic of *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), the *Iskanian* rule is a "generally applicable" contract defense that may be preserved by the FAA's § 2 savings clause, provided it did not conflict with the FAA's purposes. The panel further found that the *Iskanian* Rule did not conflict with the FAA's purposes.

The panel held that the non-PAGA claims in the first amended complaint must be arbitrated. The panel remanded for the district court and the parties to decide in the first instance where plaintiff's representative PAGA claim should be resolved, and to conduct other proceedings consistent with this opinion.

Dissenting, Judge N.R. Smith would hold that the majority should have applied *Concepcion* and deferred to the FAA's "liberal federal policy favoring arbitration." Judge N.R. Smith would hold that the *Iskanian* rule is preempted by the FAA, and he would affirm the district court.

---

## COUNSEL

Kyle R. Nordrehaug (argued), Norman B. Blumenthal, and Aparajit Bhowmik, Blumenthal, Nordrehaug & Bhowmik, La Jolla, California, for Plaintiff-Appellant.

Keith A. Jacoby (argued), Scott M. Lidman, and Judy M. Iriye, Littler Mendelson, P.C., Los Angeles, California, for Defendant-Appellee.

Andrew J. Pincus (argued) and Archis A. Parasharami, Mayer Brown LLP, Washington, D.C., for Amici Curiae.

---

## OPINION

M. SMITH, Circuit Judge:

This appeal presents issues of first impression regarding the scope of Federal Arbitration Act (FAA) preemption, 9 U.S.C. § 2 *et seq.*, and the meaning of the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011). We must decide whether the FAA preempts the California rule announced in *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348 (2014), which bars the waiver of representative claims under the Private Attorneys General Act of 2004 (PAGA), Cal. Lab. Code § 2698 *et seq*. After closely examining *Concepcion* and the Court's other statements regarding the purposes of the FAA, we conclude that the *Iskanian* rule does not stand as an obstacle to the accomplishment of the FAA's objectives, and is not preempted. We reverse the judgment of the district court and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

The Plaintiff-Appellant, Shukri Sakkab (Sakkab), is a former employee of Lenscrafters, an eyewear retailer owned by the Defendant-Appellee, Luxottica Retail North America, Inc. (Luxottica). On January 17, 2012, Sakkab filed a putative class action complaint against Luxottica in the Superior Court of the State of California in and for the County of San Diego. The complaint asserted four causes of action arising out of Sakkab's employment by Luxottica,

including (1) unlawful business practices, (2) failure to pay overtime compensation, (3) failure to provide accurate itemized wage statements, and (4) failure to pay wages when due. The complaint alleged that Luxottica misclassified Sakkab and other employees as supervisors so that they would be exempt from overtime wages and meal and rest breaks. Luxottica answered and timely removed the case to federal court. On March 27, 2012, Sakkab filed a first amended complaint (FAC) adding a non-class, representative claim for civil penalties under the PAGA.

On April 23, 2012, Luxottica filed a motion to compel arbitration under the dispute resolution agreement contained in its "Retail Associate Guide." The agreement provided, in pertinent part:

> You and the Company each agree that, no matter in what capacity, neither you nor the Company will (1) file (or join, participate or intervene in) against the other party any lawsuit or court case that relates in any way to your employment with the Company or (2) file (or join, participate or intervene in) a class-based lawsuit, court case or arbitration (including any collective or representative arbitration claim).[1]

[1] According to Luxottica, two different versions of the dispute resolution agreement existed during the time that Luxottica employed Sakkab. In June 2011, Luxottica circulated a revised version of the dispute resolution agreement. The revised version provided:

> You and the Company each agree that, no matter in what capacity, neither you nor the Company will (1) file (or join, participate or intervene in) against the

Sakkab signed an acknowledgment indicating that he understood and agreed to the terms of the dispute resolution agreement on June 25, 2010.

On January 10, 2013, the district court granted Luxottica's motion to compel arbitration and dismissed the FAC. The court noted that Sakkab did not dispute that his first four claims were arbitrable. Sakkab argued, however, that the portion of the alternative dispute resolution agreement prohibiting him from bringing any PAGA claims on behalf of other employees was unenforceable under California law. For this reason, Sakkab argued, even if he was required to arbitrate his claims, he could not be denied a forum for his representative PAGA claim. The district court rejected Sakkab's argument that the right to bring a

---

> other party any lawsuit or court case that relates in any way to your employment with the Company or (2) file (or join, participate or intervene in) a class-based lawsuit or court case (including any collective action) that relates in any way to your employment with the Company or (3) file (or join, participate or intervene in) a class-based arbitration (including any collective arbitration claim) with regard to any claim relating in any way to your employment with the Company to the extent permitted by applicable law.

Sakkab acknowledged that he understood and agreed to the terms of the revised version. For reasons that are not entirely clear, the district court assumed that the earlier version governed the arbitrability of this dispute. We need not resolve which version of the agreement governs. Neither party has argued that the district court erred by construing the earlier version of the agreement instead of the later version, or that the results would be any different if one version applied instead of the other. On appeal, Sakkab concedes that the version relied on by the district court governs, and that this version purports to prohibit him from arbitrating representative PAGA claims.

representative PAGA claim is unwaivable under California law. At the time, the California Supreme Court had not yet considered whether PAGA waivers were enforceable under California law. Relying on the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, the district court concluded that the FAA would preempt a state rule barring waiver of PAGA claims. The court then granted the motion to compel arbitration of the claims in the FAC, dismissed Sakkab's complaint, and entered judgment. This timely appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. § 1332(d)(2). We have appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment of the district court.

"The district court's decision to grant or deny a motion to compel arbitration is reviewed de novo." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564 (9th Cir. 2014) (quoting *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1152 (9th Cir. 2004)).

## DISCUSSION

After the district court entered judgment in this case, the California Supreme Court ruled that PAGA waivers are unenforceable under California Law. *Iskanian*, 59 Cal. 4th 348. On appeal, Luxottica argues that the FAA preempts the *Iskanian* rule. After considering the history of the PAGA statute and the Supreme Court's FAA preemption cases, we hold that the FAA does not preempt the *Iskanian* rule.

## I. The Labor Code Private Attorneys General Act

California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698 *et seq.*, "authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the proceeds of that litigation going to the state." *Iskanian*, 59 Cal. 4th at 360. An action brought under the PAGA is a type of qui tam action. *Id*. at 382.

The PAGA was enacted to correct two perceived flaws in California's Labor Code enforcement scheme. *Id*. at 378–79. The first flaw was that civil penalties were not available to redress violations of some provisions of the Labor Code. *Id*. at 378. Those provisions only provided for criminal sanctions, not civil fines, and could only be enforced in criminal prosecutions brought by district attorneys, not in civil actions brought by the Labor Commissioner. *See id*. at 379. As a result, many violations of the Labor Code went unpunished. *Id*. The PAGA addressed this problem by providing for civil penalties for most Labor Code violations. "For Labor Code violations for which no penalty is provided, the PAGA provides that the penalties are generally $100 for each aggrieved employee per pay period for the initial violation and $200 per pay period for each subsequent violation." *Id*. (citing Cal. Lab. Code § 2699(f)(2)).[2]

[2] A court may award a lesser amount "if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2).

The second flaw the PAGA addressed was that, even where the Labor Code provided for civil penalties, "there was a shortage of government resources to pursue enforcement." *Id.*; *see also* 2003 Cal. Stat. ch. 906 § 1. The legislative history of the PAGA describes the legislature's perception of the seriousness of this problem:

> "Estimates of the size of California's 'underground economy'—businesses operating outside the state's tax and licensing requirements—ranged from 60 to 140 billion dollars a year, representing a tax loss to the state of three to six billion dollars annually. Further, a U.S. Department of Labor study of the garment industry in Los Angeles, which employs over 100,000 workers, estimated the existence of over 33,000 serious and ongoing wage violations by the city's garment industry employers, but that DIR was issuing fewer than 100 wage citations per year for all industries throughout the state. [¶] Moreover, evidence demonstrates that the resources dedicated to labor law enforcement have not kept pace with the growth of the economy in California." (Assembly Com. on Labor and Employment, Analysis of Sen. Bill No. 796 (Reg.Sess. 2003–2004) as amended July 2, 2003, p. 4.)

*Iskanian*, 59 Cal. 4th at 379. To compensate for the lack of "[a]dequate financing of essential labor law enforcement functions," the legislature enacted the PAGA to permit aggrieved employees to act as private attorneys general to collect civil penalties for violations of the Labor Code. 2003

Cal. Stat. ch. 906 § 1(d). Labor Code section 2699(a) provides:

> any provision of [the Labor Code] that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees . . . .

Seventy-five percent of the civil penalties recovered by aggrieved employees[3] under the PAGA are distributed to the Labor and Workforce Development Agency, while the remainder is distributed to the aggrieved employees. Cal. Lab. Code § 2699(i).[4]

---

[3] An "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

[4] Prior to bringing a PAGA action, an employee must notify the employer and the Labor and Workforce Development Agency of the specific provisions of the Labor Code alleged to have been violated. Cal. Lab. Code § 2699.3(a)(1). The Agency is required to notify the employee and employer of whether it intends to investigate the alleged violations. *Id*. § 2699.3(a)(2)(A). An aggrieved employee may commence an action if he receives notice that the Agency does not intend to investigate the alleged violations, or if he does not receive notice from the Agency within 33 days of notifying the Agency and the employer. *Id*. An employee may also bring a PAGA action if the Agency investigates the alleged violations and does not issue a citation to the employer within a specified period of time. *Id*. § 2699.3(a)(2)(B).

Pre-dispute agreements to waive PAGA claims are unenforceable under California law. In *Iskanian v. CLS Transportation Los Angeles, Inc.*, the California Supreme Court held that two state statutes prohibited the enforcement of PAGA waivers. 59 Cal. 4th at 382–83. The first, California Civil Code §1668, codifies the general principle that agreements exculpating a party for violations of the law are unenforceable.[5] The *Iskanian* court observed that allowing employees to waive the right to bring PAGA actions would "disable one of the primary mechanisms for enforcing the Labor Code." *Id*. at 383. It reasoned that "[b]ecause such an agreement has as its 'object, . . . indirectly, to exempt [the employer] from responsibility for [its] own . . . violation of law,' it is against public policy and may not be enforced." *Id*. (alterations in original) (quoting Cal. Civ. Code § 1668). The *Iskanian* court also found that agreements waiving the right to bring PAGA actions violated California Civil Code § 3513. *Id*. Civil Code § 3513 codifies the general principle that a law established for a public reason may not be contravened by private agreement.[6] The court reasoned that "agreements requiring the waiver of PAGA rights would harm the state's interests in enforcing the Labor Code and in receiving the proceeds of civil penalties used to deter violations." *Id*.

[5] California Civil Code §1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[6] California Civil Code § 3513 provides that "[a]ny one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

Agreements waiving the right to bring "representative" PAGA claims–that is, claims seeking penalties for Labor Code violations affecting other employees–are also unenforceable under California law. In *Iskanian*, the court held that even if the PAGA authorized purely "individual" claims,[7] an agreement to waive representative PAGA claims would be unenforceable. *Id*. at 384. The court observed that individual PAGA claims do not "result in the penalties contemplated under the PAGA to punish and deter employer practices that violate the rights of numerous employees under the Labor Code." *Id*. (quoting *Brown v. Ralphs Grocery Co.*, 197 Cal. App. 4th 489, 502 (Ct. App. 2011)).

## II. The Federal Arbitration Act Does Not Preempt the *Iskanian* Rule

If the *Iskanian* rule is valid, Sakkab's waiver of his right to bring a representative PAGA action is unenforceable. Therefore, this case turns on whether the FAA, 9 U.S.C. § 2 *et seq*., preempts the *Iskanian* rule. We conclude that it does not.

"The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements." *Concepcion*, 131 S. Ct. at 1745. Section 2 is the "primary substantive provision of the Act." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). It provides:

> A written provision in any maritime transaction or a contract evidencing a

[7] The court declined to decide whether the PAGA authorizes purely "individual" claims. *Iskanian*, 59 Cal. 4th at 384.

> transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. While "[t]he FAA contains no express pre-emptive provision" and does not "reflect a congressional intent to occupy the entire field of arbitration," *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989), it preempts state law "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id*. (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The final clause of § 2, its saving clause, "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 131 S. Ct. at 1746 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)); *see also Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1204 (2012). Even if a state-law rule is "generally applicable," it is preempted if it conflicts with the FAA's objectives. *Concepcion*, 131 S. Ct. at 1748.

### A. The *Iskanian* Rule is a Ground for the Revocation of Any Contract

To fall within the ambit of § 2's saving clause, the *Iskanian* rule must be a "ground[] . . . for the revocation of *any contract*." 9 U.S.C. § 2 (emphasis added). We conclude that it is.

The Supreme Court has clarified that a state contract defense must be "generally applicable" to be preserved by § 2's saving clause. *Concepcion*, 131 S. Ct. at 1746. It is well established that the FAA preempts state laws that single out arbitration agreements for special treatment. *See, e.g.*, *Doctor's Assocs.*, 517 U.S. at 687. At minimum, then, § 2's "any contract" language requires that a state contract defense place arbitration agreements on equal footing with non-arbitration agreements. *See id*. The *Iskanian* rule complies with this requirement. The rule bars any waiver of PAGA claims, regardless of whether the waiver appears in an arbitration agreement or a non-arbitration agreement.

Some of our cases can be read to suggest that the phrase "any contract" in § 2's saving clause requires that a defense apply generally to all *types* of contracts, in addition to requiring that the defense apply equally to arbitration and non-arbitration agreements. *See Ting v. AT&T*, 319 F.3d 1126, 1147–48 (9th Cir. 2003) (holding that California's Consumer Legal Remedies Act, Cal. Civ. Code § 1751, is "not a law of 'general applicability'" within the ambit of § 2's saving clause because it applies only to noncommercial consumer contracts); *Bradley v. Harris Research, Inc.*, 275 F.3d 884, 890 (9th Cir. 2001) (holding that California Business & Professions Code § 20040.05 does not apply to "any contract" because it "applies only to forum selection

clauses and only to franchise agreements").[8] However, the Court's decision in *AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740, cuts against this construction of the saving clause. The Court in *Concepcion* held that the FAA preempted California law providing that class action waivers in certain consumer contracts of adhesion were unconscionable and unenforceable. 131 S. Ct. at 1748–53. Even though the state-law rule at issue only applied to a narrow class of consumer contracts, the Court strongly implied that the rule was a "generally applicable contract

---

[8] The reasoning of these cases was based on an ambiguous passage in *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.11 (1984). The Court in *Southland* held that § 2 preempted a provision of California's Franchise Investment Law, Cal. Corp. Code § 31512 (1977), as applied to arbitration agreements. *Id.* at 10. In a partial dissent, Justice Stevens argued that the law was preserved by § 2 as a "ground[] . . . at law or in equity for the revocation of any contract." *Id.* at 18–20 (Stevens, J., concurring in part and dissenting in part). The majority rejected this argument. It reasoned that "the defense to arbitration found in the California Franchise Investment Law is not a ground that exists at law or in equity 'for the revocation of *any* contract' but merely a ground that exists for the revocation of arbitration provisions in contracts subject to the California Franchise Investment Law." *Id.* at 16 n.11.

Cases following *Southland* appear to clarify that § 2's "any contract" language refers to whether a state law places arbitration agreements on equal footing with non-arbitration agreements, not whether it applies to all types of contracts. *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("A court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law."); *Doctor's Assocs.*, 517 U.S. at 686–87 ("States may not . . . decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. . . . [T]hat kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [FAA]'s language and Congress's intent." (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281 (1995))).

defense[].” *See id.* at 1748. The Court held that the rule was preempted because it conflicted with the purposes of the FAA, even though the rule purported to apply to “any contract.” *See id.* (“Although § 2’s saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA’s objectives.”).

Following the logic of *Concepcion*, we conclude that the *Iskanian* rule is a “generally applicable” contract defense that may be preserved by § 2’s saving clause, provided it does not conflict with the FAA’s purposes.

### B. The *Iskanian* Rule Does Not Conflict with the FAA’s Purposes

We turn now to whether the *Iskanian* rule conflicts with the FAA’s purposes. We apply ordinary conflict preemption principles to determine whether a state-law rule conflicts with a federal statute containing a saving clause. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 870–72 (2000). In determining whether a state law is impliedly preempted, “[t]he purpose of Congress is the ultimate touchstone.” *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (alteration in original) (quoting *Retail Clerks Int’l Ass’n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963)). “What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . .” *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 373 (2000). In exercising our judgment, we do not write on a blank slate, for the Supreme Court has repeatedly identified the purposes of the FAA and defined the scope of FAA preemption. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 283 (1995)

(O'Connor, J., concurring) (describing the Court's FAA preemption jurisprudence as "an edifice of [the Court's] own creation"). After considering the objectives of the FAA, we conclude that the *Iskanian* rule does not conflict with those objectives, and is not impliedly preempted.[9]

#### 1. The FAA's Purpose to Overcome Judicial Hostility to Arbitration

The Supreme Court has stated that Congress enacted the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302 (2010) (quoting *Volt*, 489 U.S. at 478). The FAA therefore preempts state laws prohibiting the arbitration of specific types of claims. *See, e.g.*, *Marmet*, 132 S. Ct. at 1203; *Preston v. Ferrer*, 552 U.S. 346, 356–59 (2008). The Amici Curiae argue that the *Iskanian* rule conflicts with the FAA's purpose to overcome judicial hostility to arbitration because it prohibits outright the arbitration of "individual" PAGA claims. We reject this argument.

The California Supreme Court's decision in *Iskanian* expresses no preference regarding whether individual PAGA claims are litigated or arbitrated. It provides only that

---

[9] We reject Sakkab's contention that the PAGA waiver is invalid because it bars the assertion of statutory rights under *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985). "The 'effective vindication' exception, which permits the invalidation of an arbitration agreement when arbitration would prevent the 'effective vindication' of a federal statute, does not extend to state statutes." *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 936 (9th Cir. 2013).

representative PAGA claims may not be waived outright. 59 Cal. 4th at 384. The *Iskanian* rule does not prohibit the arbitration of any type of claim.

### 2. The FAA's Purpose to Ensure Enforcement of the Terms of Arbitration Agreements

The Supreme Court has stated that "[t]he 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *Concepcion*, 131 S. Ct. at 1748 (second alteration in original) (quoting *Volt*, 489 U.S. at 478). The Court has also stated that the FAA embodies "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Id*. at 1749 (quoting *Moses H. Cone*, 460 U.S. at 24). The *Iskanian* rule does not conflict with these purposes.

Read broadly, these statements of the FAA's purposes would require strict enforcement of all terms contained in an arbitration agreement, including terms that are unenforceable under generally applicable state law. Such a broad construction of the FAA's purposes is untenable, of course, because it would render § 2's saving clause wholly "ineffectual." *See Geier*, 529 U.S. at 870; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) ("As the 'saving clause' in § 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so."). Congress plainly did not intend to preempt all generally applicable state contract defenses, only those that "interfere[] with arbitration," *Concepcion*, 131 S. Ct. at 1750.

A defense interferes with arbitration if, for example, it prevents parties from selecting the procedures they want applied in arbitration. *See id.* at 1748–53. *Concepcion* illustrates how a generally applicable contract defense might do so. The California rule at issue in *Concepcion*, which provided that class action waivers in certain consumer contracts of adhesion were unconscionable, did not explicitly discriminate against arbitration. *See id.* at 1745. As applied to arbitration agreements, however, the rule "interfere[ed] with fundamental attributes of arbitration," *id.* at 1748, by imposing formal classwide arbitration procedures on the parties against their will. *Id.* at 1750–51. As the Court explained,

> "In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." But before an arbitrator may decide the merits of a claim in classwide procedures, he must first decide, for example, whether the class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the class should be conducted.

*Id.* at 1751 (citation omitted) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)). The Court observed that "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration–its informality–and makes the process slower, more costly, and more likely to generate procedural morass than final

judgment." *Id*. The parties could not opt out of the formal procedures of class arbitration because the procedures were required to protect the due process rights of absent parties. *Id*. Therefore, although the California rule prohibiting class action waivers applied equally to both arbitration agreements and non-arbitration agreements, it could not be applied to arbitration agreements without interfering with parties' freedom to select informal procedures.

The *Iskanian* rule prohibiting waiver of representative PAGA claims does not diminish parties' freedom to select informal arbitration procedures. To understand why, it is essential to examine the "fundamental[]" differences between PAGA actions and class actions. *See Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014) (quoting *McKenzie v. Fed. Express Corp.*, 765 F. Supp. 2d 1222, 1233 (C.D. Cal. 2011)). The class action is a procedural device for resolving the claims of absent parties on a representative basis. *See* Fed. R. Civ. P. 23; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832–33 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–17 (1997). By contrast, a PAGA action is a statutory action in which the penalties available are measured by the number of Labor Code violations committed by the employer. An employee bringing a PAGA action does so "as the proxy or agent of the state's labor law enforcement agencies," *Iskanian*, 59 Cal. 4th at 380 (quoting *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009)), who are the real parties in interest, *see id*. at 382. As the state's proxy, an employee-plaintiff may obtain civil penalties for violations committed against absent employees, Cal. Lab. Code § 2699(g)(1), just as the state could if it brought an enforcement action directly. However, by obtaining such penalties, the employee-plaintiff does not vindicate absent employees' claims, for the PAGA does not give absent

employees any substantive right to bring their "own" PAGA claims. *See Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal. 4th 993, 1003 (2009); *see also Iskanian*, 59 Cal. 4th at 381 (explaining that "[t]he civil penalties recovered on behalf of the state under the PAGA are distinct from the statutory damages to which employees may be entitled in their individual capacities"). An agreement to waive "representative" PAGA claims–that is, claims for penalties arising out of violations against other employees–is effectively an agreement to limit the penalties an employee-plaintiff may recover on behalf of the state.

Because a PAGA action is a statutory action for penalties brought as a proxy for the state, rather than a procedure for resolving the claims of other employees, there is no need to protect absent employees' due process rights in PAGA arbitrations. *Compare Concepcion*, 131 S. Ct. at 1751–52 (observing "it is . . . odd to think that an arbitrator would be entrusted with ensuring that third parties' due process rights are satisfied"), *with Arias*, 46 Cal. 4th at 984–87. PAGA arbitrations therefore do not require the formal procedures of class arbitrations. *See Baumann*, 747 F.3d at 1123.[10]

---

[10] A judgment in a PAGA action binds absent employees because it binds the government agency tasked with enforcing the labor laws. *Arias*, 46 Cal. 4th at 986. As the California Supreme Court has explained,

> [w]hen a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as though the person were a party.

> Unlike Rule 23(c)(2), PAGA has no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action. In a PAGA action, the court does not inquire into the named plaintiff's and class counsel's ability to fairly and adequately represent unnamed employees—critical requirements in federal class actions under Rules 23(a)(4) and (g). . . . Moreover, unlike Rule 23(a), PAGA contains no requirements of numerosity, commonality, or typicality.

*Id.* at 1122–23 (citations omitted). Because representative PAGA claims do not require any special procedures, prohibiting waiver of such claims does not diminish parties' freedom to select the arbitration procedures that best suit their needs. Nothing prevents parties from agreeing to use informal procedures to arbitrate representative PAGA claims. This is a critically important distinction between the *Iskanian* rule and the rule at issue in *Concepcion*.

The dissent emphasizes that both the *Iskanian* rule and the rule at issue in *Concepcion* "interfere[] with the parties' freedom to limit their arbitration only to those claims arising between the contracting parties." We do not read *Concepcion* to require the enforcement of all waivers of representative claims in arbitration agreements. Whether a claim is technically denominated "representative" is an imperfect proxy for whether refusing to enforce waivers of that claim

---

*Id*. Since the aggrieved employee bringing the action "does so as the proxy or agent of the state's labor law enforcement agencies," absent employees are also bound by any judgment regarding civil penalties. *Id*.

will deprive parties of the benefits of arbitration.[11] Instead, *Concepcion* requires us to examine whether the waived claims mandate procedures that interfere with arbitration, as the class claims in *Concepcion* did. Here, they do not.

We take the dissent's broader point to be that the *Iskanian* rule defeats the parties' contractual expectations, as expressed in their arbitration agreement. *See Concepcion*, 131 S. Ct. at 1752 ("Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations."). We recognize that Sakkab and Luxottica likely expected the waiver of representative PAGA claims to be enforced, and that the *Iskanian* rule prevents that expectation from being fulfilled. Any generally applicable state law that invalidates a mutually agreed upon term of an arbitration agreement will, by definition, defeat the parties' contractual expectations. However, the FAA's saving clause clearly indicates that Congress did not intend for the parties' expectations to trump any and all other interests. As we have explained, a rule requiring that the parties' expectations be enforced in all circumstances, regardless of whether doing so conflicts with generally applicable state law, would render the saving clause wholly ineffectual.

We acknowledge that the Court in *Concepcion* also expressed concern that "class arbitration greatly increases risks to defendants" by aggregating claims and increasing the

---

[11] For example, even an "individual" PAGA claim does not arise solely between an employer and an employee. As the court in *Iskanian* observed, "*every* PAGA action, whether seeking penalties for Labor Code violations as to only one aggrieved employee–the plaintiff bringing the action–or as to other employees as well, is a representative action on behalf of the state." *Iskanian*, 59 Cal. 4th at 387.

amount of potential damages. *Id.* at 1752. As the Court observed, arbitration is "poorly suited to the higher stakes of class litigation," because it does not provide for judicial review. *Id.* Although PAGA actions do not aggregate individual claims, they may nonetheless involve high stakes. Defendants may face hefty civil penalties in PAGA actions, and may be unwilling to forgo judicial review by arbitrating them. It does not follow, however, that the FAA preempts the *Iskanian* rule just because the amount of civil penalties the PAGA authorizes could make arbitration a less attractive method than litigation for resolving representative PAGA claims. By their nature, some types of claims are better suited to arbitration than others. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (recognizing that agreements to arbitrate federal statutory claims are enforceable even if they do not appear to be "appropriate for arbitration"). But the FAA would not preempt a state statutory cause of action that imposed substantial liability merely because the action's high stakes would arguably make it poorly suited to arbitration. *Cf. Medtronic*, 518 U.S. at 485 ("[B]ecause the states are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). Nor, we think, would the FAA require courts to enforce a provision limiting a party's liability in such an action, even if that provision appeared in an arbitration agreement. *Cf. Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 83 (D.C. Cir. 2005) (assuming, without deciding, that a term in an arbitration agreement barring punitive damages was unenforceable as applied to a claim under the District of Columbia Human Rights Act). The FAA contemplates that parties may simply agree *ex ante* to litigate high-stakes claims if they find arbitration's informal procedures unsuitable. By the same token, the FAA does not

require courts to enforce agreements to waive the right to bring representative PAGA actions just because the amount of penalties an aggrieved employee is authorized to recover for the state makes the formal procedures of litigation more attractive than arbitration's informal procedures. Just as the high stakes involved in antitrust actions may cause parties to agree *ex ante* to exclude antitrust claims from arbitration, parties may prefer to litigate representative PAGA claims.

It is true that PAGA actions, like many causes of action, can be complex. It is not true, however, that PAGA actions are necessarily "procedurally" complex, as the dissent claims. Rather, the potential complexity of PAGA actions is a direct result of how an employer's liability is measured under the statute. The amount of penalties an employee may recover is measured by the number of violations an employer has committed, and the violations may involve multiple employees. "[P]otential complexity should not suffice to ward off arbitration," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633 (1985), where, as here, the complexity flows from the substance of the claim itself, rather than any procedures required to adjudicate it (as with class actions). *Cf. id.* (holding that an agreement to arbitrate antitrust claims was enforceable).

The dissent argues that representative PAGA actions will make the arbitration process "slower" and "more costly." There is no support for this conclusion in the record. *Cf. Concepcion*, 131 S. Ct. at 1751 (citing American Arbitration Association statistics regarding the duration of class arbitrations). Moreover, even if there were evidence that representative PAGA actions take longer or cost more to arbitrate than other types of claims, the same could be said of any complex or fact-intensive claim. Antitrust claims, for

example, have the potential to make arbitration slower and more costly. This does not mean that a rule declining to enforce waivers of such claims interferes with the FAA in any meaningful sense, since, unlike class claims, parties are free to arbitrate them using the procedures of their choice. In many ways, arbitration is well suited to resolving complex disputes, provided that the parties are free to decide how the arbitration will be conducted. *See id.*; *see also* American Arbitration Association Commercial Arbitration Rules (describing separate procedures for "Large, Complex, Commercial Disputes").

The dissent also argues that representative PAGA claims are "more likely to generate procedural morass." But whether arbitration of representative PAGA actions is likely to "generate procedural morass" depends, first and foremost, on the procedures the parties select. One way parties may streamline the resolution of complex PAGA claims is by agreeing to limit discovery in arbitration. *See Dotson v. Amgen, Inc.*, 181 Cal. App. 4th 975, 983 (Ct. App. 2010) (observing that "arbitration is meant to be a streamlined procedure. Limitations on discovery, including the number of depositions, is one of the ways streamlining is achieved"). California courts have recognized that "discovery limitations are an integral and permissible part of the arbitration process." *Id.* (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 106 n.11 (2000)); *see also Roman v. Superior Court*, 172 Cal. App. 4th 1462, 1476 (Ct. App. 2009). Notably, California law permits parties to arbitrate under the American Arbitration Association's employment dispute resolution rules. *See Roman*, 172 Cal. App. 4th at 1476. The rules give arbitrators broad authority to decide how much discovery is appropriate, "consistent with the expedited nature of arbitration." *See* American Arbitration

Association Employment Arbitration Rules and Mediation Procedures (2009), at 19.

Of course, whether representative PAGA claims are likely to "generate procedural morass" will also depend on whether, and to what extent, state law purports to limit parties' right to use informal procedures, including limited discovery, in representative PAGA arbitrations. It is conceivable that a state law imposing such limits could run afoul of the Court's decision in *Concepcion* by requiring a degree of formality that is inconsistent with traditional arbitration procedures. *See Concepcion*, 131 S. Ct. at 1751. No such state law is before us, however, and it is premature to conclude that representative PAGA claims will necessarily result in "procedural morass" when there is no indication that state law limits parties' freedom to select informal procedures, or limit discovery, in PAGA arbitrations. *Cf. Williams v. Superior Court*, 236 Cal. App. 4th 1151, 1156–58 (Ct. App. 2015) (upholding trial court's refusal to order statewide discovery in a PAGA action and observing that "[p]laintiff's proposed procedure, which contemplates jumping into extensive statewide discovery based only on the bare allegations of one local individual having no knowledge of the defendant's statewide practices would be a classic use of discovery tools to wage litigation rather than facilitate it").

In sum, the *Iskanian* rule does not conflict with the FAA, because it leaves parties free to adopt the kinds of informal procedures normally available in arbitration. It only prohibits them from opting out of the central feature of the PAGA's private enforcement scheme–the right to act as a private attorney general to recover the full measure of penalties the state could recover.

Our conclusion that the FAA does not preempt the *Iskanian* rule is bolstered by the PAGA's central role in enforcing California's labor laws. The Court has instructed that "[i]n all pre-emption cases" we must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012) (considering historic police powers of the State in analyzing obstacle preemption). "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quoting *DeCanas v. Bica*, 424 U.S. 351, 356 (1976)).

Both the PAGA statute and the *Iskanian* rule reflect California's judgment about how best to enforce its labor laws. "[T]he Legislature's purpose in enacting the PAGA was to augment the limited enforcement capability of the Labor and Workforce Development Agency by empowering employees to enforce the Labor Code as representatives of the Agency." *Iskanian*, 59 Cal. 4th at 383. And the "sole purpose" of the *Iskanian* rule "is to vindicate the Labor and Workforce Development Agency's interest in enforcing the Labor Code." *Id*. at 388–89. The explicit purpose of the rule barring enforcement of agreements to waive representative PAGA claims is to preserve the deterrence scheme the legislature judged to be optimal. *See id*. at 384.

As the California Supreme Court has explained, a PAGA action is a form of qui tam action. *See id*. at 382. Qui tam actions predate the FAA by several centuries. *See Vermont*

*Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773–76 (2000). The FAA was not intended to preclude states from authorizing qui tam actions to enforce state law. Nor, we think, was it intended to require courts to enforce agreements that severely limit the right to recover penalties for violations that did not directly harm the party bringing the action. The right to inform the state of violations that did not injure the informer is the very essence of a qui tam action. *See id.* at 775. That qui tam actions can be difficult to arbitrate does not mean that the FAA requires courts to enforce private agreements opting out of the state's chosen method of enforcing its labor laws.

## III. Severability of the PAGA Waiver

Sakkab has not argued that the PAGA waiver contained in the arbitration agreement rendered the entire arbitration agreement void. Nor has he disputed that he is required to arbitrate the four non-PAGA claims in the FAC. It is therefore clear that the non-PAGA claims in the FAC must be arbitrated.

We have held that the waiver of Sakkab's representative PAGA claims may not be enforced. It is unclear, however, whether the parties have agreed to arbitrate such surviving claims or whether they must be litigated instead.[12] Accordingly, we reverse the district court's order dismissing the FAC, and return the issue to the district court and the parties to decide in the first instance where Sakkab's representative PAGA claims should be resolved, and to

[12] We note that the dispute resolution agreement provides that Luxottica "expressly does not agree to arbitrate any claim on a . . . representative basis."

conduct such other proceedings as are consistent with this opinion.

**REVERSED and REMANDED.**

---

N.R. SMITH, dissenting:

In 1925, "Congress enacted the [Federal Arbitration Act] in response to widespread judicial hostility to arbitration." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2308–09 (2013). Despite ninety years of Supreme Court precedent invalidating state laws deemed hostile to arbitration, the majority today displays this same "judicial hostility" to arbitration agreements. Our court employed the same "judicial hostility" in *Laster v. AT&T Mobility LLC*, 584 F.3d 849 (9th Cir. 2009), *rev'd sub nom. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740 (2011), for which we were subsequently reversed.

In this case, rather than upholding the purposes of the Federal Arbitration Act ("FAA"), the majority upholds a "judicially created" state rule that prevents parties to an arbitration agreement from agreeing that their future arbitration will address individual claims arising between one employee and one employer. To conclude that the state rule (created by *Iskanian v. CLS Transp. Los Angeles, LLC*, 327 P.3d 129 (Cal. 2014)) does not frustrate the purposes of the FAA, the majority ignores the basic precepts enunciated in *Concepcion*. Because the majority should have applied *Concepcion* and deferred to the FAA's "liberal federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp. v.*

*Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), rather than circumventing it, I must dissent.

## *I.* Concepcion

Because the majority essentially ignores the Supreme Court's direction in *Concepcion* (a case very similar in detail to this case), I begin by describing this important precedent in some detail.

In *Concepcion*, a consumer contract provided for "arbitration of all disputes between the parties, but required that claims be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class or representative proceedings." 131 S. Ct. at 1744 (internal quotation marks omitted). Relying on the California Supreme Court's decision in *Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005), *abrogated by AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), which established a rule that invalidated class action waivers in contracts of adhesion, a federal district court "found that the arbitration provision was unconscionable." *Concepcion*, 131 S. Ct. at 1745. We affirmed, holding that the *Discover Bank* rule was not preempted by the FAA, because it was simply "a refinement of the unconscionability analysis applicable to contracts generally in California." *Id.* Further, we rejected AT&T's argument that "class proceedings will reduce the efficiency and expeditiousness of arbitration." *Id.*

The Supreme Court reversed and concluded that a rule "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 1748. The Court held that, despite § 2's savings clause, even generally

applicable contract defenses can violate the FAA if they serve as an obstacle to the objectives of the FAA. *Id.* The Court also identified the appropriate inquiry: If the state rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the rule is preempted. *Id*. at 1753. As part of that inquiry, the Court clarified the purpose and objective of the FAA. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.* at 1748.

The Court then applied that analysis to the *Discover Bank* rule prohibiting the class action waivers. The Court explained that "arbitration is a matter of contract," *id.* at 1745, and "[a]lthough the [*Discover Bank* ] rule does not *require* classwide arbitration, it allows any party to a consumer contract to demand it *ex post*," *id.* at 1750. Thus, rather than holding the parties to the terms of bilateral arbitration agreed upon in their contract, the *Discover Bank* rule allowed any party to subject the other to class-action arbitration. *Id.* The Court reasoned that "class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA." *Id.* at 1750–51.

The Court then provided three reasons why *ex post*, state-mandated class arbitration worked as an obstacle to the FAA's purposes and objectives. First, "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 1751. The Court explained that "[i]n bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs,

greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.* (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)). Because of the complex nature of class litigation, those benefits are lost when parties are forced to pursue class arbitration rather than the bilateral arbitration to which the parties agreed in their agreement. *See Concepcion*, 131 S. Ct. at 1751.

Second, the Court reasoned that "class arbitration *requires* procedural formality." *Id.* "For a class-action money judgment to bind absentees in litigation, class representatives must at all times adequately represent absent class members, and absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class." *Id.* (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985)). The Court found it unlikely that Congress, when passing the FAA, envisioned requiring such complex procedural requirements in an arbitration context. *Id.* at 1751–52.

Third, "class arbitration greatly increases risks to defendants." *Id.* at 1752. The Court explained:

> Informal procedures do of course have a cost: The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts. But when damages allegedly owed to tens of thousands of potential claimants are aggregated and

> decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims. . . . Arbitration is poorly suited to the higher stakes of class litigation. . . . We find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision.

*Id.*

After presenting these three reasons why *ex post*, state-mandated class arbitration worked as an obstacle to the objectives of the FAA, the Court addressed the argument that class arbitration was "necessary to prosecute small-dollar claims that might otherwise slip through the legal system." *Id.* at 1753. The Court rejected the argument, reasoning that "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id.* Thus, the Court concluded that "[b]ecause 'it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' California's *Discover Bank* rule is preempted by the FAA." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

## *II. FAA's preemption of the* **Iskanian** *rule*

The majority cannot distinguish the present case from the principles outlined in *Concepcion*. *Concepcion* dealt with a state rule that prohibited class-action waivers in arbitration agreements. The present case involves a state rule that

14-cv-01766-DMG-DTB Document 44 Filed 09/28/15 Page 40 of 11
ID #:605



prohibits representative action waivers in arbitration agreements.

The *Discover Bank* rule and the *Iskanian* rule are sufficiently analogous to guide our decision.[1] Class actions and PAGA actions both allow an individual (who can normally only raise his or her own individual claims) to bring an action on behalf of other people or entities. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (reasoning that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)); *Arias v. Superior Court*, 209 P.3d 923, 986 (Cal. 2009) (explaining that an aggrieved employee suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies" and a judgment binds the state law enforcement agencies and

---

[1] The majority spends a significant portion of its decision discussing whether *Iskanian*'s rule is a "generally applicable contract defense." *See Concepcion*, 131 S. Ct. at 1746 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). However, the parties do not address the issue of whether the *Iskanian* rule is a generally applicable contract defense. Therefore, I do not address the issue (although (a) I have serious doubts that the rule established by *Iskanian* falls into the same category as the common law contract defenses of duress or fraud, and (b) the Supreme Court did not determine in *Concepcion* whether the alleged unconscionability of failing to apply the *Discover Bank* rule was a generally applicable contract defense). Further, declaring that the *Iskanian* rule is a "generally applicable contract defense" does not help the majority. Under *Concepcion*, even generally applicable contract defenses may be preempted if they "stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 1748. The *Iskanian* rule stands as such an obstacle to "[t]he overarching purpose of the FAA . . . to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.*

nonparty aggrieved employees). Likewise, *waivers* of class actions and representative actions both seek to prevent the parties from raising claims on behalf of others by limiting arbitration to only those claims arising between the parties to the agreement.

Because the class action and representative action waivers fulfill the same purpose, it should be no surprise that they are often (if not always) grouped together and use similar language.[2] The common inclusion of both class action and representative waivers in arbitration agreements indicates that one waiver, without the other, would not be sufficient to create the type of arbitration desired by the parties. For example, an arbitration agreement that includes a class waiver without including a representative waiver would not effectively limit the arbitration to only individual claims arising between the parties to the agreement. Thus, both the *Discover Bank* rule and *Iskanian* rule (by invalidating these waivers) act to prevent contracting parties from crafting arbitration agreements in a way that limits the arbitration to claims arising solely between the contracting parties.[3]

---

[2] In *Concepcion*, the arbitration agreement required claims to be brought in the parties' "individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." *Concepcion*, 131 S. Ct. at 1744. Here, Sakab's arbitration agreement requires that he will not "file (or join, participate or intervene in) a class-based lawsuit, court case or arbitration (including any collective or representative arbitration claim)." Both waivers expressly prohibited both class and representative actions.

[3] The majority responds by claiming that this argument would require courts to enforce all waivers of representative claims, including individual claims in a representative capacity, in arbitration agreements. However, this argument regarding individual claims in a representative capacity again is not relevant to the facts at hand. Sakkab was given the right to

The majority emphasizes the differences between class actions and PAGA claims. But differences between the two types of actions, no matter how plentiful the majority would want to characterize them, do not change the fact that a rule prohibiting the waiver of either type of action in an arbitration agreement interferes with the parties' freedom to limit their arbitration only to those claims arising between the contracting parties. The majority recognizes that one of the key problems with the *Discover Bank* rule in *Concepcion* was that "it could not be applied to arbitration agreements without interfering with *parties' freedom* to select informal procedures" for their own arbitrations. Maj. Op. at 20 (emphasis added). In an attempt to apply that principle to the *Iskanian* rule, the majority reasons that "the *Iskanian* rule does not conflict with the FAA, because *it leaves parties free to adopt the kinds of informal procedures normally available in arbitration.*" Maj. Op. at 27 (emphasis added). However, the majority's reasoning overlooks the simple fact that, by preventing parties from limiting arbitration only to individual claims arising between the two contracting parties, the *Iskanian* rule interferes with the parties' freedom to craft arbitration in a way that preserves the informal procedures and simplicity of arbitration (just as did the *Discover Bank* rule). By requiring the availability of representative PAGA claims in arbitration (i.e., claims not specific to the contracting parties), the *Iskanian* rule interferes with the fundamental attributes of arbitration and thus creates a

---

pursue his individual PAGA claim in this arbitration. His employer did not object to Sakkab pursuing such an individual claim. Sakkab refused, instead pursuing the broader claim at issue here. That said, when parties contractually agree to waive any representative claims in an arbitration agreement and a state rule mandates a different decision, an analysis under *Concepcion* is warranted.

scheme inconsistent with the FAA. *See Concepcion*, 131 S. Ct. at 1748.

Because the effect of the waivers before challenged in *Concepcion* and now challenged in this case are similar, the analytic framework and reasoning in *Concepcion* is directly applicable. Just like the *Discover Bank* rule in *Concepcion*, the *Iskanian* rule does not *require* the parties to arbitrate representative PAGA claims. However, by invalidating representative waivers in an arbitration agreement (as applied to PAGA claims), the rule allows any party to an employment contract to demand arbitration of a representative PAGA claim *ex post*, despite the fact that the parties agreed to forgo such a demand in the agreement, where the parties have already agreed to waive all other forums. *See id.* at 1750. As explained below, by (a) preventing parties from crafting arbitration agreements to limit the arbitration only to individual claims and (b) allowing *ex post* demand for the arbitration of representative PAGA actions, the *Iskanian* rule forces the parties to lose the benefits of arbitration and frustrates the purposes of the FAA. The *Iskanian* rule burdens arbitration in the same three ways identified in *Concepcion*: it makes the process slower, more costly, and more likely to generate procedural morass; it requires more formal and complex procedure; and it exposes the defendants to substantial unanticipated risk. *See id.* at 1751–52.

*A. The* Iskanian *rule makes arbitration slower, more costly, and more likely to generate procedural morass.*

First, the switch from the arbitration of only individual claims to the arbitration of representative PAGA claims on behalf of the State and all other aggrieved employees

"sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass." *Concepcion*, 131 S. Ct. at 1751.[4] When an aggrieved employee raises a representative PAGA claim, he must first show that his employer violated the California Labor Code. If the PAGA claimant is successful in proving that his or her employer violated the Labor Code, civil penalties are assessed against the employer in the amount of "one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation." Cal. Labor Code § 2699(f)(2). Thus, rather than merely focusing on the individual employee, the hours he worked, and the damages due to him, an arbitrator overseeing a representative PAGA claim would have to make specific factual determinations regarding (1) the number of other employees affected by the labor code violations, and (2) the number of

[4] For some unknown reason, the majority states that there is no support in the record for the conclusion that representative PAGA actions will make the arbitration process "slower" and "more costly." However, the arbitration of representative PAGA actions is clearly slower and more costly than bilateral arbitration for the reasons outlined herein (for example, the review of labor code violations and number of pay periods for affected employees will inherently be slower and more costly when brought in a representative capacity for multiple employees than the review of labor code violations and number of pay periods when brought in bilateral arbitration for a single employee). This conclusion is not unique and is adequately reflected in the record. Indeed, the Chamber of Commerce of the United States of America and Retail Litigation Center, Inc. filed an *amicus* brief in this case detailing how such representative claims lack "the simplicity, informality, and expedition that are characteristic of arbitration" and concluding that the arbitration of representative PAGA claims is as incompatible with arbitration as a class proceeding.

pay periods that *each* of the affected employees worked. Because of the high stakes involved in these determinations, both of these issues would likely be fiercely contested by parties. In arbitrations involving large companies, the arbitrator would be required to make individual factual determinations regarding the employment status for hundreds or thousands of employees, none of whom are party to such arbitration. Further, the employee who brought the representative PAGA claim would not initially have access to the information needed to prove the number of affected employees or the number of pay periods they worked. Therefore, some kind of discovery would need to take place, requiring the employer to divulge the necessary documents (potentially a tremendous number of payroll and employment forms) to the PAGA claimant. This would not be a minor undertaking. All of these additional tasks and procedures necessarily makes the process substantially slower, substantially more costly, and more likely to generate procedural morass than non-representative, individual arbitration.

Despite these additional procedural hurdles present in a PAGA claim, the majority denies that representative PAGA claims would make the process slower, substantially more costly, and more likely to generate procedural morass. Instead, the majority reasons that any potential complexity of PAGA claims does not render such claims incompatible with arbitration. The majority holds that "arbitration is well suited to resolving complex disputes, *provided that the parties are free to decide how the arbitration will be conducted*." Maj. Op. at 26. However, that rationale ignores the problem the *Iskanian* rule creates; the parties had already decided how their arbitration would be conducted (individually, in a non-representative capacity). The *Iskanian* rule instead allows the

employee, *ex post*, to demand arbitration of representative claims.[5] Although two parties certainly could agree to arbitrate representative PAGA claims when they construct and sign the arbitration agreement, requiring the parties to resolve representative actions (after a contrary agreement between the parties has been struck) renders the arbitration much more complex, costly, and time consuming *than what the parties had agreed to do*. "Arbitration is a matter of contract," and "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 131 S. Ct. at 1745, 1748. When the parties have agreed to a specific, streamlined method of arbitration (such as the arbitration of individual claims only), and a relevant, state rule forces the parties to forego their chosen method of dispute resolution in favor of a procedure that is more costly and time consuming, the state rule frustrates the purposes of the FAA. As the *Concepcion* Court explained in the class arbitration context, "The conclusion follows that class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA." *Id.* at 1750–51. Likewise, it follows that representative arbitration,

[5] The majority holds that parties could, *ex ante*, craft their arbitration agreements to deal with the complexity involved in the arbitration of representative PAGA claims. However, *Concepcion*'s analysis was not concerned with the effect of the *Discover Bank* rule on future arbitration agreements, but instead focused on the *ex post* effect of the rule on arbitration agreements containing class waivers. *See Concepcion*, 131 S. Ct. at 1750 ("California's *Discover Bank* rule similarly interferes with arbitration. Although the rule does not *require* classwide arbitration, it allows any party to a consumer contract to demand it *ex post*."). Therefore, we also focus on *Iskanian*'s *ex post* effect on Sakkab's arbitration agreement.

to the extent it is manufactured by *Iskanian* rather than consensual, is inconsistent with the FAA.

The majority further reasons that, even if representative PAGA actions will make the arbitration process slower or more costly, the same could be said of any complex or fact-intensive claim. The majority compares representative PAGA actions to antitrust claims as an example of another type of claim that has the potential to make arbitration slower and more costly. This comparison is incorrect. Instead, the principle enumerated in *Concepcion* requires us to compare a representative PAGA claim (what the *Iskanian* rule would require) to individual, bilateral arbitration (what the parties had agreed to do in their arbitration agreement). Had the majority conducted the correct comparison, it would be forced to conclude that the arbitration of representative PAGA claims is certainly more likely to make the process slower, substantially more costly, and more likely to generate procedural morass than non-representative, individual arbitration.

*B. The* Iskanian *rule requires more formal and complex procedure.*

Second, representative PAGA actions are procedurally more complex than the arbitration of solely individual claims. Specifically, the discovery required in a representative PAGA claim is vastly more complex than would be required in an individual arbitration. In an individual arbitration, the employee already has access to all of his own employment records (or can easily obtain them from his employer). He knows how long he has been working for the employer and can easily determine how many pay periods he has been employed. Likewise, he knows whether he has been affected

by the Labor Code violations he is alleging and can provide individual evidence to support his claims. However, in a representative PAGA claim, the individual employee does not have access to any of this information on behalf of all the other potentially aggrieved employees. Therefore, the employee must be able to obtain the information from the employer or the other employees. The discovery necessary to obtain these documents from the employer would be significant and substantially more complex than discovery regarding only the employee's individual claims. The majority's proposed solution to this complexity, the use of hypothetical informal procedures instead of more formal ones, misses the mark. The procedural complexity present in representative PAGA claims is not attributable to the use of formal versus informal procedures. Instead, such complexity is a function of the sheer number of tasks and procedural hurdles present in bringing a representative PAGA claim.

The majority completely dismisses the procedural complexity that a representative PAGA claim entails. As the majority suggests, the arbitration of representative PAGA claims may not be as procedurally complex *as class arbitrations*. *See Concepcion*, 131 S. Ct. at 1751–52. However, (for the second time), the majority makes the wrong comparison. Instead of comparing a representative PAGA claim to individual, bilateral arbitration (i.e., what the parties had agreed to versus what the *Iskanian* rule would require, as the principle enumerated in *Concepcion* requires), the majority compares a representative PAGA claims to class arbitration and concludes that, because the two procedures are different, a representative PAGA action is not inconsistent with arbitration. Had the majority conducted the correct comparison, the majority would be forced to conclude that the

arbitration of representative PAGA claims is certainly more procedurally complex than bilateral arbitration.

The majority holds that any potential procedural complexity will depend on the arbitration procedures the parties select and that the parties may streamline complex PAGA claims by agreeing to informal procedures. However, this type of reasoning was also considered and rejected in *Concepcion*, where the plaintiff contended that because the parties could agree to informal procedures, class procedures were not necessarily incompatible with arbitration. 131 S. Ct. at 1752–53. Again, the majority fails to recognize that, although the parties could choose to employ procedures to address the complexity inherent in representative PAGA actions, they cannot be required by a state to do so. As the Court in *Concepcion* reasoned:

> The Concepcions contend that because parties may and sometimes do agree to aggregation, class procedures are not necessarily incompatible with arbitration. But the same could be said about procedures that the Concepcions admit States may not superimpose on arbitration: Parties *could* agree to arbitrate pursuant to the Federal Rules of Civil Procedure, or pursuant to a discovery process rivaling that in litigation. Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations. But what the parties in the aforementioned examples would have agreed to is not arbitration as envisioned by the FAA, lacks its benefits, and therefore may not be required by state law.

*Id.* (citation omitted). Therefore, although parties may *choose* to employ complex discovery procedures, as would be required by a representative PAGA claim, state law cannot *demand* that they do so. Here, Sakkab and Luxottica chose to pursue individual, non-representative arbitration. Therefore, the *Iskanian* rule frustrates the purposes of the FAA by requiring them to undertake the procedural complexity of representative PAGA claims.

*C. The* Iskanian *rule exposes the defendants to substantial unanticipated risk.*

Third, the arbitration of representative PAGA claims greatly increases the risk to employers. *See id.* at 1752. Rather than awarding damages for Labor Code violations for just one employee, representative PAGA claims award damages for all affected employees. Cal. Labor Code § 2699(f)(2). A representative PAGA claim could therefore increase the damages awarded in arbitration by a multiplier of a hundred or thousand times (depending on the size of the company). Thus, the concerns expressed in *Concepcion* are just as real in the present case:

> The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts. But when damages allegedly owed to [hundreds or thousands] of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a

> small chance of a devastating loss, defendants will be pressured into settling questionable claims. . . . We find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision.

*Concepcion*, 131 S. Ct. at 1752.

The majority admits that representative PAGA actions may involve high stakes, but then concludes that high stakes, alone, cannot lead to invalidation of the *Iskanian* rule and again compares PAGA actions to antitrust claims in illustrating its argument. Once again, (for the third time), the majority completely misses the point of *Concepcion* and invokes an incorrect comparison. Parties to an arbitration *could agree* to arbitrate high stakes issues. However, a state court cannot "force such a decision." *Id.* Comparing such high stakes PAGA actions to antitrust claims is not relevant. Again, the majority should have compared high stakes PAGA actions against the individual, bilateral arbitration that the parties actually agreed to undertake. When Sakkab and Luxottica entered into their arbitration agreement, they chose to limit the risk to which they were subjecting themselves to damages arising out of individual claims between the two parties. That is all. The *Iskanian* rule invalidates that decision and allows Sakkab to demand *ex post* arbitration of claims outside of that framework. *Concepcion* declared that this increased risk, to which the parties did not agree, frustrated the purposes of the FAA. When combined with the increased cost, time, and procedural complexity inherent in the arbitration of representative PAGA claims (when compared to solely individual arbitration), the increased risk

to a defendant works as yet another way that the benefits of arbitration are lost through application of the *Iskanian* rule.

### *D. The* Iskanian *rule cannot be justified on state policy grounds.*

The majority holds that its decision "is bolstered by the PAGA's central role in enforcing California's labor laws" and that "[b]oth the PAGA statute and the *Iskanian* rule reflect California's judgment about how best to enforce its labor laws." Maj. Op. at 28. However, under *Concepcion*, "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." 131 S. Ct. at 1753. As is evidenced by our discussion of the effective vindication exception to the FAA in *Ferguson v. Corinthian Colls., Inc.*, when it comes to arbitration agreements, "'[w]e have no earthly interest (quite the contrary) in vindicating' a state law."[6] 733 F.3d 928, 936 (9th Cir. 2013) (quoting *Italian Colors Rest.*, 133 S. Ct. at 2320 (Kagan, J., dissenting)). Thus, if a state law violates or frustrates the FAA, the state law must give way, even if such a decision prevents the state's interest from being vindicated. *Ferguson*, 733 F.3d at 936–37. By relying so heavily on state policy grounds to support its decision, the majority strays awfully close to invocation of the effective vindication doctrine, which the majority admits does not apply to the present case. Therefore, because the *Iskanian* rule serves as an obstacle to

[6] Sakkab argues that he cannot be denied a forum for his representative PAGA claims. However, Sakkab has no right to the vindication of a state law claim, as the majority correctly recognizes.

the objectives of the FAA, the desirability and importance of the rule to the State's policies and purposes cannot save it.[7]

Although the State's interest in an employee's ability to bring PAGA claims is ultimately irrelevant to the *Concepcion* analysis, it is important to note that preemption of the *Iskanian* rule does not preempt PAGA itself. In fact, PAGA could continue to play a meaningful role in California's labor law enforcement scheme without the *Iskanian* rule. First, any employee not subject to an arbitration agreement waiving such actions is free to bring a PAGA claim. In the present case, Luxottica gave Sakkab the option to opt out of the arbitration agreement if he simply returned the opt-out form to Luxottica within a specified period of time. We have previously reasoned that an opt out provision prevents an arbitration agreement from being a contract of adhesion, and supports the enforceability of the agreements. *See Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199–1200 (9th Cir. 2002). Thus, employers are incentivized to include opt out provisions in their arbitration agreements. Any employees who opt out of arbitration, or whose employers do not utilize arbitration, will be free to bring PAGA claims. Second, PAGA requires that potential claimants provide notice to the State before pursuing a PAGA action. Cal. Labor Code § 2699.3. As no one has asserted that the State of California is prevented from raising the labor violations on

---

[7] The majority holds that "[t]he FAA was not intended to preclude states from authorizing qui tam actions to enforce state law." Maj. Op. at 29. However, the majority provides no support for that declaration. Under *Concepcion*, if a state rule authorizing a qui tam action frustrated the purposes or objectives of the FAA, that rule would certainly be invalidated. The majority provides no authority to support the contention that state law can preempt federal law if the state law involves qui tam actions.

its own, the notice provision of PAGA and the implementation of statutory damages for Labor Code violations can continue to provide a meaningful benefit to the State of California. Finally, inasmuch as a PAGA claim can be limited to damages stemming from a single employee's employment, PAGA continues to provide an opportunity for individuals to collect damages on behalf of the State, even in arbitration. Luxottica has expressly argued that an "individual" PAGA claim could be raised under its arbitration agreement with Sakkab. Although the existence of "individual" PAGA claims is disputed, *see Reyes v. Macy's, Inc.*, 202 Cal. App. 4th 1119, 1123 (Ct. App. 2011) (holding that a PAGA claimant may not bring an individual PAGA claim), the *Iskanian* court expressly chose not to decide the issue. *See Iskanian, LLC*, 327 P.3d at 384. Instead, the court reasoned that, even if such claims are available, individual PAGA claims would not "result in the penalties contemplated under the PAGA to punish and deter employer practices that violate the rights of numerous employees under the Labor Code." *Id.* But, once again, the state's purpose is irrelevant. A state may not insulate causes of action from arbitration by declaring that the purposes of the statute can only be satisfied via class, representative, or collective action. If the rule conflicts with the objectives of the FAA, the state rule must give way. *Concepcion*, 131 S. Ct. at 1753.

Because the *Iskanian* rule stands as an obstacle to the purposes and objectives of the FAA, there is no question—the rule must be preempted. Preemption would be consistent both with the Supreme Court's controlling decision in *Concepcion* and the FAA's "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24. Numerous state and federal courts have attempted to find creative ways to get around the FAA. We did the same in

*Laster*, and were subsequently reversed in *Concepcion*. The majority now walks that same path. Accordingly, I would affirm.

# Exhibit B

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Bank of America Corporation *and* Joshua D. Buck and Mark Thierman, Thierman Law Firm *and* Paul Cullen, The Cullen Law Firm.** Cases 31–CA–072916 and 31–CA–072918

August 14, 2015

DECISION AND ORDER

BY CHAIRMAN PEARCE AND MEMBERS HIROZAWA AND JOHNSON

On February 13, 2013, Administrative Law Judge William G. Kocol issued the attached decision. The Respondents filed exceptions, a supporting brief, and a brief in support of the judge's dismissal of a complaint allegation. The General Counsel filed exceptions and a supporting brief, which the Charging Parties joined. The Respondents and General Counsel filed answering briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to adopt the judge's rulings, findings, and conclusions only to the extent consistent with this Decision and Order.[1]

At issue is whether Countrywide Financial Corporation (CFC), Countrywide Home Loans, Inc. (CHL), and Bank of America (BAC), collectively the Respondents, violated Section 8(a)(1) of the Act by: (1) maintaining a mandatory arbitration agreement that employees would reasonably believe restricted their right to file unfair labor practice charges with the Board, and (2) filing motions in Federal court to compel individual arbitration of employees' collective wage claims. Although the judge found that Respondent CHL unlawfully maintained the arbitration agreement, he dismissed allegation (2), above, and all allegations against CFC and BAC. For the following reasons, we adopt the judge as to the violation found but reverse his dismissals.[2]

I. THE 8(A)(1) MAINTENANCE ALLEGATION

Respondent CFC was a holding company which, through its subsidiaries, provided banking, mortgage lending, and other real estate finance-related services. CHL was one of its subsidiaries. In June 2008, Respondent BAC purchased CFC and became the parent of CFC and CHL (CFC ultimately "merged out of existence").

The parties stipulated that Dominique Whitaker and John White applied for employment with Respondent CHL in August 2007 and September 2008, respectively. As part of the application process, both were required to execute a document bearing the heading "Countrywide Financial" and entitled "Mutual Agreement to Arbitrate Claims" (Arbitration Agreement or Agreement). The Agreement states that it is between the "Company and the Employee" and defines the Company as "Countrywide Financial Corporation and all of its subsidiary and affiliated entities . . . and all successors and assigns and any of them."

The Agreement includes 16 numbered sections. Section 1, titled, "Designated Claims," lists those claims subject to "resolution by arbitration." The list includes myriad claims relating to employment with the Company.[3] Section 3, entitled, "Claims Not Covered by This

---

[1] We have modified the judge's recommended Order and substituted new notices consistent with this decision, and to conform to the violations found.

[2] Although the judge found that Respondent CHL unlawfully maintained the arbitration agreement, he dismissed similar allegations against Respondents CFC and BAC. In the judge's view, because the two individuals involved in this proceeding were solely employed by CHL, and CHL alone required them to sign the arbitration agreement, he concluded that the complaint was "too attenuated to hold [CFC and BAC] liable" for the alleged violations. We disagree. The Board and courts have consistently held that "an employer under Section 2(2) of the Act may violate Section 8(a) not only with respect to its own employees but also by actions affecting employees who do not stand in such an immediate employer/employee relationship." *New York New York & Casino*, 356 NLRB No. 119, slip op. at 5 (2011), enfd. 676 F.3d 193 (D.C. Cir. 2012), quoting *International Shipping Assn*., 297 NLRB 1059, 1059 (1990). See, e.g., *Hudgens v. NLRB*, 424 U.S. 507, 510 fn. 3 (1976) (noting that the "Board has held that a statutory 'employer' may violate 8(a)(1) with respect to employees other than his own"). Here, CFC and BAC are appropriately held liable under these principles. As discussed in sec. I below, CFC is identified as the author of the arbitration agreement that the two CHL employees were required to sign, with its name and logo prominently displayed on the heading; further, CFC is defined as one of the "Compan[ies]" that maintains the agreement. BAC, as the judge found, became the parent of CFC and its subsidiaries, including CHL, and is clearly an "affiliated entit[y]," within the agreement's definition of "Company," with CFC and CHL. And as discussed in sec. II below, the three Respondents joined together and were active participants in seeking to enforce the agreement in Federal court litigation. Under these circumstances, we find that CFC and BAC, like CHL, violated Sec. 8(a)(1) by maintaining the arbitration agreement in the manner set forth in sec. I.

[3] Sec. 1 provides:

> Except as otherwise provided in this Agreement, the Company and the Employee hereby consent to the resolution by arbitration of all claims or controversies arising out of, relating to or associated with the Employee's employment with the Company that the Employee may have against the Company or that the Company may have against the Employee, including any claims or controversies relating to the Employee's application for employment with the Company, the Company's actual or potential hiring of the Employee, the employment relationship itself, or its termination (hereinafter the "Covered Claims"). The Covered Claims subject to this Agreement include, but are not limited to, claims for wages or other compensation

Agreement," states that "[n]othing in this Agreement shall be construed to require arbitration of any claim if an agreement to arbitrate such claim is prohibited by law." There is no language in the Agreement addressing whether arbitration may be conducted individually or collectively as a class.

The Agreement requires applicants to select whether they agree or disagree to be bound to its terms and conditions. For those who select the "agree" option, the Agreement states that they do so "voluntarily." If the "disagree" option is selected, the Agreement states that the applicant "will not be able to move forward in the application process at this time." Whitaker and White selected the "agree" option and were hired.[4] The parties stipulated that from about 2007 through approximately March 2009, applicants for employment with CHL typically were presented with arbitration agreements substantially similar to the ones presented to Whitaker and White.

Applying *D.R. Horton, Inc.*,[5] the judge found that Respondent CHL violated Section 8(a)(1) by maintaining the Arbitration Agreement because employees would reasonably read it to prohibit their filing of unfair labor practices with the Board. We agree.

In *D.R. Horton*, supra, 357 NLRB No. 184, slip op. at 4, the Board endorsed the *Lutheran Heritage*[6] test for determining whether employer work rules interfere with employees' Section 7 rights. When, as here, the rule does not explicitly restrict Section 7 rights, an 8(a)(1) violation may be found if there is a showing that: (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to Section 7 activity; or (3) the rule has been applied to restrict Section 7 activity. 343 NLRB at 646–647.

Similar to the arbitration policy found unlawful in *D.R. Horton*, the Arbitration Agreement here violates Section 8(a)(1) under prong (1) of the *Lutheran Heritage* test because employees would reasonably construe its language to prohibit filing Board charges or otherwise accessing the Board's processes–activities which are protected by Section 7. As set forth above, section 1 of the Agreement specifies in broad terms that it applies to "all claims or controversies," including those related to the employee's application for employment, hiring, employment relationship, and termination. Section 1 further states, by way of example, that "Covered Claims" include those for wages, contract breach, discrimination, harassment, and "violation of any federal . . . statute, . . . regulation, or public policy." The Agreement states in section 10 that "[a]rbitration is the parties' exclusive remedy for Covered Claims." In *U-Haul Co. of California*, 347 NLRB 375, 377 (2006), enfd. 255 Fed. Appx. 527 (D.C. Cir. 2007), the Board found that a policy requiring arbitration of "all disputes relating to or arising out of an employee's employment . . . [including] claims . . . recognized by . . . federal law or regulations" violated Section 8(a)(1) because employees reasonably would construe it to prohibit the filing of Board charges, notwithstanding that the policy did not explicitly prohibit employees from resorting to the Board's procedures. See also *D.R. Horton*, slip op. at fn. 2. We reach the same conclusion here based on the breadth of the policy language encompassing claims under Federal statutes and regulations. We accordingly affirm the judge's finding that Respondents' maintenance of the Arbitration Agreement violated Section 8(a)(1).

The Respondents[7] argue, however, that employees would understand that the Arbitration Agreement does not prohibit them from filing Board charges, in light of the explanatory sentence in section 1 that the "purpose and effect of this Agreement is to substitute arbitration, instead of a federal or state court, as the exclusive forum for the resolution of Covered Claims." The Respondents argue that this language makes clear that the Arbitration Agreement applies only to claims brought in Federal or State court. We find no merit in this contention. As the Board explained in rejecting a similar defense in *U-Haul*, 347 NLRB at 377–378, "[t]he reference to a 'court of law' . . . does not by its terms specifically exclude an action governed by an administrative proceeding such as one conducted by the National Labor Relations Board . . . [and thus] does nothing to clarify that the arbitration policy does not extend to the filing of unfair labor prac-

due; claims for breach of any contract or covenant, express or implied; tort claims; claims for discrimination or harassment on bases which include but are not limited to race, sex, sexual orientation, religion, national origin, age, marital status, disability or medical condition; claims for benefits and claims for violation of any federal, state or other governmental constitution, statute, ordinance, regulation, or public policy. The purpose and effect of this Agreement is to substitute arbitration, instead of a federal or state court, as the exclusive forum for the resolution of Covered Claims. The parties' responsibilities and legal remedies available under any substantive law applicable to a Covered Claim shall be enforced in any arbitration conducted pursuant to this Agreement.

[4] We agree with the judge's implicit finding that because an applicant would not be employed if he or she selected the " disagree" option, acceptance of the Agreement was a condition of employment and not a voluntary choice as the Respondents contend.

[5] 357 NLRB No. 184 (2012), enf. denied in part on other grounds 737 F.3d 344 (5th Cir. 2013).

[6] *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 647 (2004).

[7] Although the judge found the violation only as to Respondent CHL, the Respondents (CHL, CFC, and BCA) jointly filed exceptions to this finding.

tice charges." Here, as in *U-Haul*, the reference to arbitration as a substitute for filing a claim in a "federal or state court" does nothing to clarify that the Arbitration Agreement does not prohibit the filing of Board charges. Indeed, the last phrase in the sentence relied on by Respondents, i.e., that arbitration is the "exclusive forum for the resolution of Covered Claims," actually reinforces the notion that Board charges are forbidden.

We also reject the argument by the Respondents and our dissenting colleague that the right to file Board charges is made clear by the language of section 3 that "[n]othing in this Agreement shall be construed to require arbitration of any claim if an agreement to arbitrate such a claim is prohibited by law." The Board rejected this same argument in *2 Sisters Food Group*, 357 NLRB No. 168 (2011), where the arbitration agreement comparably stated that it only covered claims "that may be lawfully [ ] resolve[d] by arbitration." The Board explained that this language did not "specifically exclude NLRB proceedings, and 'most nonlawyer employees' would not be sufficiently familiar with the limitations the Act imposes on mandatory arbitration for the language to be effective." Slip op. at 2, citing *U-Haul*, 347 NLRB at 378. We reject the Respondents' argument for the same reasons.

In sum, we agree with the judge that employees would reasonably construe the Arbitration Agreement to prohibit the filing of unfair labor practice charges or otherwise accessing the Board's processes. Accordingly, in this respect we adopt his finding that maintenance of the Agreement violates Section 8(a)(1).

## II. THE 8(A)(1) ENFORCEMENT ALLEGATION

On June 16, 2009, Whitaker filed a class action lawsuit against CFC and BAC in the Superior Court of California (Ventura County), alleging minimum wage and overtime pay violations of the California Labor Code and the Fair Labor Standards Act (FLSA). Thereafter, the case was removed to the United States District Court for the Central District of California, where CHL was added as a defendant and White was added as a plaintiff.[8] The Respondents filed motions with the district court pursuant to the Federal Arbitration Act (FAA) to stay the lawsuit and compel Whitaker and White to arbitrate their wage claims individually, and not on a class or collective basis. Whitaker and White filed oppositions to the motions.

The district court granted the Respondents' motions to compel in part and stayed the lawsuit, but left to the arbitrator the question of whether the wage claims should be arbitrated individually or collectively. The parties stipulated that, as of the date of the hearing, this issue has yet to be determined by an arbitrator or other authority.

The complaint alleges that by moving the district court to stay the collective lawsuit and to compel Whitaker and White to arbitrate their wage claims individually, the Respondents have maintained and enforced the Agreement in violation of Section 8(a)(1). The judge dismissed the allegation, finding that the Respondents did nothing more than argue before the appropriate forum that the claims be heard on an individual basis, and that they did not argue that the employees had waived their right to pursue classwide claims. Contrary to the judge, we agree with the General Counsel that the Respondents violated Section 8(a)(1) by enforcing the Agreement through its district court motion to compel arbitration.

A workplace rule that does not explicitly restrict activities protected by Section 7 will be found unlawful under the third prong of the *Lutheran Heritage* test if the "rule has been applied to restrict the exercise of Section 7 rights." *Lutheran Heritage*, supra, 343 NLRB at 647. See, e.g., *Hitachi Capital America Corp*., 361 NLRB No. 19, slip op. at 3 (2014); *Albertson's Inc.,* 351 NLRB 254, 259 (2007). Here we find that the Arbitration Agreement, as applied by the Respondents, violated Section 8(a)(1) under *Lutheran Heritage*'s third prong.

In *D.R. Horton*, the Board held that class or collective litigation by employees of claims relating to their terms and conditions of employment is a "core substantive right" protected by Section 7 (357 NLRB No. 184, slip op. at 10), and an employer violates Section 8(a)(1) by compelling employees, as a condition of their employment, to waive that right by prohibiting them from "filing joint, class, or collective claims addressing their wages, hours or other working conditions against the employer in any forum, arbitral or judicial." Id. at 1. The Board explained that an employer may avoid a violation "so long as [it] leaves open a judicial forum for class and collective claims" and, if this is done, the employer is "free to insist that *arbitral* proceedings be conducted on an individual basis." (Emphasis in original.) Id. at 12. In *Murphy Oil USA, Inc*., 361 NLRB No. 72 (2014), the Board reexamined and reaffirmed the holding and rationale of *D. R. Horton.* In both cases, the Board found 8(a)(1) violations based on language in arbitration agreements that were unlawful on their face in compelling employees to waive their right to proceed collectively in all forums in pursuit of their employment claims.

As noted above, the Arbitration Agreement here is silent on whether employees are prohibited from filing class or collective employment claims. Therefore, the Agreement is not facially unlawful as in *D. R. Horton* and *Murphy Oil*, and the complaint does not so allege.

[8] By this time, Whitaker and White were no longer employed by CHL.

But there is sufficient evidence, as demonstrated by the Respondents' conduct in Federal district court, to establish that they applied the Arbitration Agreement in violation of Section 8(a)(1). In defending against the collective lawsuit by Whitaker and White, the Respondents argued in their motion that the employees were "compelled to arbitrate [their] claims on an individual basis, and [were] not permitted to arbitrate on a class or collective basis" because the Agreement did not so provide. Noting that the Agreement did not expressly state whether or not the parties agreed to class or collective arbitration, the Respondents argued that the "only fair reading of the Agreement is that the parties contemplated only *individual* arbitration."

By these arguments to the court, the Respondents made clear their interpretation of the mandatory Arbitration Agreement: arbitration is the exclusive forum for resolving employees' employment claims, and it must be conducted on an individual basis, not collectively. This is precisely what the Board enjoined in *D. R. Horton* ("[E]mployers may not compel employees to waive their NLRA right to collectively pursue litigation of employment claims in *all* forums, arbitral and judicial." 357 NLRB No. 184, slip op at 12. (Emphasis in original.) This holding was reinforced in *Murphy Oil*, where the Board found that the respondent's motion in Federal district court in response to a FLSA collective action by employees, to compel the employees to arbitrate their claims individually as required by a binding arbitration agreement, violated Section 8(a)(1). 361 NLRB No. 72, slip op. at 19 ("It is well settled that an employer violates Section 8(a)(1) by enforcing a rule that unlawfully restricts Section 7 rights.").

We reach the same conclusion here. As in *Murphy Oil*, the Respondents enforced an arbitration agreement in violation of Section 8(a)(1) by filing their district court motion to compel employees to arbitrate their employment claims individually, thereby barring them from any other forum, arbitral or judicial, to litigate such claims on a class or collective basis.

By finding this violation, we necessarily disagree with the judge that the Respondents "did nothing more than argue" in their court motion that the employees' claims be heard on an individual basis, and that they relied solely on case law under the FAA in support of this position rather than on the basis that the employees had waived their right to pursue class-wide claims. There was much more to the Respondents' motion than a simple demand for individual arbitration. By arguing in court that the employees' claims must be resolved in binding individual arbitration, the Respondents completely denied employees their Section 7 right of access to *all* other forums where they could seek to litigate their employment claims collectively. Contrary to the judge, this clearly constituted an argument that employees had waived their right to pursue class-wide claims—a waiver that the Respondents unlawfully imposed on them—and the foundation for that argument was the Arbitration Agreement and not solely FAA case law.

We recognize, of course, the Board's holding in *D. R. Horton* that there is no Section 7 right to class certification,[9] and that the employees therefore have no right to have their lawsuit claims heard on that basis. But that was not the issue in *D. R. Horton* nor is it here.

> The issue here is whether Respondent[s] may lawfully condition employment on employees' waiving their right under the NLRA to take the collective action inherent in seeking class certification, whether or not they are ultimately successful under [Federal Rule of Civil Procedure 23]. Rule 23 may be a procedural rule, but the Section 7 right to act concertedly by invoking Rule 23, Section 216(b) [of the collective action procedures of the FLSA], or other legal procedures is not.

Id.

Thus, while the employees here have no Section 7 right to class certification, they do have a Section 7 right to act concertedly to *seek* class certification in pursuit of their employment claims "without employer coercion, restraint or interference," and to prove in district court that they meet "the requirements for certification under Rule 23" and Section 216 of the FLSA. Id. at fn. 24. The Respondents, however, by filing their court motion to compel individual arbitration, blocked the employees from concertedly pursuing their employment claims. Although, as the judge noted, the Respondents were privileged under *D. R. Horton* to thwart the judicial route taken by employees by "assert[ing] any and all arguments against certification" (other than the Arbitration Agreement)[10] they were not free to do what they did here: acting to compel employees to follow a route that foreclosed them from collectively pursuing their employment claims in all forums, arbitral and judicial. *D. R. Horton*, slip op. at 12.

In sum, as the Board made clear in *D. R. Horton* (slip op. at 12), the Respondents were "free to insist" that the employees arbitrate their employment claims and to require that the "*arbitral* proceedings be conducted on an individual basis," but only "[s]o long as [they left] open a judicial forum for class and collective claims . . . ." (Emphasis in original.) The Respondents did not do so.

---

[9] 357 NLRB No. 184 slip op. at 10.

[10] Id., fn. 24.

They applied the Arbitration Agreement in a manner that required employees to resolve all employment claims through individual arbitration, thereby compelling them to waive their Section 7 right to collectively pursue litigation of their employment claims in *all* forums. By taking steps to enforce the Agreement in Federal district court when the employees filed their collective claims against the Respondents under the FLSA, the Respondents maintained and enforced the Agreement in violation of Section 8(a)(1).

Contrary to the judge and our dissenting colleague, our finding does not interfere with the Respondents' First Amendment right under *Bill Johnson's Restaurants v. NLRB,* 461 U.S. 731 (1983), to petition the government for redress of grievances. As the Board explained in *Murphy Oil*, 361 NLRB No. 72, slip op. at 20–21, the Supreme Court held in footnote 5 of *Bill Johnson's* that court proceedings having an objective that is illegal under Federal law enjoy no First Amendment protection and may be condemned by the Board as an unfair labor practice.[11]

The Board so found in *Murphy Oil*, holding that because employees cannot lawfully be compelled to waive their Section 7 right to collectively pursue litigation of their employment claims in all forums, the respondent's motion filed with the district court to enforce such a waiver had an illegal objective under *Bill Johnson's*. As such, the motion was both unprotected by the First Amendment and violated Section 8(a)(1). Because, in the present case, the Respondents' motions filed with the district court had the illegal objective of enforcing the same unlawful waiver as in *Murphy Oil*, we can, and do, condemn that objective as an 8(a)(1) violation without running afoul of the First Amendment.

Our dissenting colleague contends that because the instant Arbitration Agreement, unlike in *Murphy Oil*, does not contain an unlawful waiver, and because the Board has not "previously ruled" that the enforcement of such an arbitration agreement is unlawful, the illegal objective exception of *Bill Johnson's* does not apply and the 8(a)(1) enforcement violation cannot be found. We disagree. Application of the illegal objective exception is not confined to cases where the Board has previously found a violation based on the same conduct. As the Board held in *Teamsters Local 776 (Rite Aid Corp.*), if a lawsuit "is aimed at achieving a result that is incompatible with the Board's [prior] ruling, the lawsuit falls within the 'illegal objective' exception to *Bill Johnson's*." 305 NLRB 832, 835 (1991), enfd. 973 F.2d 230 (3d Cir. 1992), cert. denied 507 U.S. 959 (1993); see id. at 835 fn. 7; see, e.g., *Regional Construction Corp*., 333 NLRB 313, 318–319 (2001) (discussing several different categories of cases in which the exception has been applied).[12] In fact, the Board has previously applied the illegal objective exception in an analogous case, *Elevator Constructors (Long Elevator*), 289 NLRB 1095, 1095 (1988), enfd. 902 F.2d 1297 (8th Cir. 1990). There, the respondent union filed a grievance on behalf of an employee, relying on a clause in a collective-bargaining agreement that the "General Counsel [did] not contend . . . [was] unlawful on its face . . . ." Id. at fn. 2. However, the union sought a "construction of the clause" that, if successful, would have resulted in a de facto hot cargo clause. The Board concluded that because the "contract clause as construed by the Respondent would violate Section 8 (e)," the union sought an illegal objective in violation of Section 8(b)(4)(ii)(A) by attempting to enforce the unlawful construction of the clause through the grievance procedure.

The same reasoning applies here. Notwithstanding the facial validity of the arbitration agreement, the Respondents sought a construction of the agreement that was plainly unlawful under the Board's decisions in *D.R. Horton* and *Murphy Oil*. Accordingly, their court actions to enforce their construction of the agreement constituted an illegal objective under *Bill Johnson's* and violated Section 8(a)(1).[13]

[11] See, e.g., *Manno Electric*, 321 NLRB 278, 297 (1996), affd. mem. 127 F.3d 34 (5th Cir. 1997) (a lawsuit has an illegal objective "if it is aimed at achieving a result incompatible with the objectives of the Act."

[12] See also *Booster Lodge 405 (Boeing Co.)*, 185 NLRB 380 (1970) (interpreting the Act in light of recent Supreme Court decisions, the Board deemed illegal the respondent union's imposition of fines on individuals who resigned from the union, and thus found unlawful the union's lawsuits seeking to enforce the fines), enfd. in relevant part 459 F.2d 1143 (D.C. Cir. 1972), affd. 412 U.S. 84 (1973). In *Bill Johnson's*, the Court cited with approval *Booster Lodge 405* in setting forth the illegal objective exception. 461 U.S. at 737 fn. 5.

[13] Accordingly, consistent with *Murphy Oil* and *Cellular Sales of Missouri, LLC*, 362 NLRB No. 27, slip op. at 2 fn. 6 (2015), we amend the judge's remedy and shall order the Respondents to reimburse Whitaker and White for all reasonable expenses and legal fees, with interest, incurred in opposing the Respondents' unlawful motion to compel individual arbitration in the collective FLSA action. See *Bill Johnson's Restaurants*, 461 U.S. at 747 ("If a violation is found, the Board may order the employer to reimburse the employees whom he had wrongfully sued for their attorneys' fees and other expenses" as well as "any other proper relief that would effectuate the policies of the Act."). Interest shall be computed in the manner prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010). See *Teamsters Local 776 (Rite Aid)*, 305 NLRB at 835 fn. 10 ("[I]n make-whole orders for suits maintained in violation of the Act, it is appropriate and necessary to award interest on litigation expenses.").

We shall also amend the judge's remedy to order the Respondents to notify the district court that they have rescinded or revised the mandatory Arbitration Agreement and to inform the court that they no longer oppose the plaintiffs' claims on the basis of the Arbitration Agreement.

ORDER

A. The National Labor Relations Board orders that the Respondent, Countrywide Home Loans, Calabasas, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a mandatory arbitration agreement that employees would reasonably believe bars or restricts employees' rights to file charges with the National Labor Relations Board or to access the Board's processes.

(b) Maintaining or enforcing/applying a mandatory arbitration agreement in a manner that requires employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind or revise the mandatory arbitration agreement to make clear to employees that it does not restrict employees' right to file charges with the National Labor Relations Board or to access the Board's processes, and that the agreement does not constitute a waiver of employees' right to maintain employment-related joint, class or collective actions in all forums.

(b) Notify all applicants and current and former employees who were required to sign the arbitration agreement that it has been rescinded or revised as set forth in paragraph 2 (a) and, if revised, provide them a copy of the revised agreement, and further notify them that the agreement will not be enforced in a manner that compels them to waive their right to maintain employment-related joint, class or collective actions in all forums.

(c) Notify the United States District Court for the Central District of California that it will no longer enforce the arbitration agreement upon which it based its motion to stay the collective FLSA lawsuit of Dominique Whitaker and John White and to compel individual arbitration of their employment claims, and inform the court that it no longer opposes their lawsuit on the basis of the arbitration agreement.

(d) In the manner set forth in this decision, reimburse Dominique Whitaker and John White for any reasonable attorneys' fees and litigation expenses that they may have incurred in opposing the Respondents' motion to stay their collective lawsuit and compel individual arbitration.

(e) Within 14 days after service by the Region, post at its Calabasas, California facility copies of the attached notice marked "Appendix A."[14] Copies of the notice, on forms provided by the Regional Director for Region 31, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix A" to all current employees and former employees employed by the Respondent at any time since July 19, 2011, and any employees against whom the Respondent has enforced its mandatory arbitration agreement since August 22, 2011.

(f) Within 21 days after service by the Region, file with the Regional Director for Region 31, a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

B. The National Labor Relations Board orders that the Respondent, Countrywide Financial Corporation, Calabasas, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a mandatory arbitration agreement that employees reasonably would believe bars or restricts employees' rights to file charges with the National Labor Relations Board or to access the Board's processes.

(b) Maintaining or enforcing/applying a mandatory arbitration agreement in a manner that requires employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

[14] If this Order is enforced by a judgment of a United States court of appeals, the words in the notices reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

(a) Rescind or revise the mandatory arbitration agreement to make clear to employees that it does not restrict employees' right to file charges with the National Labor Relations Board or to access the Board's processes, and that the agreement does not constitute a waiver of employees' right to maintain employment-related joint, class or collective actions in all forums, whether arbitral or judicial.

(b) Notify all applicants and current and former employees who were required to sign the arbitration agreement that it has been rescinded or revised as set forth in paragraph 2 (a) and, if revised, provide them a copy of the revised agreement, and further notify them that the agreement will not be enforced in a manner that compels them to waive their right to maintain employment-related joint, class or collective actions in all forums.

(c) Notify the United States District Court for the Central District of California that it will no longer enforce the arbitration agreement upon which it based its motion to stay the collective FLSA lawsuit of Dominique Whitaker and John White and to compel individual arbitration of their employment claims, and inform the court that it no longer opposes their lawsuit on the basis of the arbitration agreement.

(d) In the manner set forth in this decision, reimburse Dominique Whitaker and John White for any reasonable attorneys' fees and litigation expenses that they may have incurred in opposing the Respondents' motion to stay their collective lawsuit and compel individual arbitration.

(e) Within 14 days after service by the Region, post at its Calabasas, California facility copies of the attached notice marked "Appendix B."[15] Copies of the notice, on forms provided by the Regional Director for Region 31, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix B" to all current employees and former employees employed by the Respondent at any time since July 19, 2011, and any employees against whom the Respondent has enforced its mandatory arbitration agreement since August 22, 2011.

(f) Within 21 days after service by the Region, file with the Regional Director for Region 31, a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

C. The National Labor Relations Board orders that the Respondent, Bank of America Corporation, Lancaster, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a mandatory arbitration agreement that employees reasonably would believe bars or restricts employees' rights to file charges with the National Labor Relations Board or to access the Board's processes.

(b) Maintaining or enforcing/applying a mandatory arbitration agreement in a manner that requires employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind or revise the mandatory and binding arbitration agreement to make clear to employees that it does not restrict employees' right to file charges with the National Labor Relations Board or to access the Board's processes, and that the agreement does not constitute a waiver of employees' right to maintain employment-related joint, class or collective actions in all forums, whether arbitral or judicial.

(b) Notify all applicants and current and former employees who were required to sign the arbitration agreement that it has been rescinded or revised as set forth in paragraph 2 (a) and, if revised, provide them a copy of the revised agreement, and further notify them that the agreement will not be enforced in a manner that compels them to waive their right to maintain employment-related joint, class or collective actions in all forums.

(c) Notify the United States District Court for the Central District of California that it will no longer enforce the arbitration agreement upon which it based its motion to stay the collective FLSA lawsuit of Dominique Whitaker and John White and to compel individual arbitration of their employment claims, and inform the court that it no longer opposes their lawsuit on the basis of the arbitration agreement.

---

[15] See fn. 14.

(d) In the manner set forth in this decision, reimburse Dominique Whitaker and John White for any reasonable attorneys' fees and litigation expenses that they may have incurred in opposing the Respondents' motion to stay their collective lawsuit and compel individual arbitration.

(e) Within 14 days after service by the Region, post at its Lancaster, California facility copies of the attached notice marked "Appendix C."[16] Copies of the notice, on forms provided by the Regional Director for Region 31, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix C" to all current employees and former employees employed by the Respondent at any time since July 19, 2011 and any employees against whom the Respondent has enforced its mandatory arbitration agreement since August 22, 2011.

(f) Within 21 days after service by the Region, file with the Regional Director for Region 31, a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. August 14, 2015

Mark Gaston Pearce, Chairman

Kent Y. Hirozawa, Member

(SEAL) NATIONAL LABOR RELATIONS BOARD

MEMBER JOHNSON, dissenting.

Today the Board takes one more step down the primrose path of administrative hostility toward valid arbitration agreements. The Board previously (and wrongly) found separate violations of Section 8(a)(1) where an employer both maintained a mandatory arbitration agreement expressly foreclosing class or collective claims and attempted to enforce that agreement in court. See *Murphy Oil USA, Inc.*, 361 NLRB No. 72, slip op. at 19 (2014) ("It is well settled that an employer violates Section 8(a)(1) by enforcing a rule that unlawfully restricts Section 7 rights."). Now, for the first time, the Board finds a violation based on the Respondents' mere enforcement of an arbitration agreement that is silent on the arbitrability of class and collective claims, and therefore not restrictive of Section 7 rights on its face. Rather than turn from this legally problematic path, the majority places the Board in even greater conflict with the Federal Arbitration Act (FAA)[1] and Supreme Court precedent construing it. For these reasons and those that follow, I respectfully dissent.[2]

Initially, for the reasons set forth in detail in my dissent in *Murphy Oil*, supra, slip op. at 35-58, I fundamentally disagree with the Board's central holding in that case and in *D. R. Horton, Inc.*,[3] which together effectively invalidate class arbitration waivers in most mandatory arbitration agreements.[4] The courts resoundingly disagree as well.[5] Moreover, the Supreme Court has made

[16] See fn. 14.

[1] 9 U.S.C. § 1 et seq.

[2] Additionally, I disagree with my colleagues' determination that employees would reasonably construe the Respondents' "Mutual Agreement To Arbitrate Claims" to prohibit the filing of unfair labor practice charges or otherwise accessing the Board's processes. See *U-Haul Co. of California*, 347 NLRB 375, 377 (2006), enfd. 255 Fed. Appx. 527 (D.C. Cir. 2007). The language of Section 3 of the Agreement operates as a "savings clause," excluding from mandatory arbitration any claim "if an agreement to arbitrate such a claim is prohibited by law." Given this language, employees would not reasonably conclude that the Agreement restricts their access to the Board's processes. Indeed, no individual arbitration agreement purporting to impose such a restriction would be lawful under the Act in any event. And, inasmuch as extant precedent might suggest a contrary result, I agree with the dissenting position of former Member Hayes in *2 Sisters Food Group*, 357 NLRB No. 168, slip op. at 14–15 (2011). Accordingly, I would reverse the judge and dismiss this allegation.

[3] 357 NLRB No. 184 (2012), enf. denied in relevant part 737 F.3d 344 (5th Cir. 2013).

[4] For these reasons alone, I would not find that the Respondents' maintenance or enforcement of its arbitration agreement violates the Act insofar as it has been applied to prevent employees from pursuing class and other collective actions. Because I do not find these violations, I find it unnecessary to consider here whether or under what circumstances the remedies related to the maintenance or enforcement violations would be appropriate. See *Murphy Oil*, slip op. at 39 fn. 15 (Member Johnson, dissenting); see generally *BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002).

[5] See *Murphy Oil*, slip op. at 36 fn. 5 (Member Johnson, dissenting) and cases cited. See also *Patterson v. Raymours Furniture Co.*, No. 14-

clear that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. Animal Feeds International Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original).[6] Thus, "[a]n implicit agreement to authorize class-action arbitration … is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Stolt-Nielsen*, supra at 685. Here, the Respondents' motions to compel individual arbitration of employees' collective wage claims are firmly grounded in the Supreme Court's FAA jurisprudence. The "Mutual Agreement To Arbitrate Claims" at issue is silent on the matter of class arbitration, providing no "contractual basis" to conclude that the Respondents "agreed" to it. Although the district court referred the class arbitrability question to the arbitrator, it appears unlikely that an arbitrator could conclude, consistent with *Stolt-Nielsen*, that class arbitration should be required here. Inasmuch as my colleagues seek to punish the Respondents for pursuing their well-founded motions to compel, they bring the Board's jurisprudence into further conflict with the FAA.

The Board compounds its error by rejecting the judge's concern that finding the violation here would interfere with the Respondents' First Amendment right to petition the government for a redress of grievances. In *Bill Johnson's Restaurants v. NLRB*,[7] the Supreme Court held that "the Board may not halt the prosecution of a state-court lawsuit, regardless of the plaintiff's motive, unless the suit lacks a reasonable basis in fact or law." However, the Court clarified that a lawsuit is entitled to no First Amendment protection where the action is either preempted by Federal law or where "a suit . . . has an objective that is illegal under federal law." Where "the Board has *previously ruled on a given matter*, and where the lawsuit is aimed at achieving a result that is incompatible with the Board's ruling, the lawsuit falls within the 'illegal objective' exception to *Bill Johnson's*." *Sheet Metal Workers Local 27 (E. P. Donnelly, Inc.)*, 357 NLRB No. 131, slip op. at 2 (2011) (emphasis added) (quoting *Teamsters Local 776 (Rite Aid)*, 305 NLRB 832, 835 (1991), enfd. 973 F.2d 230 (3d Cir. 1992), cert. denied 507 U.S. 959 (1993)).

Consistent with the Board's approach in *Murphy Oil*, supra, slip op. at 20, the majority here relies on the "illegal objective" theory to conclude that its cease-and-desist order pertaining to the Respondents' motions to compel would not impinge on the First Amendment.[8] Undoubtedly, the Respondents' motions have a reasonable basis in fact and law in light of *Stolt-Nielsen*, supra. The First Amendment should therefore protect these motions unless the *Bill Johnson's* "illegal objective" exception applies. However, the Board has not, in this case or any other, "previously ruled" on the question of whether an employer violates the Act by moving to enforce a facially valid arbitration agreement as requiring individual arbitration where the agreement is silent on the matter of class arbitration. Indeed, in *Murphy Oil*, supra, slip op. at 19–21, the Board found that an employer violated Section 8(a)(1)—and acted with an illegal objective under *Bill Johnson's*—by enforcing an arbitration agreement expressly waiving class arbitration "that [was] itself an unfair labor practice."[9] Even assuming, without deciding, that the Respondents' motions were "aimed at achieving a result that is incompatible with the Board's ruling" in *Murphy Oil*, the Board has not "previously ruled" on the enforcement of a facially lawful arbitration agreement like that at issue here. See *Sheet Metal Workers Local 27 (E. P. Donnelly, Inc.)*, supra, slip op. at 2. Meanwhile, setting aside the Board's definition of "illegal objective" under *Bill Johnson's*, it seems inconceivable that the Supreme Court would find an illegal objective under Federal law where, as here, an employer has sought to enforce an arbitration agreement consistent with the Court's own precedent (*Stolt-Nielsen*) construing the FAA. Accordingly, the Respondents could not have filed their motions to compel with the requisite illegal objective to forfeit the First Amendment's protection.[10]

---

CV-5882-VEC, ––F.Supp.3d ––, ––, 2015 WL 1433219, at *7 and fn. 7 (S.D.N.Y. Mar. 27, 2015) (declining to apply *Murphy Oil*, instead following binding Second Circuit precedent rejecting *D. R. Horton* to enforce a class action waiver, and observing that "the NLRB stands alone in holding that the NLRA overrides the FAA relative to class action waivers"); *Nanavati v. Adecco USA, Inc.*, No. 14-CV-04145-BLF, 2015 WL 4035072, at *2 (N.D. Cal. Jun. 30, 2015) (observing that "every court to have considered *Horton I* and *Murphy Oil* has rejected the reasoning in those opinions…"); *Hobson v. Murphy Oil USA, Inc.*, No. CV-10-S-1486-S, 2015 WL 4111661, at *2 (N.D. Ala. Jul. 8, 2015) (citing *D. R. Horton* and observing that "the NLRB's decisions are not entitled to deference when they concern the interpretation of the Federal Arbitration Act, or any statutory provision other than the NLRA").

[6] See also *AT&T Mobility, LLC v. Concepcion*, 131 S.Ct. 1740 (2011) (holding that class action waivers are enforceable under the FAA).

[7] 461 U.S. 731, 748 (1983).

[8] The Board has previously accepted the view that First Amendment protection extends to defendants as well as plaintiffs. See *Murphy Oil*, supra, slip op. at 20 and fn. 101.

[9] Similarly, in *Cellular Sales of Missouri, LLC*, 362 NLRB No. 27, slip op. at 2 and fn. 8 (2015), the Board found an 8(a)(1) violation where an employer enforced a mandatory arbitration policy expressly waiving class arbitration, relying "solely on the principle that the enforcement of an unlawful provision is, in itself, an independent violation of Sec. 8(a)(1)."

[10] My colleagues' reliance on *Elevator Constructors (Long Elevator)*, 289 NLRB 1095, 1095 (1988), enfd. 902 F.2d 1297 (8th Cir.

Finally, even assuming that my colleagues' conclusion that the Respondents acted with an illegal objective under *Bill Johnson's* is reasonable, the Board should, in my view, avoid ruling on matters outside of its core expertise. The Board's foray into the *Bill Johnson's* analysis necessarily involves evaluating the merits of lawsuits under other Federal (and State) statutes. This evaluation is the proper province of courts and the administrative agencies authorized to implement and enforce particular statutes. Thus, the Board should principally concern itself with enforcing the Act and leave the enforcement of other statutes to those whom Congress has appointed for that purpose.

Dated, Washington, D.C. August 14, 2015

Harry I. Johnson, III, Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain a mandatory arbitration agreement that our employees reasonably would believe bars or restricts their right to file charges with the National Labor Relations Board or to access the Board's processes.

WE WILL NOT maintain or enforce/apply the mandatory arbitration agreement in a manner that requires our employees, as a condition of employment, to waive their right to maintain employment-related joint, class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind or revise the mandatory arbitration agreement to make clear that it does not restrict your right to file charges with the National Labor Relations Board or to access the Board's processes, and that the arbitration agreement does not constitute a waiver of your right to maintain employment-related joint, class, or collective actions in all forums, whether arbitral or judicial.

WE WILL notify all applicants and current and former employees who were required to sign the mandatory arbitration agreement that it has been rescinded or revised and, if revised, provide them a copy of the revised agreement, and WE WILL further notify them that the agreement will not be enforced in a manner that compels them to waive their right to maintain employment-related joint, class or collective actions in all forums.

WE WILL notify the court in which Dominique Whitaker and John White filed their collective lawsuit that we will no longer enforce/apply the mandatory arbitration agreement upon which we based our motion to stay their collective lawsuit and compel individual arbitration of their employment claims, and WE WILL inform the court that we no longer oppose their collective lawsuit on the basis of that agreement.

WE WILL reimburse Dominique Whitaker and John White for any reasonable attorneys' fees and litigation expenses that they may have incurred in opposing our motion to stay their collective lawsuit and compel individual arbitration.

COUNTRYWIDE HOME LOANS

The Board's decision can be found at www.nlrb.gov/case/31–CA–072916 or by using the QR code below. Alternatively, you can obtain a copy of the

1990), is misplaced. There, the Board found an illegal objective under *Bill Johnson's* where a union filed a grievance seeking to construe a facially lawful contract clause in a manner that would have created a de facto hot cargo agreement in violation of Sec. 8(e). Id. That hot cargo agreements violate the Act was not in dispute. However, in this case, the underlying legal predicate for finding a violation of the Act is vigorously disputed. Indeed, as noted above, the courts have categorically rejected the Board's legal theory in *Murphy Oil* and *D. R. Horton* that mandatory arbitration agreements expressly foreclosing class or collective claims in all forums violate Sec. 8(a)(1). Further, in *Stolt-Nielsen*, 559 U.S. at 684–685, the Supreme Court made clear that a party cannot be forced into class arbitration absent its contractual agreement to do so, and no such class arbitration agreement may be inferred from the mere existence of a general arbitration agreement. Thus, even assuming, arguendo, that the Board's decisions in *Murphy Oil* and *D. R. Horton* were valid, and that the arbitration agreement at issue here could not preclude class arbitration under Board law, the Respondents could not be compelled to engage in class arbitration under Supreme Court precedent in any event. The Respondents therefore cannot be charged with having an illegal objective under Federal law in attempting to enforce their arbitration agreement consistent with *Stolt-Nielsen*.

decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

APPENDIX B

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain a mandatory arbitration agreement that our employees reasonably would believe bars or restricts their right to file charges with the National Labor Relations Board or to access the Board's processes

WE WILL NOT maintain or enforce/apply the mandatory arbitration agreement in a manner that requires our employees, as a condition of employment, to waive the right to maintain employment-related joint, class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind or revise the mandatory arbitration agreement to make clear that it does not restrict your right to file charges with the National Labor Relations Board or to access the Board's processes, and that the arbitration agreement does not constitute a waiver of your right to maintain employment-related joint, class, or collective actions in all forums, whether arbitral or judicial.

WE WILL notify all applicants and current and former employees who were required to sign the mandatory arbitration agreement that it has been rescinded or revised and, if revised, provide them a copy of the revised agreement, and WE WILL further notify them that the agreement will not be enforced in a manner that compels them to waive their right to maintain employment-related joint, class or collective actions in all forums.

WE WILL notify the court in which Dominique Whitaker and John White filed their collective lawsuit that will no longer enforce/apply the mandatory arbitration agreement upon which we based our motion to stay their collective lawsuit and compel individual arbitration of their employment claims, and WE WILL inform the court that we no longer oppose their collective lawsuit on that basis.

WE WILL reimburse Dominique Whitaker and John White for any reasonable attorneys' fees and litigation expenses that they may have incurred in opposing our motion to stay their collective lawsuit and compel individual arbitration.

COUNTRYWIDE FINANCIAL CORPORATION

The Board's decision can be found at www.nlrb.gov/case/31–CA–072916 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

APPENDIX C

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain a mandatory arbitration agreement that our employees reasonably would believe bars or restricts their right to file charges with the National Labor Relations Board or to access the Board's processes.

WE WILL NOT maintain or enforce/apply the mandatory arbitration agreement in a manner that requires our employees, as a condition of employment, to waive the right to maintain employment-related joint, class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind or revise the mandatory and binding arbitration agreement to make clear that it does not restrict your right to file charges with the National Labor Relations Board or to access the Board's processes, and that the arbitration agreement does not constitute a waiver of your right to maintain employment-related joint, class, or collective actions in all forums, whether arbitral or judicial.

WE WILL notify all applicants and current and former employees who were required to sign the mandatory arbitration agreement that it has been rescinded or revised and, if revised, provide them a copy of the revised agreement, and WE WILL further notify them that the agreement will not be enforced in a manner that compels them to waive their right to maintain employment-related joint, class or collective actions in all forums.

WE WILL notify the court in which Dominique Whitaker and John White filed their collective lawsuit that we will no longer enforce/apply the mandatory arbitration agreement upon which we based our motion to stay their collective lawsuit and compel individual arbitration of their employment claims, and WE WILL inform the court that we no longer oppose their collective lawsuit on the basis of that agreement.

WE WILL reimburse Dominique Whitaker and John White for any reasonable attorneys' fees and litigation expenses that they may have incurred in opposing our motion to stay their collective lawsuit and compel individual arbitration.

BANK OF AMERICA CORPORATION

The Board's decision can be found at www.nlrb.gov/case/31–CA–072916 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

*Katherine Mankin, Esq.,* for the General Counsel.
*Paul Berkowitz, Gregg A. Fisch,* and *Richard W. Kopenhefer, Esqs. (Sheppard Mullin Richter & Hampton LLP),* of Los Angeles, California, for the Respondent.
*Joshua D. Buck, Esq. (Thierman Law Firm P.C.),* of Reno, Nevada, for Charging Party Theirman.
*Paul T. Cullen, Esq. (The Cullen Law Firm),* of Agoura Hills, California, for John White.
*Shaun Setareh, Esq. (The Law Offices of Shaun Setareh*), of Los Angeles, California, for Dominique Whitaker.

## DECISION

### STATEMENT OF THE CASE

WILLIAM G. KOCOL, Administrative Law Judge. This trial in this case opened in Los Angeles, California, on December 10, 2012. At that time I postponed the case indefinitely to allow the parties time to complete a stipulated record. On December 18, 2012, all parties filed a joint motion to accept parties' joint stipulation of facts and to close the record. Upon consideration, that motion is granted, Joint Exhibits 1–20 are received into evidence, and the record is closed.

Joshua D. Buck and Mark Thierman, Thierman Law Firm filed the charge in Case 31–CA–072918 on January 19, 2012, and Paul Cullen, The Cullen Law Firm filed the charge in Case 31–CA–072918 against Countrywide Financial Corporation (CFC), Countrywide Home Loans, Inc. (CHL) and Bank of America Corporation (BAC), collectively called Respondents and the General Counsel issued the order consolidating cases, consolidated complaint, and notice of hearing on October 23, 2012. The complaint as amended at trial, alleges that Respondents violated Section 8(a)(1) by maintaining and enforcing an arbitration agreement that requires employees to arbitrate all employment-related claims, including any claims arising under a Federal statute or regulation, and by asserting it against employees Dominique Whitaker (Whitaker) and John White (White) in a lawsuit brought by those employees against the Respondent.

Respondents filed a timely answer that denied "each and every" allegation in the complaint except that it admitted the Board's jurisdiction over BAC and that "on or about September 19, 2011, the United States District Court for the Central District of California, Honorable Christine A. Snyder presiding, in

*Whitaker*, et al, *v. Countrywide Financial Corp.,* et al, Case No. VC 09–5898 (PJWx), granted, in part, Respondents' motion to compel arbitration and also stayed litigation. Respondents further admit that, in the Order, the District Court specifically found that the 'question of whether plaintiffs are subject to individual or class arbitration depends on the parties' intent and is a question for the arbitrator to decide.'" Respondent asserted a number of affirmative defenses.

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, the Charging Parties, and Respondent, I make the following

## FINDINGS OF FACT

### I. JURISDICTION

Effective July 1, 2008, through a complex and involved transaction, BAC became the ultimate parent company of the entity that was previously named "Countrywide Financial Corporation" but has since merged out of existence (the Merged CFC) and its subsidiaries (the Merged CFC's Subsidiaries), including CHL. Prior to the July 1, 2008 transaction, the Merged CFC was a holding company, incorporated under the laws of the State of Delaware, with its corporate headquarters in Calabasas, California. At that same time, CHL was a separate company and a wholly-owned subsidiary of the Merged CFC. CHL was, and continues to be, incorporated in New York, with its corporate headquarters in Calabasas, California.

At all material times, BAC has been a separate company from CFC (and the Merged CFC as well) and CHL, and is incorporated under the laws of the State of Delaware, and its corporate headquarters are in Charlotte, North Carolina, with an office and place of business in Lancaster, California, and has been engaged in the operation of a financial institution providing financial services. In conducting its operations during the 12-month period ending March 23, 2012, BAC, on its own or through its subsidiaries, in the course and conduct of its business operations described above had gross revenue valued at in excess of $500,000. During the same 12-month period, BAC, on its own or through its subsidiaries, in the course and conduct of its business operations, purchased and caused to be transferred and delivered to its facilities within the State of California, goods and materials valued at in excess of $50,000 directly from sources outside of the State of California, or from suppliers within the state which, in turn, obtained such goods and materials directly from sources outside the state.

At all material times through at least March 31, 2009, CFC was a corporation with an office and place of business in Calabasas, California, and a holding company which, through its subsidiaries, engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, and dealing in securities and insurance underwriting. In conducting its operations during the 12-month period ending March 31, 2009, CFC, on its own or through its subsidiaries, in the course and conduct of its business operations described above, had gross revenue valued at in excess of $500,000. During the same 12-month period, CFC, on its own or through its subsidiaries, in the course and conduct of its business operations, purchased and caused to be transferred and delivered to its facilities within the State of California, goods and materials valued at in excess of $50,000 directly from sources outside of the State of California, or from suppliers within the state which, in turn, obtained such goods and materials directly from sources outside the state.

At all material times through at least March 31, 2009, CHL was a corporation with an office and place of business in Calabasas, California, and engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, and dealing in securities and insurance underwriting. In conducting its operations during the 12-month period ending March 31, 2009, CHL, in the course and conduct of its business operations described above had gross revenue from its operations valued at in excess of $500,000. During the same 12-month period, CHL, in the course and conduct of its business operations, purchased and caused to be transferred and delivered to its facilities within the State of California, goods and materials valued at in excess of $50,000 directly from sources outside of the State of California, or from suppliers within the state which, in turn, obtained such goods and materials directly from sources outside the State of California. At all material times, CHL, BAC, and CFC, each has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. The foregoing facts are taken from the parties' joint stipulation.

However, Respondents do not admit or stipulate that either BAC or CFC was an employer of Whitaker or White. And it is important to note that the complaint does not allege any relationship between the Respondents such as a single- integrated enterprise, joint employer, successorship, or agency.

### II. ALLEGED UNFAIR LABOR PRACTICES

#### *A. Arbitration Agreement*

On or about August 30, 2007, Whitaker applied for employment at CHL. On or about August 30, 2007, as part of the application process, CHL presented Whitaker with a mutual agreement to arbitrate claims (the arbitration agreement) and Whitaker electronically checked "I agree." Whitaker began working for CHL on or about November 19, 2007, as a customer service telephone representative. She went out on a leave of absence on or about May 5, 2008, and did not return to work at CHL after that date. Her last day of employment at CHL was on or about August 20, 2008. On or about September 26, 2008, White applied for employment at CHL. On or about September 26, 2008, CHL, as part of the application process, presented White with the arbitration agreement, and White electronically checked "I Agree." White worked for CHL as an account manager from in or about November 2008 until approximately November 2009. Neither Whitaker nor White is still employed by CHL and neither ever worked for BAC or CFC.

The arbitration agreement bears the heading "Countrywide Financial" and explains that reference in that agreement to the "Company" means "Countrywide Financial Corporation and all of its subsidiary and affiliated entities, . . . and all successors and assigns from any of them." The arbitration agreement contains the following provision:

> Except as otherwise provided in this agreement, the Company and the Employee hereby consent to the resolution by arbitration of all claims or controversies arising out of, relating to or associated with the Employee's employment with the Company that the Employee may have against the Company or that the Company may have against the Employee, including any claims or controversies relating to the Employee's application for employment with the Company, the Company's actual or potential hiring of the Employee, the employment relationship itself, or its termination (hereinafter the "Covered Claims"). The Covered Claims subject to this Agreement include, but are not limited to, claims for wages or other compensation due . . . and claims for violation of any federal, state or other governmental constitution, statute, ordinance, regulation, or public policy. The purpose and effect of this Agreement is to substitute arbitration, instead of a federal or state court, as the exclusive forum for the resolution of Covered Claims. The parties' responsibilities and legal remedies available under any substantive law applicable to a Covered Claim shall be enforced in any arbitration conducted pursuant to this agreement.

The arbitration agreement also provides that "Nothing in this Agreement shall be construed to require any claim if an agreement to arbitrate such a claim is prohibited by law." The arbitration agreement indicates that each party entered the agreement "voluntarily"; however, if the employee did not agree to the arbitration agreement, then the employee "will not be able to move forward in the application process at this time." The arbitration agreement is silent concerning whether arbitration may be compelled on an individual or collective basis.

During the period of in or about 2007 through approximately March 31, 2009, applicants for employment at CHL typically were presented with an arbitration agreement, similar to those described above, or with language substantially similar to the arbitration agreement.

### *B. Lawsuit*

On or about June 16, 2009, Whitaker filed lawsuit against CFC and BAC in Ventura County Superior Court. On or about August 12, 2009, the case was removed to the United States District Court for the Central District of California. As amended, the lawsuit, a putative class action, alleges seven claims of failure to pay overtime and other wages in violation of California and Federal law. The putative class of employees includes employees of "Countrywide" and *not* any employees of BAC. Rather, the claims against BAC were brought as a "successor in liability." On June 27, 2011, White was added to the lawsuit. On or about August 22, 2011, CFC, BAC, and CHL filed motions to compel individual arbitration for Whitaker's and White's claims.

Whitaker and White filed an opposition to the motions to compel, and CFC, BAC, and CHL then filed a reply. In both the motion to compel and the reply, Respondents unequivocally expressed its intent to compel individual, and not class, arbitration. Respondents' arguments, however, were not based on any purported waiver of class-based arbitration contained within the arbitration agreement. Rather, Respondents argued that case law, as described below, compelled individual arbitration. On September 19, 2011, United States District Court Judge Christine A. Snyder granted, in part, the motions to compel, and also stayed the litigation of the lawsuit. In doing so Judge Snyder rejected the assertion that Section 7 rendered the arbitration agreement unenforceable; the court pointed to case authority that described that argument as "nonsensical." Judge Snyder held that "the question of whether plaintiffs are subject to individual or class arbitration depends on the parties' intent and is a question for the arbitrator to decide."

On or about June 11, 2012, CFC, BAC, and CHL filed a motion for partial reconsideration of Judge Snyder's order. On or about June 25, 2011, Whitaker and White filed an opposition to the motion for partial reconsideration and on or about July 16, 2012, CFC, BAC, and CHL filed a reply. On or about August 20, 2012, Judge Snyder denied the motion for partial reconsideration. To date, the parties have not selected an arbitrator. There has been no determination by an arbitrator (or any other authority) as to whether Whitaker and White can assert their employment-related claims on a class-wide or collective basis in arbitration. On or about October 19, 2011, Whitaker and White filed with the Ninth Circuit a petition for writ of mandamus; on or about October 30, 2012, CFC, BAC, and CHL also filed a petition for writ of mandamus with the Ninth Circuit.

To summarize, Respondents have sought to compel litigation of Whitaker's and White's claims made in the lawsuit on an individual basis before an arbitrator and White and Whitaker have collectively resisted Respondents' efforts. Importantly, Respondents' have *not* contended that White and Whitaker have waived their right under the arbitration agreement to act collectively in seeking class-wide arbitration; rather, Respondents' have only argued that case law favors their position and they did not otherwise agree to class-wide arbitration.

## III. ANALYSIS

### *A. Arbitration Agreement*

The complaint alleges that Respondents have maintained and enforced the arbitration agreement that includes provisions that require employees to arbitrate all employment-related claims, including any claims arising under Federal statute or regulation. I have described above how that arbitration agreement does so. Respondents argue that BAC and CFC should be dismissed as parties in the complaint. I have noted above that Whitaker and White were employed by CHL and not BAC or CFC. I have also described how CHL but not BAC or CFC required employees to sign the arbitration agreement. In his brief the General Counsel correctly points White and Whitaker are statutory employees in a general sense and the facts show that BAC and CFC are employers engaged in commerce. But so is General Motors. Importantly, the General Counsel has not pled in complaint or even explained at the hearing any legal theory under which BAC and CFC should be held liable for the conduct of CHL. This lack of due process has caused Respondents to guess that the General Counsel is proceeding under a "successorship" theory, given that this was the theory used by

the charging parties to join BAC in the lawsuit at issue in this case. But the facts do not support such a theory. Under these circumstances I conclude that relationship of BAC and CFC to this allegation of the complaint is too attenuated to hold them liable. I dismiss BAC and CFC from this allegation.

Although the arbitration agreement was signed well outside the 10(b) period, CHL sought to maintain it within that period. The arbitration agreement, as reasonably read by employees, prohibits employees from filing charges with the Board, an activity protected by Section 7 and Section 8(a)(4). An employer cannot condition employment on a waiver of employees' right to file charges with the Board and thereby lose the advantages provided to them by the Act. *Supply Technologies, LLC,* 359 NLRB No. 38 (2013); *D. R. Horton,* 357 NLRB No. 184, slip op. at 2 (2012); *U-Haul Co. of California,* 347 NLRB 375, 377 (2006), enfd. 255 Fed. Appx. 527 (D.C. Cir. 2007). For example, by compelling arbitration as a substitute for Board proceedings, the employee must forego having a Board agent conduct an investigation of the charge, thereby acquiring evidence and then making a legal analysis of that evidence. The employee gives up the benefit of an NLRB-prepared complaint as well as having an NLRB attorney prosecute the complaint. Nor will the employee have the resources of the General Counsel to prepare any meritorious case against the Respondents. Indeed, the Supreme Court has indicated that Congress intended to ensure that employees be "completely free from coercion" with respect to access to the Board. *NLRB v. Scrivener,* 405 U.S. 117, 123 (1972). In its brief Respondents do not address the merits of this allegation of the complaint. I conclude that by maintaining an arbitration agreement that interferes with employees' right to file charges with the Board, CHL violated Section 8(a)(1). Nothing in this conclusion should properly be understood to touch upon Respondents' First Amendment right to petition the government for a redress of grievances, described more fully in the following section of this decision. Respondents' remain free to assert their claims concerning the meaning of the arbitration agreement in the lawsuit. Rather, it is only the maintenance of an unlawfully broad policy that I find unlawful; this finding does not require Respondents to alter their litigation position.

### *B. Lawsuit*

The complaint alleges that Respondents violated Section 8(a)(1) "by moving the district court to compel plaintiffs Whitaker and White to individually arbitrate their class-wide wage and hour claims against Respondent." I have described above how, in its motion to compel, Respondents unequivocally expressed its intent to compel individual, and not class, arbitration. I have also described above how the arbitration agreement is silent concerning this matter and at no time have Respondents argued that the arbitration agreement, by its terms, compelled only individual arbitrations. I have also described above how Whitaker and White have continued to maintain that their claims should be heard collectively and there is no evidence that Respondents have sought to interfere with, as opposed to disagree with, that contention. The General Counsel argues that *D. R. Horton,* supra, requires the conclusion that Respondents here violated the Act. I disagree. First, I identify the Section 7 rights implicated in *D. R. Horton.* In that case the employer required, as a condition of employment, that employees sign an agreement that precluded them *filing* joint collective, or class action claims concerning their working conditions. The Board held that "Collective *pursuit* of a workplace grievance in arbitration is . . . protected by the NLRA." Id., slip op. at 2 (emphasis added). The Board concluded:

> We need not and do not mandate class arbitration in order to protect employees' rights under the NLRA. Rather, we hold only that employers may not compel employees to *waive* their NLRA right to collectively *pursue* litigation of employment claims in all forums, arbitral and judicial. So long as the employer leaves open a judicial forum for class and collective claims, employees' rights are preserved without requiring the availability of classwide arbitration. Employers remain free to *insist* that arbitral proceedings be conducted on an individual basis.

Id., slip op. at 12 (emphasis added). The Board gave, as an example, Rule 23 of the Federal Rules of Civil Procedure. The Board stated that there is no Section 7 right to class certification. It continued:

> Nothing in our holding guarantees class certification; it guarantees only employees' opportunity to pursue without employer coercion, restraint or interference such claims of a class or collective nature *as may be available to them under Federal, State or local law. . [T]heir employer remains free to assert any and all arguments against certification (other than the MAA).*

Id., slip op. 10 fn. 24 (emphasis added). So the Section 7 that could not be waived in *D. R. Horton* was the right of employees to collectively pursue class or collective work-related complaints against their employer. This is different from any right that the claims be heard and decided on a class-wide basis; that issue is for the appropriate forum, and not the Board, to decide. Here, Respondent did nothing more than argue before the appropriate forum that the claims be heard on an individual basis, and it did so not on the basis that the employees had waived their right to pursue class-wide claims. Rather, it relied solely on case law that it felt support that position.

The General Counsel argues:

> This is a hollow sanctuary. While employees may be able to argue to an arbitrator that they are entitled to bring their claims as a class, *Stolt-Nielsen*[1] and *AT&T Mobility v. Concepcion*[2] make clear that the arbitrator has no authority to grant such status in the absence of some authorization for class arbitration in the arbitration agreements themselves or where, as here, the agreements are silent as to whether the mandatory arbitration may be heard on a collective or class basis. See *Stolt-Nielsen,* 130 S. Ct. at 1775("a party may not be compelled under the FAA to submit to class arbitration unless there is a basis for concluding that the party *agreed* to do

[1] *Stolt-Nielsen SA v. Animal Feeds International Corp*., 130 S.Ct. 1758 (2010).

[2] 131 S.Ct. 1740 (2011).

so") (emphasis in original); *AT&T Mobility v. Concepcion,* 131 S. Ct. at 1750 ("the agreement at issue, which was silent on the question of class procedures, could not be interpreted to allow them").

But by making this argument the General Counsel conflates the Section 7 right to collectively seek class wise arbitration with the non Section 7 right to actually have their claims addressed in a class wide fashion; as described above this was something the Board was careful to differentiate in *D. R. Horton.*

What the General Counsel is seeking in this case is to have the Respondents stop presenting their legal arguments to the court concerning why class-wide arbitration is not appropriate. If the Board were to do so, it would likely trench upon Respondents' rights under the First Amendment "to petition the Government for a redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983)[3]; *BE & K Construction v. NLRB*, 536 U.S. 516 (2002). The General Counsel cites *Elevator Constructors (Long Elevator),* 289 NLRB 1095 (1988), enfd. 902 F.2d 1297 (8th Cir. 1990). In that case the Board concluded that a grievance filed by a union concerning the meaning of a contract clause, if successful, would result in the clause being read in a manner that violated Section 8(e); the grievance thereby violated Section 8(b)(4)(ii)(A). The Board concluded that *Bill Johnson's* did not preclude it from reaching that result. But that case is clearly inapposite here. Respondents have not sought to have the court interpret the arbitration agreement in a manner that would violate the Act. And while, as the Charging Parties point out in their brief, Respondents have argued that the arbitration agreement does not provide for class-wide arbitration but only individual arbitration, these assertions must be seen in context. That context shows that Respondents are arguing that under existing law, class-wide arbitrations can arise only by agreement of the parties and the arbitration agreement does not so provide. In other words, Respondents are *not* arguing that under the terms of the arbitration Agreement the employees waived whatever right they may have to make class-wide claims. I dismiss this allegation of the complaint.[4]

### Conclusion of Law

By maintaining an arbitration agreement that interferes with employees' right to file charges with the Board, CHL has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

### Remedy

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[5]

### ORDER

The Respondent, Countrywide Home Loans, Calabasas, California, its officers, agents, successors, and assigns, shall

1. Cease and desist

(a) Maintaining an arbitration agreement that interferes with employees' right to file charges with the Board.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days after service by the Region, post at its facility in Calabasas, California, copies of the attached notice marked "Appendix."[6] Copies of the notice, on forms provided by the Regional Director for Region 31, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since August 22, 2011.

(b) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C. February 13, 2013

---

[3] Fn. 5 of that decision offers no way out for the General Counsel because the motions to compel individual arbitration at issue in this case do not have an objective that is illegal under Federal law. To the contrary, those motions simply assert existing Federal case law as viewed by Respondents.

[4] The complaint also alleges that Respondent independently violated Sec. 8(a)(1) by "About August 30, 2007, Respondent required employee Dominique Whitaker to agree to the arbitration agreement" and "About September 26, 2008, Respondent required employee John White to agree to the arbitration agreement." Of course, those allegations are facially invalid under Sec. 10(b) and I dismiss them.

[5] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[6] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain an arbitration agreement that interferes with employees' right to file charges with the Board.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

COUNTRYWIDE HOME LOANS

# Exhibit C

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Leslie's Poolmart, Inc.** ***and*** **Keith Cunningham.** Case 21–CA–102332

August 25, 2015

DECISION AND ORDER

MEMBERS HIROZAWA, JOHNSON, AND MCFERRAN

On January 17, 2014, Administrative Law Judge Lisa D. Thompson issued the attached decision. The Respondent filed exceptions and a supporting brief. The General Counsel filed a limited cross-exception and an answering brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision[1] and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings,[2] findings,[3] and conclusions[4]

[1] The judge applied the Board's decision in *D.R. Horton, Inc.*, 357 NLRB No. 184 (2012), enf. denied in relevant part, 737 F.3d 344 (5th Cir. 2013), to find that the Respondent violated Sec. 8(a)(1) by maintaining and enforcing a Mutual Agreement to Arbitrate Claims (Agreement), which required employees, as a condition of employment, to agree to resolve certain employment-related disputes exclusively through individual arbitration and to relinquish any right to resolve such disputes through collective or class action. In *Murphy Oil USA, Inc.*, 361 NLRB No. 72 (2014), the Board reaffirmed the relevant holdings of *D.R. Horton*. We affirm the judge's findings and conclusions based on her application of *D.R. Horton* and on our subsequent decision in *Murphy Oil*. The Respondent argues that Member Becker's appointment expired before the decision in *D.R. Horton* issued. For the reasons set forth in *Murphy Oil*, above, slip op. at 2 fn. 16, we reject this argument.

[2] The Respondent argues that the complaint is time-barred by Sec. 10(b) because the Charging Party, Keith Cunningham, did not file an unfair labor practice charge within six months of the date he became subject to the Agreement. We agree with the judge that this argument lacks merit. The complaint alleges that the Respondent violated the Act by maintaining and enforcing the Agreement. The Respondent stipulated that it has maintained the Agreement as a condition of employment at all material times and since at least October 10, 2012, and that it has sought to enforce the Agreement since at least about April 1, 2013. These dates are within the 6-month period preceding the filing of the charge. The Board has repeatedly held that the maintenance of an unlawful rule is a continuing violation, regardless of when the rule was promulgated. See *Cellular Sales of Missouri, LLC*, 362 NLRB No. 27, slip op. at 12 (2015).

We further reject the Respondent's argument that Cunningham does not have standing to assert his unfair labor practice charge because he is no longer an employee. The Board has long held that the broad definition of "employee" contained in Sec. 2(3) of the Act covers former employees. See *Briggs Mfg. Co.*, 75 NLRB 569, 571 (1947); accord *Cellular Sales of Missouri, LLC*, supra, 362 NLRB No. 27, slip op. at 1 fns. 3, 7. Moreover, Sec. 102.9 of the Board's Rules & Regulations provides that a charge may be filed by "any person," without regard to whether that person is a Sec. 2(3) employee.

[3] Although the Agreement does not explicitly restrict activities protected by Sec. 7, we agree with the judge in finding, based upon the parties' stipulation, that the Agreement has been enforced to compel arbitration on an individual rather than a class or collective basis. Accordingly, the Agreement has been applied to restrict the exercise of Sec. 7 rights, and is thus unlawful under *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 647 (2004). Cf. *Hitachi Capital America Corp.*, 361 NLRB No. 19, slip op. at 2–3 (2014) (finding rule unlawful because it was applied to restrict Sec. 7 rights, without reaching whether rule was facially overbroad). In affirming the judge's finding, we do not rely on *Brighton Retail, Inc.*, 354 NLRB 441 (2009), a case decided when the Board had only two sitting members. See *New Process Steel, L.P. v. NLRB*, 130 S.Ct. 2635 (2010). Instead, we rely on the language of Secs. 7 and 8(a)(1) of the Act. We additionally reject the Respondent's argument that its Motion to Compel Arbitration cannot be an unfair labor practice because it is protected by the First Amendment. See *Countrywide Financial Corp.*, 362 NLRB No. 165 (2015).

We also reject the Respondent's argument, with which our dissenting colleague agrees, that Cunningham was not engaged in protected concerted activity when he filed his class action suit. See *Beyoglu*, 362 NLRB No. 152, slip op. at 2 (2015) ("[T]he filing of an employment-related class or collective action by an individual employee is an attempt to initiate, to induce, or to prepare for group action and is therefore conduct protected by Section 7."). Our dissenting colleague observes that the lawsuit filed by Cunningham is an "opt-out" form of class action, which our colleague says does not demonstrate concertedness because, by its nature, such a lawsuit does not require, or seek to induce, "action" by other class members in order to participate. As the Board has previously stated, whether a plaintiff class is styled as "opt in" or "opt out" by the procedural rules governing any particular class action is not relevant to the question of whether the filing of that class action constitutes concerted activity:

> Plainly, the filing of the action contemplates—and may well lead to—active or effective *group* participation by employees in the suit, whether by opting in, by not opting out, or by otherwise permitting the individual employee to serve as a representative of his coworkers. It is this potential "to initiate or to induce or to prepare for group action," in the phrase of *Meyers II* [*Meyers Industries*, 281 NLRB 882, 887 (1986), affd. sub nom *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988)]—collectively seeking legal redress—that satisfies the concert requirement of Section 7.

*Murphy Oil*, 361 NLRB No. 72, slip op. at 13 (2014) (emphasis in original); see also *Beyoglu*, supra, 362 NLRB No. 152, slip op. at 2 (quoting *Murphy Oil* on this point). Moreover, as our colleague notes with respect to opt-out classes, "class members must decide whether or not to opt out." *Hernandez v. Vitamin Shoppes*, 95 Cal. Rptr. 3d 734, 745 (Cal. App. 2009). Making that decision whether to participate in the lawsuit is itself a form of "action."

[4] For the reasons set forth in detail in his dissents in *Murphy Oil*, slip op. at 35–58, and *Countrywide Financial Corp.*, above, Member Johnson would not find that the Respondent's maintenance or enforcement of the Agreement violates the Act. Because he does not find these violations, Member Johnson finds it unnecessary to consider here whether or under what circumstances the remedies related to the enforcement violation would be appropriate. See *Murphy Oil*, slip op. at 39 fn. 15 (Member Johnson, dissenting); see generally *BE&K Construction Co.* v. *NLRB*, 536 U.S. 516 (2002). Because he finds no merit to this allegation, he does not pass on the Respondent's related argument that Cunningham was not engaged in concerted activity when, as an individual plaintiff, he filed a complaint in the Supreme Court of Los Angeles County on behalf of himself and other similarly situated current and former employees of the Respondent. He observes, however, that the lawsuit filed by Cunningham is an "opt-out" form of class action, typical under California law, where the entire class of employ-

and to adopt the recommended Order, as modified and set forth in full below.[5]

ORDER

The National Labor Relations Board orders that the Respondent, Leslie's Poolmart, Inc., Phoenix, Arizona, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining or enforcing a mandatory arbitration agreement that requires employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the Mutual Agreement to Arbitrate Claims (Agreement) in all of its forms, or revise it in all of its forms to make clear to employees that the Agreement does not constitute a waiver of their right to maintain employment-related joint, class, or collective actions in all forums.

(b) Notify all applicants and current and former employees who were required to sign the Agreement in any form that the Agreement has been rescinded or revised and, if revised, provide them a copy of the revised agreement.

(c) Notify the United States District Court for the Central District of California that it has rescinded or revised the mandatory arbitration agreement upon which it based its motion to dismiss Keith Cunningham's class and representative claims, and inform the court that it no longer opposes the plaintiff's action on the basis of that agreement.

(d) In the manner set forth in this decision, reimburse Keith Cunningham for any reasonable attorneys' fees and litigation expenses that he may have incurred in opposing the Respondent's motion to dismiss his class and representative claims.

(e) Within 14 days after service by the Region, post at its City of Industry, California facility copies of the attached notice marked "Appendix A" and at all other facilities nationwide copies of the attached notice marked "Appendix B,"[6] in both English and Spanish. Copies of the notices, on forms provided by the Regional Director for Region 21, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered,

ees is denominated as plaintiffs, and post-certification, will be considered plaintiffs if they do not subsequently opt out. See Cal. Code Civ. Proc. 382; see also, e.g., *Hernandez v. Vitamin Shoppes*, 95 Cal. Rptr. 3d 734, 745 (Cal. App. 2009) (in case of post-certification class settlement, "class members must decide whether or not to opt out"). Considering the realities of the opt-out class action, therefore, Member Johnson believes that the mere filing of such an action falls outside of the framework created by *Meyers II* for determining protected, concerted activity. See *Meyers Industries, Inc.*, 281 NLRB No. 118 (1986) ("*Meyers II*"), enfd., *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied, 487 U.S. 1205 (1988). This kind of filing, as a matter of procedural law, is not a request for class member employees to actually do anything, and thus it does not "initiate" or "induce" those employees to engage in action, as described by *Meyers II*. Id. at 887 ("We reiterate, our definition of concerted activity…encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management.") In fact, the named plaintiff(s) in an opt-out class action would logically seek to induce *inaction* by other employees (i.e., not opting out) in response to the litigation. Nor do such filings constitute preparation for actual group action or a "truly group complaint," under *Meyers II*. Here, the concept that everyone within the ambit of the complaint's class description supports the class action—merely upon the filing of that complaint—is a legal fiction created by the class action procedure, not an actuality. See also *Murphy Oil*, slip op. at 43–44 (Member Johnson, dissenting).

[5] Consistent with our decision in *Murphy Oil*, we amend the judge's remedy and shall order the Respondent to reimburse Cunningham for all reasonable expenses and legal fees, with interest, incurred in opposing the Respondent's unlawful motion in the United States District Court for the Central District of California to compel individual arbitration of his class or collective claims. See *Bill Johnson's Restaurants v. NLRB*, 461 U.S. 731, 747 (1983) ("If a violation is found, the Board may order the employer to reimburse the employees whom he had wrongfully sued for their attorneys' fees and other expenses" as well as "any other proper relief that would effectuate the policies of the Act."). Interest shall be computed in the manner prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010). See *Teamsters Local 776 (Rite Aid Corp.)*, 305 NLRB 832, 835 fn. 10 (1991) ("[I]n make-whole orders for suits maintained in violation of the Act, it is appropriate and necessary to award interest on litigation expenses."), enfd. 973 F.2d 230 (3d Cir. 1992).

We also amend the judge's remedy to order the Respondent to notify the district court that the Respondent has rescinded or revised the Agreement and to inform the court that it no longer opposes the plaintiff's claims on the basis of the Agreement.

Finally, we shall modify the judge's recommended Order and substitute a new notice to conform to our amended remedy and the Board's standard remedial language.

[6] If this Order is enforced by a judgment of a United States court of appeals, the words in the notices reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix A" to all current employees and former employees employed by the Respondent at any time since October 10, 2012.

(f) Within 21 days after service by the Region, file with the Regional Director for Region 21 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. August 25, 2015

Kent Y. Hirozawa, Member

Harry I. Johnson, III, Member

Lauren McFerran, Member

(SEAL) NATIONAL LABOR RELATIONS BOARD

APPENDIX A
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain or enforce a mandatory arbitration agreement that requires our employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the Mutual Agreement to Arbitrate Claims (Agreement) in all of its forms, or revise it in all of its forms to make clear that the Agreement does not constitute a waiver of your right to maintain employment-related joint, class, or collective actions in all forums.

WE WILL notify all applicants and current and former employees who were required to sign the Agreement in any of its forms that the Agreement has been rescinded or revised and, if revised, provide them a copy of the revised agreement.

WE WILL notify the court in which we moved to dismiss Keith Cunningham's class and representative claims that we have rescinded or revised the mandatory arbitration agreement upon which we based our motion and WE WILL inform that court that we no longer oppose the plaintiff's action on the basis of that agreement.

WE WILL reimburse Keith Cunningham for any reasonable attorneys' fees and litigation expenses that he may have incurred in opposing our motion to dismiss his class and representative claims.

LESLIE'S POOLMART, INC.

The Board's decision can be found at http://www.nlrb.gov/case/21-CA-102332 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

APPENDIX B
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain or enforce a mandatory arbitration agreement that requires our employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the Mutual Agreement to Arbitrate Claims (Agreement) in all of its forms, or revise it in all of its forms to make clear that the Agreement does not constitute a waiver of your right to maintain employment-related joint, class, or collective actions in all forums.

WE WILL notify all applicants and current and former employees who were required to sign the Agreement in any of its forms that the Agreement has been rescinded or revised and, if revised, provide them a copy of the revised agreement.

LESLIE'S POOLMART, INC.

The Board's decision can be found at http://www.nlrb.gov/case/21-CA-102332 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

*Alice J. Garfield, Esq.,* for the General Counsel.
*Frank M. Liberatore* and *Jaclyn Floryan, Esqs.,* for the Respondent.
*Kyle R. Nordrehaug* and *Nicholas De Blouw, Esqs.,* for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

LISA D. THOMPSON, Administrative Law Judge. This matter is before me on a stipulated record. On April 8, 2013, Keith Cunningham ("Charging Party" or "Cunningham") filed a charge in Case 21–CA–102332 against Leslie's Poolmart, Inc. ("Respondent"). The General Counsel issued the complaint and notice of hearing on June 28, 2013. On July 12, 2013, Respondent filed its answer, denying all material allegations and setting forth its affirmative defenses to the complaint.

The complaint alleges that Respondent violated Section 8(a)(1) of the National Labor Relations Act (the "NLRA" or the "Act") when: (1) Respondent required its current and former employees, including Cunningham, as a condition of employment, to enter into individual arbitration agreements that do not expressly require employees to waive their right to pursue class, collective, or representative actions, but Respondent intends for them to do so; and (2) on or about April 1, 2013, Respondent filed a Motion to Compel with the United States District Court for the Central District of California ("District Court") in Case No. 13-02122 CAS (CWx) seeking an order compelling arbitration of Cunningham's individual claims, dismissing his lawsuit, and dismissing his class or collective action claims. (Jt. Mot. Stip. Facts Exhs. 1–2.)[1]

On September 25, 2013, the parties submitted their Stipulation of Facts, Motion to Submit Case on Stipulation, and their Motion Requesting Permission to Forego Submission of Short Position Statements to Associate Chief Administrative Law Judge Gerald Etchingham. Judge Etchingham directed the parties to submit posthearing briefs by November 1, 2013, but ultimately, extended the posthearing brief deadline to December 2, 2013. On November 22, 2013, this case was reassigned to the docket of the undersigned. On December 2, 2013, the parties submitted their respective posthearing briefs in this case.

Upon the stipulated record, and in full consideration of the briefs submitted, I make the following

### FINDINGS OF FACT

#### I. JURISDICTION

The parties stipulated to the following facts as to the nature of Respondent's business and jurisdiction:

1. At all material times, Respondent, a Delaware corporation operates and sells pool and spa chemicals and supplies throughout the United States. Its principal office is located in Phoenix, Arizona, but it has branch locations throughout the State of California. (Jt. Mot. Stip. Facts, Stip. 3.)

2. During a 12-month period ending May 14, 2013, Respondent derived gross revenues in excess of $500,000. At its California branch locations, Respondent purchased and received goods valued in excess of $50,000 from outside the State of California. (Jt. Mot. Stip. Facts, Stip. 4.)

[1] Abbreviations used in this decision are as follows: "Jt. Mot. Stip. Facts" for the parties' Stipulation of Facts, Motion to Submit Case on Stipulation, and Motion Requesting Permission to Forgo Submission of Short Position Statements; "GC Br." for the General Counsel's brief; and "R. Br." for Respondent's brief.

3. Respondent admits, and I find, that it is an employer within the meaning of Section 2(2), (6), and (7) of the Act. (Jt. Mot. Stip. Facts, Stip. 5.)

4. Respondent further admits, and I find, Board jurisdiction as alleged in the complaint. (Jt. Mot. Stip. Facts, Stip. 2(a).)

## II. ALLEGED UNFAIR LABOR PRACTICES

### *A. Stipulated Background Facts*

1. The Charging Party was employed by Respondent as a retail assistant store manager from September 2011 to September 2012. (R. Br. 3.)

2. At all material times, Respondent maintained a Mutual Agreement to Arbitrate Claims that requires employees to resolve certain employment related disputes with Respondent exclusively through binding arbitration. Specifically, the agreement provides that:

> The Company and I mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, whether or not arising out of my employment (or its termination), that the Company may have against me or that I may have against . . . (1) the Company, (2) its officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, (4) the Company's benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates and agents, and/or (5) all successors and assigns of any of them.
>
> The only claims that are arbitrable are those that . . . would have been justiciable [sic] under applicable state or federal law. The claims covered by this Agreement include, but are not limited to: claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, race, sex, sexual orientation, religion, national origin, age, marital status, physical or mental disability or handicap, or medical condition); claims for benefits (with certain exceptions) . . . ; and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance. (Jt. Mot. Stip. Facts, Exh. 4.)[2]

3. The Agreement does not, on its face, limit an employee's employment related claims to individual arbitration. It also does not expressly prohibit an employee's right to assert classwide, collective, or representative actions in an arbitral or judicial forum. (Id.)

4. On September 22, 2011, the Charging Party received and electronically executed Respondent's arbitration agreement described in paragraph 2. The concluding language in the agreement states:

> Voluntary Agreement. I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF. I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO A JURY TRIAL.

Employee initials: KC

> I FURTHER ACKNOWLEDGE THAT I HAVE BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH MY PRIVATE LEGAL COUNSEL AND HAVE AVAILED MYSELF OF THAT OPPORTUNITY TO THE EXTENT I WISH TO DO SO (capitalized in original).

Signature: Keith Cunningham Date: 9/22/2011 1:37 PM[3]

5. At all material times, and at least since October 10, 2012, as part of its hiring process, Respondent required all new employees at its California branch locations to agree and execute the arbitration agreement described in paragraph 2 as a condition of employment. (Jt. Mot. Stip. Facts, Stips. 6–7.)

6. On or about February 13, 2013, following his separation from employment with Respondent, Cunningham filed a complaint in the Supreme Court of Los Angeles County on behalf of himself and other similarly situated current and former employees of Respondent. (Jt. Mot. Stip. Facts, Exh. 5.)

7. The complaint alleged that the Respondent incorrectly and unlawfully calculated and paid overtime to class members for overtime worked since 2009. (Id.)

8. On March 5, 2013, Respondent removed the case to District Court in Civil Case No. 13–02122 CAS (CWx). (R. Br. 5.)

9. On or about April 1, 2013, Respondent filed a Motion to Compel Arbitration and Memorandum of Points and Authorities in Support Thereof with the District Court. (Jt. Mot. Stip. Facts, Exh. 6.)

10. In its motion, Respondent sought an order to dismiss Cunningham's lawsuit, compel arbitration of Cunningham's *individual claims* and dismiss his class/collective action claims, pursuant to the terms of the arbitration agreement described in paragraph 2. (Id.)

11. On April 8, 2013, Cunningham filed an unfair labor practice complaint with the Board alleging that Respondent's arbitration agreement prohibited employees from filing class, collective and representative actions regarding employment-related disputes in an arbitral or judicial forum violative of Section 7 of the Act. (Jt. Mot. Stip. Facts, Exh. 1.)

12. On about June 25, 2013, the District Court granted Respondent's Motion by dismissing all classwide claims, finding that Cunningham's individual claims must proceed to arbitration. (Jt. Mot. Stip. Facts, Exh. 7.) However, the Court denied Respondent's motion to the extent it sought to prevent Cunningham from pursuing a representative claim under the Private

[2] The agreement expressly provided that either party could initiate an administrative charge with the Board.

[3] Jt. Mot. Stip. Facts, Exh. 4.

Attorney General Act of 2004 (PAGA) (Cal. Labor Code §2699) in arbitration. (Id.)

DISCUSSION AND ANALYSIS

The issue in this case is whether Respondent's mandatory arbitration agreement violates Section 8(a)(1) of the Act even though the agreement does not expressly prohibit employees from engaging in protected concerted activities.

The General Counsel alleges that Respondent violated the Act by maintaining and enforcing an unlawful arbitration agreement which does not expressly preclude employees from filing classwide, collective or representative actions in an arbitral or judicial forum, but is intended by the Respondent to do so. Further, the General Counsel contends that, because Respondent moved to compel Cunningham to resolve his *individual* claims through arbitration and sought to dismiss his class and collective claims in District Court, it's very actions in enforcing the agreement has the effect of leading employees to reasonably believe they cannot engage in concerted activity protected by Section 7 of the Act.

Respondent counters that the complaint must be dismissed because: (1) Charging Party's complaint was untimely filed; (2) the Board lacked jurisdiction when it decided *D. R. Horton, Inc.,* thus the decision is invalid based on the ruling in *Noel Canning v. NLRB,* 705 F.3d 490 (D.C. Cir. 2013), cert. granted 81 U.S.L.W. 3695 (U.S. June 24, 2013) (No. 12–1281); or alternatively, (3) I should stay resolution of this decision pending the Supreme Court's ruling in *Noel Canning;* (4) the Fifth Circuit recently overruled the Board's decision in *D. R. Horton* upholding mandatory arbitration of classwide, collective and representative claims;[4] (5) the Board's decision in *D. R. Horton* is inapplicable since it is contrary to controlling Supreme Court precedent and the Federal Arbitration Act (FAA); (6) the Charging Party was not engaged in "concerted activity"; and (7) Respondent's filing of its motion to compel enforcement of its arbitration agreement does not constitute a violation of the Act.

Based on the evidence, I conclude that, even though the agreement is silent regarding the filing of collective actions, Respondent violated Section 8(a)(1) of the Act because, by its own contentions and actions, it essentially mandates that employees waive, as a condition of employment, their right to file class, collective, or representative claims in any arbitral or judicial forum. As explained herein, I believe this result is consistent with the current reasoning set forth in *D. R. Horton, Inc.,* 357 NLRB No. 184 (2012) which, despite the recent Fifth Circuit decision, I am currently bound to adhere.

1. The complaint is timely

Respondent first contends that this case should be dismissed, because Cunningham's charge is time barred by Section 10(b) of the Act, because it was filed more than 6 months after September 22, 2011, the date he signed and was subject to the agreement. However, this argument is without merit as I find a continuing violation exists that makes Cunningham's charge timely.

Contrary to Respondent's assertions, I find that the alleged unlawfulness of the arbitration agreement is not related solely to circumstances existing in September 2011, when Cunningham signed the agreement and became subject to it. Instead, at issue is the legality of Respondent's *continued* maintenance of the agreement. The Board has held that an employer commits a continuing violation of the Act throughout the period that an unlawful rule is maintained. *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998). More importantly, it is well settled that an agreement entered into outside the 10(b) period may be found unlawful within the 10(b) period where its provisions are unlawful on their face or enforced inside the 10(b) period. *Teamsters Local 293 (R. L. Lipton Distributing),* 311 NLRB 538, 539 (1993); *Whiting Milk Corp.,* 145 NLRB 1035, 1037–1038 (1964), enforcement denied on other grounds 342 F.2d 8 (1st Cir. 1965). In this case, the agreement mandated that Cunningham arbitrate certain employment related claims, including wages and compensation, with Respondent even after his termination.[5] The evidence further shows that Respondent stipulated that it has continued and is continuing to require all new hires to execute the agreement. Indeed, Respondent admits that, at least since April 1, 2013, it sought to enforce its arbitration agreement with the Charging Party before the U.S. District Court. Cunningham filed his unfair labor practice charge on April 8, 2013. Thus, I find that, as late as April 1, 2013, a continuing violation existed such that the charge is not timebarred. *Control Services,* 305 NLRB 435, 435 fn. 2, 442 (1991), enfd. mem. 961 F.2d 1568 (3d Cir. 1992); *Guard Publishing Co.,* 351 NLRB 1110, 1110 fn. 2 (2007).

2. The Board had jurisdiction in *D. R. Horton, Inc.*

Respondent next asserts that the Board's ruling in *D. R. Horton, Inc.* is invalid, because the Board lacked the requisite quorum when the decision was issued. See *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013). Here, Respondent argues that President Obama's appointments of Board Members Sharon Block and Richard Griffin were invalid since they were not made during a constitutionally valid Senate recess. As such, Respondent avers that the Board has lacked a quorum to issue any decisions, including in *D. R. Horton, Inc.,* since the expiration of Member Becker's term on January 3, 2012 (citing *New Process Steel v. NLRB*, 1380 S.Ct. 2635, 2640 (2010) (held "two [remaining Board] members may [not] continue to exercise that delegated authority once the group's (and the Board's) membership falls to two.")

However, the Board has repeatedly rejected any ruling that it

[4] On December 3, 2013, Respondent filed a letter brief in addition to a post-hearing brief. The letter brief addressed the recent decision issued by the Fifth Circuit Court of Appeals in *D. R Horton v. NLRB,* 2013 WL 6231617 (C.A. 5, Dec. 3, 2013) (No. 12–60031) which effectively overruled the Board's decision in *D. R. Horton, Inc*. On December 5, 2013, the General Counsel also filed a letter brief opposing Respondent's letter brief and addressing the Fifth Circuit's decision. Although I did not authorize the parties to file additional briefs beyond the posthearing briefs, I have considered the parties' additional filings in this decision.

[5] Specifically, the language of the agreement Cunningham signed expressly provides that, "This Agreement to arbitrate shall survive the termination of my employment. . . ."

did not have the requisite three-board member authority. Although the D.C. Circuit in *Noel Canning* concluded that the President's recent recess appointments to the Board were invalid, the Court also noted that this conclusion is in conflict with several other courts of appeals' rulings. See *Evans v. Stephens*, 387 F.3d 1220 (11th Cir. 2004), cert denied 544 U.S. 942 (2005); *U.S. v. Woodley*, 751 F.2d 1008 (9th Cir. 1985); and *U.S. v. Allocco*, 305 F.2d 704 (2d Cir. 1962). While the Fourth Circuit recently agreed with the decision in *Noel Canning,* see *NLRB v. Enterprise Leasing Co. Southeast, LLC,* 722 F.3d. 609 (4th Cir. 2013), the Board declined to follow the Fourth Circuit's rationale. See *Bloomingdale's Inc.,* 359 NLRB No. 113 (2013) (citing *Evans v. Stephens,* supra; *U.S. v. Woodley,* supra; and *U.S. v. Allocco,* supra). Indeed, even the Fifth Circuit in its decision in *D. R. Horton* agreed that the Board had the requisite authority to issue decisions. See *D. R. Horton v. NLRB,* 2013 WL 6231617, (5 C.A. Dec. 3, 2013) (No. 12–60031). Thus, the Board has rejected Respondent's lack of authority argument, because the issue regarding the validity of recess appointments "remains in litigation, and pending a definitive resolution, [so] the Board is charged to fulfill its responsibilities under the Act." See *G4S Regulated Security Solutions*, 359 NLRB No. 101, slip op. at 1 fn. 1 (2013), citing *Belgrove Post Acute Care Center*, 359 NLRB No. 77, slip op. at 1 fn. 1 (2013). Accordingly, Respondent's argument fails and the Board's decision and reasoning in *D. R. Horton* is currently binding upon me.

3. Respondent's Request to Stay Resolution of this case is denied

Alternatively, Respondent requests that I stay resolution of this decision pending the Supreme Court's ruling in *Noel Canning*. This argument is also unavailing, and I decline to stay this decision for the reasons stated in *Bloomingdale's Inc.,* supra.

4. *D.R. Horton, Inc.* is the controlling law in this matter and does not conflict with the FAA or U.S. Supreme Court precedent

Respondent next avers that this matter should be dismissed as the Fifth Circuit's recent decision in *D. R Horton v. NLRB,* 2013 WL 6231617, (5 C.A. Dec. 3, 2013) (No. 12–60031) effectively overruled the Board's prior decision and is binding on the undersigned. In addition, Respondent avers that U.S. Supreme Court precedent has determined that, to the extent the NLRA conflicts with the Federal Arbitration Act (FAA) vis-à-vis the permissibility of mandatory binding arbitration of employment matters, the NLRA is preempted by the FAA. However, neither argument is persuasive.

The Supreme Court has increasingly shown great deference to enforcement of arbitration agreements. See *AT&T Mobility, LLC v. Concepcion,* 131 S.Ct. 1740, 1749 (2011). In *Concepcion*, the Court emphasized that its cases "place it beyond dispute that the FAA was designed to promote arbitration." The Court explained that the purpose of the FAA is to "ensur[e] that private arbitration agreements are enforced according to its terms." See *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 109 S.Ct. 1248 (1989). Indeed, the Board also acknowledges that the provisions of the FAA evince a "liberal policy favoring arbitration agreements." See *D. R. Horton, Inc.,* supra, slip op. at 8, so long as the agreements do not preclude employees from exercising their substantive rights under Section 7 of the Act. Id. at 9.

In *D. R. Horton, Inc.*, 357 NLRB No. 184 (2012), the charging party was required, as a condition of employment, to sign an arbitration agreement which required him to resolve all claims through mandatory, binding arbitration. The agreement did not have an opt-out clause. In addition, the arbitration agreement contained a clause precluding the charging party and other employees covered by the Act from filing joint, class, or collective claims in arbitral and judicial forums. However, the Board held that an employer violates Section 8(a)(1) of the Act "by requiring employees to waive their right to collectively pursue employment-related claims in all forums, arbitral and judicial" which the Board found to be a substantive right protected under Section 7 of the Act. While the Board acknowledged the interplay between the FAA and the NLRA, the Board reasoned that the ruling in *D. R. Horton* was consistent with Supreme Court precedent which found the FAA inapplicable when an arbitration agreement precludes employees from exercising a substantive right. Thus, the Board found the arbitration agreement fell under the exception to enforcement under the FAA since the agreement prohibited employees from filing collective and class actions, a substantive right protected under Section 7 of the NLRA.

I find that the Supreme Court has not expressly overruled *D. R. Horton*. Although the Court has upheld the enforcement of individual arbitration agreement in employment related matters, see, e.g., *Concepcion,* supra, and *American Express Co. v. Italian Colors Restaurant,* 133 S.Ct. 2304 (2013), the Court has not addressed or resolved the issue of exclusive arbitration over class and/or collective actions. As such, *D. R. Horton* is the controlling law applicable in this case. Even in the face of other Federal circuit decisions to the contrary, *D. R. Horton* represents current Board precedent that I must follow. *Manor West, Inc.,* 311 NLRB 655, 667 fn. 43 (1993); see also *Waco, Inc*., 273 NLRB 746, 749 fn. 14 (1984) ("We emphasize that it is a judge's duty to apply established Board precedent which the Supreme Court has not reversed. It is for the Board, not the judge, to determine whether precedent should be varied") (citation omitted). This is true even in the face of criticism of the rule of *D. R. Horton* by some Federal courts. See *Pathmark Stores*, 342 NLRB 378 fn. 1 (2004). Moreover, because I find that Respondent has effectively precluded Charging Party from exercising his right to engage in protected concerted activity, a substantive right under Section 7 of the Act, the NLRA is not preempted by the FAA.

Applying Board precedent to this case, I find that Respondent's arbitration agreement violates the Act. While the arbitration agreement does not, on its face, prohibit collective or class action, it has the effect of doing so as evinced when Respondent, in moving to compel arbitration of his claims, sought to preclude Cunningham from filing a class action lawsuit and maintained that "arbitration is the elected and required forum for resolving [Charging Party's] *individual claims."* (Jt. Mot. Stip. Exh. 6) (emphasis in original). The NLRA "protects employees' ability to join together to pursue workplace grievances, including through litigation." *D. R. Horton,* supra, slip op.

at 2. By filing a class action lawsuit in court, both Cunningham (and the charging party in *D. R. Horton*) were engaging in conduct that the Board noted is "not peripheral but central to the Act's purposes." Id. at 4. The Board found that there was no conflict between the NLRA and the FAA "so long as the employer leaves open a judicial forum for class and collective claims, [thus] employees' NLRA rights are preserved without requiring the availability of classwide arbitration." Id., slip op. at 16. While the agreement is silent as to collective or class actions, in practice, Respondent closed the avenue to pursue collective and/or classwide litigation when it sought to limit Cunningham and other similarly situated employees to arbitration of their individual claims. Because I am currently bound by the ruling in *D. R. Horton* until it is reversed by the Supreme Court, I do not find anything meaningfully distinguishable between Respondent's arbitration agreement and the one in *D. R. Horton,* which the Board found violative of the Act.

5. Charging Party engaged in protected concerted activity

Respondent next claims that Cunningham's filing of his lawsuit in State court is not protected concerted activity under Section 7 of the Act, because "although [his] complaint contained class allegations and a description of a putative class, he had no co-plaintiff and there was no evidence that anyone other than Cunningham and his counsel were involved in the initiation or prosecution of the case." (R. Br. 17.) The General Counsel counters that Cunningham engaged in protected activity because whether class member status existed is immaterial since the Act "protects employees who engage in individual action . . . with the objective of initiating or inducing group action." (GC Br. 10 citing *Mushroom Transportation Co. v. NLRB,* 330 F.2d. 683, 685 (3d Cir. 1964).)

Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 of the Act. The rights guaranteed in Section 7 include the right "to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." See *Brighton Retail, Inc.,* 354 NLRB 441, 441 (2009).

In *Meyers Industries (Meyers I),* 268 NLRB 493 (1984), and in *Meyers Industries (Meyers II),* 281 NLRB 882 (1986), the Board held that "concerted activities" protected by Section 7 are those "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." However, the activities of a single employee in enlisting the support of fellow employees in mutual aid and protection is as much concerted activity as is ordinary group activity. Individual action is concerted if it is engaged in with the object of initiating or inducing group action. *Whitaker Corp.,* 289 NLRB 933 (1988). The "mutual aid or protection" clause of the Act includes employees acting in concert to improve their working conditions through administrative and judicial forums.

In this case, it is clear under Board law that Cunningham engaged in protected concerted activity when he filed his class action lawsuit in State court. See *Harco Trucking, LLC,* 344 NLRB 478 (2005); *Host International,* 290 NLRB 442, 443 (1988) (filing a collective action to address wages, hours, and other terms and conditions of employment constitutes protected activity unless done with malice or in bad faith). Even without class member status, the evidence demonstrates that, by filing his classwide lawsuit, Cunningham sought to "enlist the support of fellow employees in mutual aid and protection" and intended to "initiat[e] or induc[e] group action" regarding alleged overtime pay violations against Respondent. *Whitaker,* supra. Consequently, Respondent's action to force Cunningham, and other employees covered under the Act, to waive their right to file a classwide action in any arbitral or judicial forum, interfered with and restrained them from exercising their Section 7 rights. Accordingly, Respondent's argument fails on this point.

Therefore, based on the foregoing, I find that Respondent's actions violated Section 8(a)(1) of the Act when, by its actions and practices, it mandates that employees covered by the Act must waive, as a condition of employment, their right to file joint, class, or collective claims in any arbitral or judicial forum.

6. Respondent's Motion to Compel Arbitration violates Section 8(a)(1) of the Act

Lastly, the General Counsel advances the same arguments and cited authority to this allegation as it does to the charge contesting the arbitration agreement. (GC Br. 5–6, fn. 6.) Respondent argues that filing its motion to compel is not violative of the Act, because its filing constitutes a "constitutionally protected petitioning of the government under the First Amendment." (R. Br. 11–13.) However, Respondent's argument misses the point. Rather, this matter involves whether Respondent's actions in enforcing its mandatory arbitration agreement (by filing a motion to compel in district court) interferes, restrains, or coerces Cunningham and similarly situated employees from exercising their substantive rights to file classwide litigation. Under *D. R. Horton, Inc.* and other Board precedent, I find that Respondent's action violates the Act.

Therefore, I find that Respondent's action violated Section 8(a)(1) of the Act when it moved to restrict Cunningham's exercise of his Section 7 rights by filing a motion in District Court to compel arbitration and dismissal of Cunningham's collective and class claims.

## Conclusions of Law

1. Respondent, Leslie's Poolmart is an employer within the meaning of Section 2(6) and (7) of the Act.

2. Respondent violated Section 8(a)(1) of the Act by maintaining and enforcing a mandatory and binding arbitration agreement which required employees to resolve certain employment-related disputes exclusively through individual arbitration and, though not expressly, but in practice, required them to relinquish any right they have to resolve such disputes through collective or class action.

3. Respondent violated Section 8(a)(1) of the Act by seeking to enforce its unlawful arbitration agreement by filing a motion in District Court compelling arbitration and dismissing Charging Party's collective and class claims.

REMEDY

Having found that the Respondent engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended.[6]

ORDER

The Respondent, Leslie's Poolmart, Inc. of Phoenix, Arizona, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing a mandatory and binding arbitration policy that, either expressly or impliedly, or by Respondent's actions or practice, waives the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(b) Seeking court action to enforce a mandatory and binding arbitration policy that, either expressly or impliedly, or by Respondent's actions or practice, waives the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind or revise the arbitration agreement to make it clear to employees that the agreement does not constitute a waiver of their right to maintain employment related class or collective actions in all forums.

(b) Notify the employees of the rescinded or revised agreement to include providing them a copy of the revised agreement or specific notification that the agreement has been rescinded.

(c) File a motion with the United States District Court for the Central District of California in Civil Case No. 13–02122 CAS (CWx) asking that the court vacate its order to compel arbitration.

(d) Reimburse Charging Party and/or any other employees who joined in Civil Case No. 13–02122 CAS (CWx) for any litigation expenses: (i) directly related to opposing Respondent's Motion to Compel; and/or (ii) resulting from any other legal action taken in response to Respondent's efforts to enforce the arbitration agreement.

(e) Within 14 days after service by the Region, post at all facilities where the arbitration agreement applied, copies of the attached notice marked "Appendix"[7] in both English and Spanish. Copies of the notice, on forms provided by the Regional Director for Region 21, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees and former employees by such means. Respondent also shall duplicate and mail, at its own expense, a copy of the notice to all former employees who were required to sign the mandatory and binding arbitration policy during their employment with Respondent. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since January 1, 2011.

(f) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

Dated, Washington, DC January 17, 2014

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities

WE WILL NOT maintain or enforce a mandatory and binding arbitration policy that, expressly or impliedly, by our actions or practices, waives the right to maintain class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any other manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL rescind or revise the arbitration agreement to make it clear to employees that the agreement does not constitute a waiver of their right to maintain class or collective actions in all forums.

---

[6] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[7] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

WE WILL notify employees of the rescinded or revised agreement, including providing them with a copy of the revised agreement or specific notification that the agreement has been rescinded.

WE WILL reimburse Charging Party and/or any other employees who joined in the collective litigation for litigation expenses incurred which were directly related to opposing our Motion to Compel Arbitration and/or reimburse employees for any other legal action taken in response to our efforts to enforce the agreement.

LESLIE'S POOLMART, INC.

# Exhibit D

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Hoot Winc, LLC and Ontario Wings, LLC d/b/a Hooters of Ontario Mills *and* Alexis Hanson**

**Hoot Winc, LLC and Ontario Wings, LLC d/b/a Hooters of Ontario Mills, *and* Jamie West**

**Hoot Winc, LLC and Ontario Wings, LLC d/b/a Hooters of Ontario Mills, *and* Chanelle Panitch.** Cases 31–CA–104872, 31–CA–104874, 31–CA–104877, 31–CA–104892, 31–CA–107256, and 31–CA–107259

September 1, 2015

DECISION AND ORDER

BY CHAIRMAN PEARCE AND MEMBERS MISCIMARRA AND HIROZAWA

On May 19, 2014, Administrative Law Judge William Nelson Cates issued the attached decision. The Respondents filed exceptions and a supporting brief, and the General Counsel filed an answering brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to adopt the judge's rulings, findings, and conclusions regarding the Respondents' arbitration agreement and to adopt his recommended Order as modified and set forth in full below.[1]

1. The judge found, and we agree, that the Respondents violated Section 8(a)(1) of the Act by maintaining a mandatory arbitration agreement that would reasonably be read by employees to prohibit the filing of unfair labor practice charges with the Board. It is well settled that a work rule violates Section 8(a)(1) if employees would reasonably believe that the rule interferes with their ability to file Board charges, even if the policy does not expressly prohibit access to the Board. See *Murphy Oil USA, Inc.*, 361 NLRB No. 72, slip op. at 19 fn. 98 (2014); *D. R. Horton, Inc.*, 357 NLRB No. 184, slip op. at 2 fn. 2 (2012), enf. denied on other grounds 737 F.3d 344 (5th Cir. 2013), petition for rehearing en banc denied (2014); *U-Haul Co. of California*, 347 NLRB 375, 377–378 (2006), enfd. mem. 255 Fed. Appx. 527 (D.C. Cir. 2007). Furthermore, it is settled that production of extrinsic evidence, such as testimony showing that employees interpreted the rule to preclude access to the Board, is not a precondition to finding that a rule is unlawful by its terms. See, e.g., *Murphy Oil*, supra, slip op. at 13 fn. 79; *Hills & Dales General Hospital*, 360 NLRB No. 70, slip op. at 1–2 (2014) (citing *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 646–647 (2004); *Claremont Resort & Spa*, 344 NLRB 832, 832 (2005)).

Here, the parties stipulated, and the judge found, that the Respondents required employees to sign an arbitration agreement as a condition of employment. The arbitration agreement requires that all "claims" between the employee and the Respondents shall exclusively be decided by arbitration. The term "claims" encompasses

> all disputes arising out of or related to your application for employment, the application and recruitment process, the interview process, the formation of the employment relationship, your employment by the Company, or your separation from employment with the Company. The term "Claims" includes, but is not limited to, any claim whether arising under federal, state, or local law, under a statute such as Title VII of the Civil Rights Act of 1964, under a rule, under a regulation or under the common law, including, but not limited [to] ANY CLAIM OF DISCRIMINATION, SEXUAL OR OTHER TYPE OF HARASSMENT, RETALIATION, WRONGFUL DISCHARGE, ANY CLAIM FOR WAGES, COSTS, INTEREST, ATTORNEYS' FEES OR PENALTIES. "Claim" does not include any dispute that cannot be arbitrated as a matter of law.

(Emphasis in original.)

Although the arbitration agreement does not explicitly prohibit employees from filing charges with the Board, we agree with the judge's finding that employees would reasonably read it to do so—particularly in light of the breadth of the provision quoted above, its reference to "any claim" under "federal law" or "under a statute," and its specific inclusion of claims of discrimination, retaliation, or discharge or for wages. See *U-Haul Co. of California*, supra, 347 NLRB at 377.

The Respondents point out that the arbitration agreement includes an express exemption for "any dispute that

[1] Following the judge's decision in this case, the parties executed an informal Board settlement agreement and a non-Board settlement agreement resolving all alleged violations other than those pertaining to the maintenance of the arbitration agreement. On October 22, 2014, the Board granted the parties joint motion to sever and remand the settled allegations. Accordingly, the only issue before us is whether the Respondents' arbitration agreement violates Sec. 8(a)(1) of the Act. There are no exceptions to the judge's finding that the Respondents are joint employers.

We shall modify the recommended Order to reflect the settlement and remand of the other allegations and to conform to the Board's standard remedial language. We shall substitute a new notice to conform to the Order as modified.

cannot be arbitrated as a matter of law." That provision, however, does not save the arbitration agreement from violating Section 8(a)(1). Although unfair labor practice charges must be filed with the Board, they may be resolved through arbitration. See *Murphy Oil*, supra, slip op. at 13, 18–19 & fn. 98. Accordingly, we affirm the judge's conclusion that the arbitration agreement violated Section 8(a)(1) because employees would reasonably believe it prohibited the filing of charges with the Board. See id.; *U-Haul Co. of California*, supra, 347 NLRB at 377–378.

2. Applying the Board's decision in *D. R. Horton, Inc.*, supra, the judge also found that the arbitration agreement violated Section 8(a)(1) because it required employees to waive their right to engage in class or collective action in all forums, whether arbitral or judicial. We agree.

In *Murphy Oil*, supra, the Board thoroughly examined and reaffirmed the rationale of *D. R. Horton*. Specifically, the Board found that class or collective litigation by employees of claims relating to the terms and conditions of their employment is protected concerted activity, and that a policy prohibiting such activity in both arbitral and judicial forums violates Section 8(a)(1). As in *Murphy Oil* and *D. R. Horton*, the Respondents here required employees to sign, as a condition of employment, an arbitration agreement that barred each employee from litigating claims against the Respondents on a class, representative, or collective basis in any forum, arbitral or judicial.[2] Thus, we agree with the judge that the Respondents' maintenance of that arbitration agreement violated Section 8(a)(1) of the Act.[3]

ORDER

The National Labor Relations Board orders that the Respondents, Hoot Winc, LLC and Ontario Wings, LLC d/b/a/ Hooters of Ontario Mills, Joint Employers, Ontario, California, their officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a mandatory arbitration agreement that employees reasonably would believe bars or restricts the right to file charges with the National Labor Relations Board.

(b) Maintaining a mandatory arbitration agreement that requires employees, as a condition of employment, to waive the right to maintain joint, class, or collective actions in all forums, whether arbitral or judicial.

(c) In any like or related manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the unlawful arbitration agreement in all of its forms, or revise it in all of its forms to make clear to employees that the agreement does not constitute a waiver of their right to maintain employment-related joint, class, or collective actions in all forums, and that it does not restrict employees' right to file charges with the National Labor Relations Board.

(b) Notify all current and former employees who were required to sign the unlawful arbitration agreement that it has been rescinded or revised and, if revised, provide them a copy of the revised agreement.

(c) Within 14 days after service by the Region, post at their Ontario, California facility, and at all other facilities where the unlawful arbitration agreement is or has been in effect, copies of the notice marked "Appendix A."[4] Copies of the notice, on forms provided by the Regional Director for Region 31, after being signed by the Respondents' authorized representative, shall be posted by the Respondents and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondents customarily communicate with their employees by such means. Reasonable steps shall be taken by the Respondents to ensure that the notices are

[2] In their statement of facts, the Respondents quote a section of the agreement, entitled "Arbitrators' Authority," which states in part that the arbitration agreement "shall not be construed to deprive a party of any substantive right preserved by law." The Respondents do not otherwise address or rely on that provision. In any event, we find that the provision does not change the result here. At most, it creates ambiguity as to an employee's right to file charges with the Board, and it is insufficient to counteract the broadly worded language requiring individual arbitration of all claims arising under Federal law. It is well established that any ambiguity in a work rule that may restrict protected concerted conduct "must be construed against the [employer] as the promulgator of the rule[ ]." *Ark Las Vegas Restaurant Corp.,* 343 NLRB 1281, 1282 (2004).

[3] For the reasons stated in his partial dissent in *Murphy Oil USA, Inc.*, 361 NLRB No. 72, slip op. at 22–35 (2014), Member Miscimarra does not believe that Sec. 8(a)(1) of the Act prohibits employees and employers from entering into agreements that waive class procedures in litigation or arbitration. Accordingly, he would find that the Respondents did not violate Sec. 8(a)(1) by maintaining a class waiver agreement. Member Miscimarra agrees with his colleagues, however, that employees would reasonably read the agreement to require arbitration of disputes arising under the NLRA and thus to prohibit the filing of charges with the Board. To that extent, he agrees that the language of the agreement violates Sec. 8(a)(1). See id., slip op. at 23 fn. 4.

[4] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

not altered, defaced, or covered by any other material. If the Respondents have gone out of business or closed the facility involved in these proceedings, the Respondents shall duplicate and mail, at their own expense, a copy of the notice to all current employees and former employees employed by the Respondents at any time since April 15, 2013.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 31 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondents have taken to comply.

Dated, Washington, D.C. September 1, 2015

Mark Gaston Pearce, Chairman

Philip A. Miscimarra, Member

Kent Y. Hirozawa, Member

(SEAL) NATIONAL LABOR RELATIONS BOARD

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain a mandatory arbitration agreement that employees reasonably would believe bars or restricts the right to file charges with the National Labor Relations Board.

WE WILL NOT maintain a mandatory arbitration agreement that requires employees, as a condition of employment, to waive the right to maintain joint, class, or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the unlawful arbitration agreement in all of its forms, or revise it in all of its forms to make clear that the agreement does not constitute a waiver of your right to maintain employment-related joint, class, or collective actions in all forums, and that it does not restrict your right to file charges with the National Labor Relations Board.

WE WILL notify all current and former employees who were required to sign the unlawful arbitration agreement that it has been rescinded or revised and, if revised, provide them a copy of the revised agreement.

HOOT WINC, LLC AND ONTARIO WINGS, LLC D/B/A HOOTERS OF ONTARIO MILLS, JOINT EMPLOYERS

The Board's decision can be found at http://www.nlrb.gov/case/31-CA-104872 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.

*Juan Carlos Gonzalez, Esq.* and *Amanda Dixon, Esq.,* for the General Counsel.
*Justin J. Johl, Esq.,* for the Respondent Hoot Winc, LLC.
*Michael Barnett, Esq.,* for the Respondent Hooters of Ontario, LLC
*Burton F. Boltuch, Esq.,* for the Charging Party Alexis Hanson.

## DECISION

### STATEMENT OF THE CASE

WILLIAM NELSON CATES, Administrative Law Judge. This case was tried before me in Los Angeles, California, on January 29 and 30, 2014.[1] Charging Party Alexis Hanson, an individual, filed the charges in Cases 31–CA–104872 and 31–CA–104874 initiating this matter on May 9,[2] and the General Coun-

[1] All dates are 2013, unless otherwise indicated.

[2] I do not allude to the other charges as Hanson's discharge is the only discharge before me. Other allegations are, however, alleged, considered, and decided here.

sel (Government) issued an order consolidating cases, consolidated complaint, and notice of hearing (complaint) on September 27 and amended on December 12 against Hoot Winc, LLC (Hoot Winc) and Hooters of Ontario, LLC d/b/a Hooters of Ontario Mills (Hooters of Ontario). The Government alleges Hoot Winc an Oceanside, California company providing restaurant management services and Hooters of Ontario, an Ontario, California company operating a public restaurant selling food and beverages are joint employers of the employees of Hooters of Ontario. I shall refer to Hoot Winc and Hooters of Ontario collectively as the Company. The complaint also alleges the Company has maintained certain rules in an employee handbook, and, a confidential information agreement, that infringe upon employees Section 7 rights in violation of Section 8(a)(1) of the Act. It is also alleged the Company maintains an arbitration policy, an agreement to arbitrate and an acknowledgement of receipt of arbitration agreement that infringes upon employees Section 7 rights in violation of Section 8(a)(1) of the Act. It is also alleged the Company on April 23 suspended and on April 26 discharged Charging Party Hanson because she concertedly complained to the Company regarding wages, hours, and working conditions of the Company's employees, and conditions surrounding an upcoming competition involving the employees and such actions of the Company are alleged to interfere with, retrain, and coerce employees in the exercise of rights protected by Section 7 and in violation of Section 8(a)(1) of the Act.

The parties were given full opportunity to participate, to introduce relevant evidence, to examine and cross-examine witnesses, and to file briefs. I carefully observed the demeanor of the witnesses as they testified and I rely on those observations here. I have studied the whole record, and based on the detailed findings and analysis below, I conclude and find the Company violated the Act as outlined below.

## FINDINGS OF FACT

### I. JURISDICTION AND RELATED ISSUES

#### *A. Jurisdictional Status of Hoot Winc and Hooters of Ontario*

Hoot Winc has been, and continues to be, a limited liability company with an office and place of business in Oceanside, California, providing restaurant management services. During the calendar year ending December 31, 2012, Hoot Winc in conducting its business operations, performed services valued in excess of $50,000 in states other than the State of California. The parties admit, and I find, Hoot Winc is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

Hooters of Ontario, has been and continues to be, a limited liability company with an office and place of business in Ontario, California, operating a public restaurant selling food and beverages. During the calendar year ending December 31, 2012, Hooters of Ontario derived gross revenues in excess of $500,000 and bought and received at its Ontario, California facility products, goods, and materials in excess of $5000 directly from points outside the State of California. The parties admit, and I find, Hooters of Ontario is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

#### *B. Joint Employer Status*

It is alleged that Hoot Winc and Hooters of Ontario have, at all times here, been joint employers of Hooters of Ontario's employees at the Hooters Restaurant of Ontario, California. It is also alleged Hoot Winc has exercised control over the labor relations policies of Hooters of Ontario and administered a common labor policy for employees of Hooters of Ontario. It is admitted that Hoot Winc has provided human resources services to Hooters of Ontario, but Hoot Winc denies they are joint employers.

The Government contends Hoot Winc had a joint employer relationship with Hooters of Ontario and the relationship existed at the time Hoot Winc suspended and terminated Hooters of Ontario employee Charging Party Hanson.

Hoot Winc and Hooters of Ontario contend they are not joint employers but separate distinct entities with Hoot Winc simply providing human resources, management, accounting, and similar expertise to not only the Ontario restaurant but 18 other Hooters' restaurant locations in California. Hoot Winc and Hooters of Ontario argue the following shows they were and are not joint employers, namely: (1) they are separate entities; (2) Hooters of Ontario is owned by a holding company not Hoot Winc and Hoot Winc is not a member of the holding company that owns Hooters of Ontario; (3) neither is a subsidiary of the other; (4) Hooters of Ontario engages Hoot Winc to provide restaurant management services through a written fee-for-services agreement; and (5) Hanson was an employee of and paid by Hooters of Ontario not Hoot Winc.

A joint employer relationship may be found to exist where there is sufficient evidence that one company has immediate control over the other company's employees. The Board in *Aim Royal Insulation, Inc*., 358 NLRB No. 91, slip op. at 7–8 (2012), stated:

> The test for joint-employer status is whether two entities "share or co-determine those matters governing the essential terms and conditions of employment." *Laerco Transportation,* 269 NLRB 324, 325 (1984). To establish a joint-employer relationship, there must be evidence that one employer "meaningfully affects matters relating to the employment relationship such as, hiring, firing, discipline, supervision, and direction of the other employer's employees." Id.

In *Capital EMI Music,* 311 NLRB 997, 999 (1993), enfd. 23 F.3d 399 (4th Cir 1994), a case which I cannot deny familiarity with, the Board noted:

> Joint employers are businesses that are entirely separate entities except they both "take part in determining essential terms and conditions" of a group of employees. *Manpower, Inc.*, 164 NLRB 287, 288 (1967). Accord: *NLRB v. Browning-Ferris Industries*, 691 F.2d 1117, 1122–1123 (3d Cir. 1982), and cases there cited.

In *NLRB v. Browning-Ferris Industries,* supra, the court specifically found that where two separate entities share or codetermine those matters governing the essential terms and condi-

tions of employment they are considered joint employers for the purpose of the Act.

Did Hoot Winc participate meaningfully in exercising control over matters governing the terms and conditions of employment of Hooters of Ontario employees, and, more specifically with respect to Charging Party Hanson's employment? The evidence establishes Hoot Winc did. Hoot Winc Vice President of Human Resources Herrmann, when notified of the situation at the Hooters of Ontario bikini contest, directed Hooters of Ontario General Manager Vidauri to suspend employees Hanson and Panitch and to conduct an investigation to see what action would be taken. Herrmann personally investigated the situation at the Ontario restaurant. Thereafter, Herrmann notified both Panitch and Hanson she was terminating their employment. Herrmann testified she determined to fire Panitch before she spoke with her and determined to fire Hanson while speaking with her. Herrmann signed the discharge notices provided to Hanson and Panitch and only mentioned her termination decisions to Regional Director Peterson and General Manager Vidauri.

During material times here, Hoot Winc Regional Director Peterson disciplined (oral and written) Ontario General Manager Vidauri and Bar Manager Ramirez. Both Vidauri and Ramirez are management personnel but it further demonstrates the direct control Hoot Winc exercised over Hooters of Ontario. The discipline given Vidauri and Ramirez was based on comments they made about Hooter Girl employees at Hooters of Ontario.

Hoot Winc developed and provides the "Employee Handbook" given to each Hooters of Ontario employee. The Hoot Winc name, appears on each page of the handbook. The Employee Handbook (GC Exh. 18) addresses conduct, dress, allowable grooming practices, open door policy, nonharassment policy, restaurant work rules, company philosophy, employee relations, employee meals, alcohol consumption, safety, discipline, pay, benefits, vacation, absences, substance abuse, and other policies. A number of the policies inform Hooters of Ontario employees to contact Hoot Winc directly. The open door policy, for example, directs employees to first address work-related concerns with their immediate supervisor or general manager but if the matter is not resolved to then report their concerns to a regional supervisor and if appropriate report their complaint directly to Hoot Winc human resources via telephone or email. Hoot Winc issues to each Hooters of Ontario employee its standard operating procedure booklet (GC Exh. 20) which addresses various policies and procedures for Hooters of Ontario employees. For example, with respect to the anti-harassment and discrimination procedures it is specifically noted that Hoot Winc Vice President of Human Resources (in this case Herrmann) was ultimately responsible for hearing complaints, conducting investigations, documenting information, and determining what action would be taken regarding those procedures. Other procedures are addressed such as what employees at Hooters of Ontario must wear, meal and rest break guidelines and requirements, when and how employees will be paid, tip allocations, communications with employees, medical reimbursement, and work schedules.

It is clear Hoot Winc has immediate and effective control in determining the terms and conditions of employment of Hooters of Ontario employees.

Hoot Winc and Hooters of Ontario's contention, there is no joint employer relationship here, is invalid, because, among other reasons, the contentions are grounded on corporate structure and separate entities and not on control, or lack thereof, by one entity over employees of the other concerning essential terms of employment. The fact, for example, that Hanson's and Panitch's paychecks were drawn from Hooters of Ontario accounts does not require a different result than I conclude here, namely, that a joint employer relationship exists.

As noted elsewhere here, I shall refer to Hoot Winc and Hooters of Ontario jointly as the Company.

### *C. Supervisory and Agency Status*

It is admitted that Vice President of Human Resources Amber Herrmann (Herrmann or Vice President of Human Resources Herrmann) and Regional Director Scott Peterson (Peterson or Regional Director Peterson) were supervisors within the meaning of Section 2(11) of the Act and/or agents of Hoot Winc or Hooters of Ontario within the meaning of Section 2(13) of the Act. It is, however, denied that Marketing coordinator/key employee Pamela Noble and Key employee Alicia Wade (Strohman) are supervisors and/or agents within the meaning of the Act.

#### 1. Facts

Marketing Coordinator Noble and employee Wade both were, at applicable times, "key employees" for the Company. As the name implies key employees are provided keys to the restaurant and cash registers. No other nonmanagement employees have keys either to the restaurant or cash registers. Charging Party Hanson explained that if a "Hooters Girl" had a problem with a customer's check (bill), that is, something was rang up incorrectly, or the customer had, for example, a discount coupon, the key employee on duty could delete items from a customer's bill or give the customer credit for a promotional coupon. Key employees may go to the bank or take inventory for the Company.

Key employees sometimes conduct "jumpstart" sessions at the beginning of the workday or shift. Hanson described "jumpstart" sessions as "just a little meeting we have before our shift every day." Upcoming events and specials at the restaurant, sales for the day, merchandise sales, and section assignments are discussed and/or made.

Key employees sometimes "cut the floor." Cutting the floor happens when there are more workers present than the customer base justifies. Key employee Noble explained "we have to check labor every hour. And if it's over ten percent, we're supposed to cut accordingly. That way we can save money on labor, so normally we ask who wants to stay and go." If volunteers do not resolve who goes "Hooter Girls" name tags are collected and it is decided who will leave work that shift by drawing name tags. Noble testified employees were never just selected because that would not be fair.

There were times at the restaurant when key employees were present while managers were not. If anything occurred on a shift, with no manager present, the key employee would leave a

note for the general manager. Key employee Wade stated if an issue arose she could coach or counsel the employee, and had, on a couple of occasions, filled out a computer generated document on which she recorded what had occurred. Wade viewed the computer form as basically a type of written warning letter. She explained the computer generated document "is not considered at issue, nor valid, unless it is given by upper management." Wade could not recall whether upper management actually issued the warnings she had drafted. General Manager Vidauri testified key employees could not hire, fire, or suspend other employees.

Marketing coordinator and key employee, Noble, when also functioning as marketing coordinator, had the additional duty of setting up promotional events such as the April 22 bikini contest at the Ontario location.

2. Analysis and applicable principles

Section 2(11) of the Act defines a "supervisor" as:

> Any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

To establish that Noble and Wade were supervisors, the Government must prove by a preponderance of the evidence: (1) that they held authority to engage in any one of the 12 enumerated supervisory functions listed above; (2) that their "exercise of such authority [was] not of a merely routine or clerical nature, but require[d] the use of independent judgment"; and (3) that their authority was held "in the interest of the employer." See, e.g., *NLRB v. Kentucky River Community Care,* 532 U.S. 706, 710–713 (2001); *Oakwood Healthcare, Inc.*, 348 NLRB 686, 687 (2006). The Government can prove they had the requisite supervisory authority either by demonstrating they actually performed a supervisory action or by showing they effectively recommended it be done. *Oakwood*, above. Further, "to exercise 'independent judgment' an individual must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." Id. at 692–693. A "judgment is not independent if it is dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective-bargaining agreement." Id. at 693. Because the Government bears the burden of proving supervisory status any lack of evidence on an element necessary to establish supervisory status must be held against the Government. *G4S Regulated Security Solutions,* 358 NLRB No. 160, slip op. at p. 1 (2012).

Applying these principles here, I find the Government's evidence fails to establish Noble and/or Wade possessed *any* indicia of supervisory authority.

The fact an employee is given a literal key to the employer's facility and cash registers does not, in any way, establish the employee has authority to exercise any indicia of supervisory status as outlined above. At best, assigning an employee keys to the facility and cash registers may indicate a degree of trust by the employer in the employee but little else. The fact a key employee is authorized to correct a customer's bill where incorrect data has been entered into the company cash register or giving customers credit for valid promotion coupons does not establish key employees have or exercise any indicia of supervisory status. That key employees may take inventory or do banking transactions for a manager does not establish an indicia of supervisory authority.

Key employees may, when managers are not present, conduct jumpstart meetings at the beginning of shifts. The evidence in this regard only establishes that key employees notify employees concerning upcoming events at the restaurant, sales for the day including particular merchandise sales, and, advising "Hooter Girls" which tables and sections of the restaurant they will be assigned for that day. There is absolutely no showing, on this record, that key employees utilize independent judgment when making such announcements or assignments. It appears key employees simply followed a set routine in selecting employees to cover customer tables.

In cutting the floor or reducing the number of "Hooter Girls" in relation to customers key employees simply perform a routine check of labor every hour, and, on a specific percentage ratio of labor to customers, they cut or reduce the work force. Key employees do not independently select employees to be cut but rather ask for volunteers; or, collect "Hooter Girl'" name tags and conduct a drawing to determine which employee(s) are sent home for the remainder of the workshift. This activity does not establish key employees responsibly direct worktimes for employees of the restaurant.

The Government contends key employees prepare written disciplinary warnings for employees which are approved by the General Manager and issued. The Government further contends this procedure establishes key employees effectively issue discipline to other employees, because upper management follows the key employees' recommendations. I find the evidence here is insufficient to carry the Government's burden. A key employee may, if no managers are present on a shift, document an event that occurred on the shift which management might need to know about. Key employee Wade indicated she could coach and/or counsel an employee and that on a couple of occasions she documented what had occurred for the general manager. Key employee Wade considered the forms she prepared basically a type of written warning but added the document was not considered an issue or valid unless it was given to the employee involved by upper management. This evidence does not shed light on a key employees' disciplinary authority. It does not establish that Wade, or the other key employee, utilized independent judgment regarding a warning recorded about an incident. The fact the general manager may have issued some form of discipline, based, at least in part, on the event documented by a key employee does not establish an effective recommendation of discipline by the key employee such as to establish Wade, or the other key employee, to be supervisors within the meaning of the Act. The evidence does not demonstrate specific examples of independent judgment regarding discipline. I find the Government failed to establish Noble and

Wade were supervisors within the meaning of the Act.

The Government additionally, or alternatively, contends Noble and Wade are agents of the Company pursuant to Section 2(13) of the Act. Section 2(13) of the Act reads as follows:

> In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his act, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

The Board looks to the common law principles of agency in determining who is an agent under the Act and those principles must be broadly construed when applied to labor relations. *Longshoremen ILA (Coastal Stevedoring Co.),* 313 NLRB 412, 415 (1993). The doctrine of apparent authority results from a manifestation by the principal to a third party that creates a reasonable basis for the latter to believe that the principal had authorized the alleged agent to perform the acts in question. The test is whether, under all the circumstances, employees would reasonably believe that the employee in question was reflecting company policy and/or acting and speaking for management. *Hausner Hard-Chrome of Kentucky*, 326 NLRB 426, 428 (1998).

The evidence establishes Noble and Wade both were agents of the Company within the meaning of Section 2(13) of the Act. Wade for example prepared incident disciplinary type reports for management by which employees would reasonably believe she was reflecting company policy and spoke for management. Noble's April 3 message to the bikini contest participants, in which she explained if they signed up for the contest and did not show up they would be terminated, would cause employees to reasonably believe her memorandum reflected Company policy, especially in light of the fact upper management knew of the message. Additionally, the fact Noble and Wade both conducted jumpstart meetings with employees, opened the restaurant, and had keys to the cash registers, made banking transactions for the Company, corrected and adjusted customers' bills and checked labor rates and cut the work force would reasonably cause employees to conclude they were performing their duties on behalf of management. I find the evidence establishes Noble and Wade were, at applicable times, agents of the Company.

## II. ALLEGED UNFAIR LABOR PRACTICES

### *A. The Suspension and Discharge of Alexis Hanson*

#### 1. The Government's evidence

The thrust of this case centers around the discharge of Charging Party Hanson. Hanson's discharge centers around the Company's annual bikini contest held at the Ontario Hooters location on April 22. Hanson was a participant in the contest. Hanson worked as one of approximately 40 "Hooter Girls" at the Ontario, California Hooters location. Her entire employment from April 2011, until her suspension on April 23, and discharge on April 26, was at that location. Hanson worked 5 days per week totaling 30 hours at $8.25 per hour plus tips. As a Hooter Girl, Hanson greeted customers, waited tables, and handled cash and credit payments by customers. In addition to her Hooter Girl duties she also served as a certified trainer, training new hires, and assisted in opening new Hooters locations.

Ontario General Manager Gerardo Vidauri, among others, conducted mandatory bartender meeting's and held such a meeting in April.

Bartender Panitch attended the April meeting and thereafter spoke with "Hooter Girls" and coworkers Hanson and Rochelle about what she considered inappropriate or disparaging remarks, about the two coworkers among others. Hanson told Panitch she should immediately telephone Regional Director Peterson and tell him everything that had happened that it was unprofessional. Panitch spoke with Hooter Girl Rochelle on the telephone. Rochelle "was very upset" and was going to speak with Regional Manager Peterson also and reported back to Panitch as soon as she had spoken to Peterson.

Hanson, who did not attend the meeting, but received a text message, with complaints, about the meeting, from bartender Chanelle Panitch, whom she met for lunch later that day. Panitch told Hanson everything that occurred at the bartenders meeting that day. Marketing coordinator and key employee, Noble, and key employee Wade were at the meeting at which General Manager Vidauri and Bar Manager Chris Ramirez talked about the Ontario Hooter Girls. Panitch testified the managers specifically spoke about five Hooter Girls; namely, Alexis Hanson, Jaime West, Jean Delroja, Kelli Rochelle, and Candyce Miller. Panitch told Hanson the first full hour of the meeting was spent talking about the Hooter Girls being fat along with other derogatory comments. Hanson testified Panitch explained that Gerardo, Ramirez, and Noble called one of the Hooter Girls, Lena Delroja, "stupid" and a "dumb blond," and, that bartender and Hooter Girl Kelli Rochelle's singing career was not going anywhere. Rochelle was not present at the meeting. Hanson testified Panitch told her General Manager Gerardo said Hooter Girl Angela was fat and looked that way in her uniform. Panitch told Hanson that Bar Manager Ramirez said Hooter Girl Candyce Miller, "scrunched her hair like a Mexican and had tattoos that they didn't like." Panitch explained to Hanson, she thought it was not a professional work environment and felt if they were saying these things about other employees, what were they saying about her when she was not present. Panitch told Hanson this upset and made her uncomfortable and unhappy. Panitch told Hanson her name was brought up at the bartenders meeting. Panitch said they were talking about promoting someone to bartender and Hanson's name was mentioned as a good candidate. Panitch told Hanson. General Manager Vidauri responded that Hanson just demanded and expected to be promoted and "if [she] didn't have an attitude problem then he would." Hanson told Panitch it wasn't right that her name was brought up without her being present and she wanted a direct meeting with Vidauri so if she had an attitude problem he could address it with her and not in front of all the other bartenders. Hanson testified it made her unhappy and she wanted to confront General Manager Vidauri in person, but Panitch thought it would make it uncomfortable for her (Panitch) because she was the one that had told Hanson what had taken place at the April bartenders meeting. Panitch asked Hanson not to do it.

Hanson testified she thereafter spoke with Hooter Girls Kelli Rochelle, Lena Delroja, and Panitch about what was said concerning specific Hooter Girls at the early April bartenders meeting. Hanson and Delroja complained about their names being brought up and Delroja said she would call Vice President of Human Relations Herrmann.

Hanson testified that about a couple of days after the April bartenders meeting, but still in early April, she and Rochelle met with General Manager Vidauri at the end of the bar in the restaurant. At the meeting Vidauri talked about Hooter Girl Angie saying; "Angie eats too many key lime pies after her shift and she needs to go to the gym, rather than laying around with her boyfriend. And that she's starting to look really bad in her uniform." Hanson testified; "me and Kelli did not respond to Gerardo [Vidauri]. We kind-of just gave him a look that indicated that we were tired of hearing them talk about our coworkers and turned our back towards him and walked away from the conversation."

Panitch testified she sent a text message to Regional Manager Peterson about the bartenders meeting and he immediately telephoned her. Panitch told Peterson all about the bartender meeting. She said he responded kind-of-like he had heard the story and said he would speak with General Manager Vidauri and Bar Manager Ramirez about it. Hanson testified Regional Director Peterson, sometime later, telephoned the restaurant and she happened to answer the phone and she discussed the bartenders meeting with him. Hanson told Peterson it was unprofessional and she had no one in management she could look up to or take her complaints to. Peterson told Hanson she could call him anytime and said he had received several complaints about the bartenders meeting.

At about this same time in early April flyers were placed in the employee breakroom announcing that the Hooters of Ontario bikini contest would be held on April 22. The annual bikini contest is one of 3 or 4 events drawing large numbers of customers to, and providing publicity for, various Hooter restaurants and the participants.

Panitch testified she had participated in approximately 10 bikini competitions before the April 22 Ontario contest. Panitch participated in early April in the West Covina and Costa Mesa, California contests as did Marketing Coordinator Noble. Panitch testified Noble's best friend, Krystle Lina, served as a judge at both contests. Noble finished in the top three at both contests. Panitch knew Lina was Noble's best friend from Nobles social media pages. Panitch testified that when in the second contest, the Costa Mesa one, Noble received second place, she (Panitch) telephoned Charging Party Hanson and said, "I told her that Pamela Nobles had got second place and that her best friend was a judge again." Panitch also spoke the next day with Hanson about Noble winning and Lina being one of the judges. Hanson suggested Panitch tell Regional Director Peterson. Panitch thought that was a good idea but told Hanson she felt uncomfortable doing so because she had already spoken to Peterson about the bartenders meeting and she "didn't want it to seem like [she] was complaining all the time."

The bikini contest is divided into two events. First there is a costume portion then a bikini portion. Cash prizes are awarded with $300 given for first place, $200 for second place, and $100 for third place. First and second place winners advance to regional and possibly the national contest where larger prizes are awarded and selections are made for the annual Hooter Girls calendar. Those pictured in the calendars are given a percentage of the profit from the calendar sales aside from the cash awards and other prizes and contestants gain exposure for possible careers in modeling and movies.

The flyer announcing the bikini contest at the Ontario location was provided by Marketing Coordinator Noble. Hanson testified Noble not only set the date for the contest but announced the theme for the costume portion and provided a signup sheet for those wishing to enter the contest. Hanson testified there was no mention, in the flyer, that after signing up to participate it was mandatory for those signing to do so. On prior occasions, employees were allowed to withdraw after signing up and could do so without penalty. Hanson had, in the past, withdrawn from the contest without penalty.

Hanson signed up for the contest at the time Noble first posted the contest details. Hanson testified Marketing Coordinator Noble told her in early April, "that she [Noble] would not be participating in the contest, because she was putting on the contest. And if she did so, she was worried that other employees and contestants would think that she was cheating."

After Hanson signed up for the contest she and other Hooter Girls received a "hot message" via their cell phones from Noble on Wednesday, April 3 which reads as follows:

> Hey Ladies, If you are not signed up for the contest you WILL be working that night. But to clarify if you have your name on the list and you plan on backing out cross your name off the list by Friday. If you are signed up for the contest and do not show up it will be a no call no show by our regional and GM and you WILL BE TERMINATED. Also you MUST be here by 8:30 p.m. if you are late you will not be allowed to enter the contest and you will work the floor that night like it was a scheduled shift. Any questions or if I'm not clear let me know.

Marketing Coordinator Noble did in fact participate in the bikini contest. Hanson testified that by the time she learned Noble would be participating in the contest it was too late to withdraw without being terminated. Hanson was upset and concerned the contest might be rigged. Hanson explained; "We had known that she was already participating in other contests, so it just made us not want to do it. Because we had known that [s]he put the whole event together."

Hanson's concerns grew the contest might be rigged when she saw certain pictures posted around April 15, by Noble on the social media site Instagram—an account where those who join can post and view pictures and related comments. Hanson and Noble followed each other on Instagram. Hanson saw pictures of Noble, one of which included Krystle Lina, identified by Noble in the comment section, as her best friend for life. The picture of Noble and Lina showed Noble winning second place at the Costa Mesa Hooters restaurant. Noble had also introduced Hanson to Linda as her best friend. According to Hanson, Lina served as a judge at other contest locations. Hanson knew at the time she saw the Instagram picture, Lina would be one of the judges at Ontario contest.

Hanson testified that before the April 22 bikini contest she and several employees discussed, Marketing Coordinator Noble having her friend serve as one of the judges at other contests at which Noble had won. Hanson spoke about this with Lena Delroja, Kelli Rochelle, Chanelle Panitch, and Jessy Wiles. Hanson testified Wiles started the conversation by saying she did not want to participate, "that it was going to be rigged, that we had to participate in something that we were not being paid for. We had to go purchase things for basically a rigged competition." Hanson agreed with Wiles. Hanson explained; "We all agree[d] that we were unhappy about participating in this unpaid competition." Hanson testified that although she, Panitch, and Delroja were unhappy having to compete, they were afraid they would be terminated if they did not and they did not like having to spend money to get ready for something they were not being paid for.

Hanson testified that at a jumpstart meeting before the bikini contest at Ontario, General Manager Vidauri reminded them "about our mandatory appearance in the competition." Hanson expressed her unhappiness about participating in the contest and asked Vidauri; "how can they force me to participate in something that I wasn't paid for, when [she] had to go and spend [her] own money on stuff for the competition and gas to drive down to the competition." General Manager Vidauri explained he did not make the mandatory decision that it came from corporate. Hanson also told Vidauri she was concerned the contest was rigged, "just like all the other one's were with Pamela [Noble] and her friend judging the contest." Vidauri "brushed" it off as corporate's decision.

Hanson testified that in the morning hours 1 or 2 days before the April 22 bikini contest she answered the telephone at the restaurant and it was Regional Director Peterson calling. According to Hanson this was the same telephone call from Peterson in which she had told Peterson about the several complaints she had received concerning the April bartenders meeting which she thought the meeting was unprofessional. Peterson asked Hanson if she was going to participate in the bikini contest. Hanson said she was but she was not looking forward to doing so. Peterson asked why. Hanson answered, "because we were forced to do it, we are not being paid and that it was rigged." Regional Director Peterson told Hanson he was looking into the competition being rigged, and added, "I will handle this for you, Alexis."

Panitch testified she spoke to Regional Director Peterson about the relationship between Nobles and Krystle Lina. Panitch explained she had Peterson's telephone number from when she previously called him about the bartenders meeting. Panitch told Peterson she did not think it was fair that Marketing Coordinator Noble had her best friend judge these competitions. Peterson told Panitch if she could prove they were friends or best friends he would not allow Lina to be a judge in the Ontario bikini competition. Panitch told Peterson she could prove it by providing him with a screenshot from her cell phone of an Instagram photograph depicting Lina and Noble together with the caption best friends for life.

Hanson testified Marketing Coordinator Noble sent a "hot schedules message" notifying all contestants they were to be at the restaurant April 22 at 8:30 p.m. although the contest did not start until 10 p.m. Hanson arrived at around 8 p.m., signed in and proceeded through the restaurant to a tent set up behind the restaurant for the contestants to change clothing.

Hanson and the other participants dressed in costume for the first portion of the contest. Hanson noticed Marketing Coordinator Noble's best friend, Krystle Lina, as well as Noble's boyfriend, were contest judges. Hanson did not recognize any of the other judges. Panitch observed Lina as a judge and that she "was whispering to the other judges." Hanson and the others later participated in the second, or bikini, portion of the contest. Panitch testified that between the costume and bikini portions of the contest she spoke with Regional Director Peterson about Lina being one of the judges. Panitch explained, "I asked him if he knew that Krystle Lina was still going to be a judge at our contest, and he said no." Panitch said Hanson was also present and asked Peterson if he knew who was going to win. Peterson shook his head and laughed. Hanson testified that when she and Panitch saw the two were still judges at the bikini portion of the contest Panitch told Regional Direction Peterson she was unhappy, "that he had said it would be dealt with and that it wasn't and then we were still forced to participate in a rigged competition." Hanson testified Peterson replied, "I know Chanelle. Know. It's okay," and put his arms around her to comfort her.

The contest ended around midnight. The winners were announced with Marketing Coordinator Noble winning first place and awarded $300 prize money. The three top finishers had their pictures taken near the changing tent. Hanson testified she, Panitch, and Kelli Rochelle congratulated the second and third place winners. Noble was present also. Hanson testified she told Noble "Congratulations, Pam, on cheating." Noble asked "What?" Hanson did not respond. Hanson testified she did not use any curse words at Noble nor did she threaten Noble in any manner. Panitch testified Hanson did not raise her voice nor use any curse words that night.

Panitch testified she was upset at the end of the contest, "not at the fact that I didn't win but at the fact that we were force[d] to do this contest that was obviously rigged." When Panitch saw Marketing Coordinator Noble in the photograph area wearing the first place sash she told Noble; "Thanks for Cheating." Panitch could not exactly remember what else she said but it was something to the effect, "you're a fucking bitch." Noble told Panitch she could leave. Hanson testified Marketing Coordinator Noble and Panitch started "yelling at each other" in back of the restaurant but not around customers. Hanson testified Noble and Panitch cursed at each other, explaining, "it was a heated exchange between both girls and there were curse words exchanged." Hanson said she and Kelli Rochelle told Panitch, "this is not the time or the place for this" and took Panitch inside the restaurant. Panitch acknowledged they may have told her to stop acting like she was, and acknowledged she went into the restaurant with Hanson. Hanson proceeded to speak with her (Hanson's) boyfriend.

Hanson testified key employee Wade approached and told Hanson she needed to leave and "if [she] didn't leave right now that she would terminate me." Hanson told Wade she had not done anything, that the conversation with Market Coordinator Noble that took place outside, was over and that she and Ro-

chelle were on their way out. Hanson also told Wade she had no right to threaten to take away her job that she had not done anything.

Hanson observed key employee Wade then approach Panitch and that a caddy—a container on each table holding paper towels, ketchup, salt and pepper—flew off the table onto the floor. Hanson thought Panitch pushed it off the table. Panitch testified Wade approached saying; "Sweetie, I know you're upset that you lost, but it's not worth your job." Hanson said she moved away from that confrontation because she did not wish anyone to think she had anything to do with it. Hanson next noticed that key employee Wade had her arms around Panitch who was telling Wade to let go of her. Panitch testified that as she was trying to leave the restaurant key employee Wade "bear hugged" her and she told Wade to, "Get the fuck off me." Panitch may also have said "I know she is your fucking friend but this isn't right." Panitch testified Hanson was speaking with her (Hanson's) boyfriend at the time then left the restaurant. Panitch denied pushing a chair against Wade.

Hanson and Rochelle left along the side of the restaurant and observed Regional Director Peterson, General Manager Vidauri, Marketing Coordinator Noble, and Noble's boyfriend. Peterson approached Hanson and asked that she not say anything to Noble. Hanson told Peterson, "Scott, I wouldn't say anything to Pamela. I haven't said anything to Pamela. Everything that has gone on tonight was Chanelle, and I apologize for that." Peterson thanked Hanson, and she and Rochelle left. Hanson testified that as she and Rochelle were in her car to leave Peterson approached and they discussed what had happened. Peterson told Hanson, "Thank you for not reacting the way that Chanelle did." Hanson told Peterson she would never do that. Peterson again thanked Hanson. Hanson told Peterson the whole thing could have been avoided. Peterson acknowledged; "I know. It's probably my fault." Hanson and Rochelle drove away.

Hanson specifically stated she was not escorted off Hooters' property by security after the bikini contest and never saw security interact with Panitch. Hanson said that as she left Hooters' parking lot she saw Noble 10 to 15 feet away but they never spoke.

Panitch testified she walked, unescorted, from the restaurant, and, as she walked toward her car she observed Marketing Coordinator Noble near Noble's car, which she had to pass getting to her car. Panitch yelled to Noble that she did not deserve to win; she was a cheater; and, "I called her a cunt" and "was basically yelling out profanities to her." Panitch was about 10 feet from Noble and Regional Director Peterson, Bar Manager Ramirez, and Former Manager Jackie. Panitch told Bar Manager Ramirez; "I know that's your friend, but what she did wasn't right." Panitch testified; "Jackie and Kelli Rochelle were just basically telling me to calm down and not to say anything." Panitch testified Hanson was not in the area at that time nor when Panitch drove away. Panitch testified she was not escorted to her car nor did she see or know if police came to the restaurant that evening. Panitch said she did, about 5 minutes after she left, receive a telephone call from Hanson checking on her. Panitch guessed Peterson was near Hanson when Hanson placed the call because she could hear Peterson in the background asking if Panitch wanted to be followed home.

Hanson was scheduled to work the next day, April 23, however, General Manager Vidauri telephoned telling her not to bother coming to work. She was suspended for what had happened the night before. Hanson asked Vidauri; "okay, well, what happened? I didn't do anything. I had nothing to do with that." Hanson testified Vidauri again stated they were investigating it and would get back with her in 2 or 3 days. Hanson asked if her job was at risk. Vidauri said it was.

Hanson received a telephone call, on or about April 26, from Vice President of Human Resources Herrmann who told Hanson, "I just want to let you know you are being discharged." Hanson asked for what. Herrmann replied, "For cursing at Pamela Noble the night of the bikini contest." Hanson told Herrmann she never cursed Noble that night. Herrmann acted surprised and stated, "Oh, you didn't?" Hanson testified Herrmann then replied, "Okay. Well, then you are being terminated for your negative social media posts." Herrmann asked if Hanson had anything to say. Hanson said she had been a good employee for Hooters and didn't understand why she was being discharged for something like this without even hearing her side of the story. Hanson reminded Herrmann she had worked for Hooters for 2 years and didn't deserve to be fired. Herrmann told Hanson, "I know, Alexis. You were always a good employee" and you are "eligible for rehire" later on.

On April 26, Vice President of Human Resources Herrmann notified Hanson in writing of her termination. The notification reads, in part, as follows:

> On April 22, 2013 after the Ontario Swim Suit Competition you got into a verbal altercation with other employees, as well as posting disparaging comments about coworkers and managers on Social Media. This behavior violated the following provisions of the "Discipline" section of the Hooters employee handbook (page 36):
>
> - Acts of violence, threats of violence, dishonesty toward guest or fellow employees of Hooters.
> - Insubordination to a manager or lack of respect and cooperation with fellow employees or guest.
> - Any off-duty conduct which negatively affects, or would tend to negatively affect, the employee's ability to perform his or her job, the Company's reputation, or the smooth operation, goodwill or profitability of the Company's business.
> - Any other action or activity which Hooters reasonably believes represents a threat to the smooth operation, goodwill, or profitability of the business.

At this time we are releasing you from employment. Your final check is enclosed and includes all monies due you at this time for termination.

| | |
|---|---|
| Alexis Hansen | Date |
| /s/Amber Herrmann | 4/26/13 |

______________________ ____________________
Amber Herrmann Date

Panitch was notified on April 23, she was suspended and approximately 5 or so days later received a telephone call from Vice President of Human Resources Herrmann. Herrmann told Panitch she was going to fire her, but she would hear her side of the story. Panitch, "told her everything from the bar meeting to the bikini contest." Panitch filed a charge with the Board regarding her discharge. The Board dismissed her charge. Panitch did not appeal the Board's dismissal.

2. The Company's evidence

General Manager Vidauri conducted a meeting in April with bartenders at the Ontario restaurant where he made comments about certain Hooter Girls not at the meeting. Thereafter Regional Director Peterson informed Vidauri there had been complaints about Vidauri's comments and he and Vice President of Human Resources Herrmann were conducting an investigation. Vidauri testified Peterson told him the complaints came from Hooter Girls and concerned bad things Vidauri had said about them. After the investigation, Vidauri was given a written disciplinary action, and, Vice President of Human Resources Herrmann told him his conduct could not be tolerated and if it reoccurred he could be further disciplined or terminated. On direct-examination Vidauri testified, neither Panitch or Hanson ever spoke with him about the comments he made at the bartenders meeting; however, on cross-examination he said he could not recall if he, on the day of the bartender's meeting, talked with Hanson about the meeting.

Regional Director Peterson received a telephone complaint from Hooters Girl Kelli Rochelle telling him she had been called a "diva" at the bartenders meeting at which General Manager Vidauri and Bar Manager Ramirez were present. Peterson told Rochelle he would take care of it and informed Vice President of Human Resources Herrmann. Peterson obtained documents regarding proper behavior for managers and how they would communicate with employees. Peterson visited the Ontario restaurant and gave both General Manager Vidauri and Bar Manager Ramirez verbal and written discipline. According to Peterson no other employees raised concerns with him about the bartenders meeting.

Although Peterson learned of comments made at the bartenders meeting from others he did not recall a telephone conversation with Hanson taking place anytime in which Hanson said the conduct at the bartender meeting was unprofessional.

Marketing Coordinator Noble performed "every last detail" setting up the bikini contest of April 22, at the Ontario store. Noble explained it included decorating the restaurant, finding a DJ, a photographer and obtaining celebrity and table judges. Noble worked as marketing coordinator the night of the contest; but, not as a key employee. Noble observed Hanson and Panitch that night but not much until after the first round of the contest because she was inside the restaurant ensuring everything for the contest was getting done. Noble testified that between the costume and bikini portions of the contest she heard Hanson and Panitch say it was unfair that Noble was cheating.

Marketing Coordinator Noble placed first overall in the contest and proceeded to the back lot for pictures with the second and third place winners. Noble testified Panitch and Hanson approached saying "Did it feel good to place first when you cheated? Noble told them, "I don't know why either of you guys are acting like this when I've been there for both of you." Noble said, "And that's when the ruckus kind of started." Noble testified Panitch and Hanson, "started coming after me saying I haven't been there for either of them and I'm a bitch . . . among other obscenities." Noble was upset and intimidated. She said other contestants were in the area as well as the photographer. Noble denied using any obscenities toward Panitch or Hanson. Noble testified Regional Director Peterson and Corporate Representative Rachel Maas said to Hanson and Panitch, "they needed to stop, and it was stopping." Peterson and Maas directed Hanson and Panitch away from the photograph area, and Hanson and Panitch went into the restaurant. Noble never heard Hanson try to clamp Panitch down. Noble said she had no further interaction with Hanson and Panitch until later in the restaurant parking lot near her car when "Chanelle [Panitch] and Alexis [Hanson] both came out of the building yelling more obscenities at me when security got in their way and basically pulled them away." Noble said when Panitch and Hanson started their obscenities they were "at least a hundred feet away." Noble testified she did not respond but stated Hanson called her a "bitch" and "cunt" and that she "cheated." Noble said she was intimidated and frightened and that employee Karen took her back to the restaurant and she never saw Panitch and Hanson again that evening. Noble said a police officer later came in the restaurant and asked if she was okay and she told him, "Fine, I guess."

Alicia Strohman (Alicia Wade)[3] worked as a "key employee" the night of the bikini contest. Wade's first interaction that evening with Charging Party Hanson concerned an issue, which was resolved, that related to where Hanson's boyfriend would be seated. Wade thereafter observed Panitch and Hanson, near the wait station, during the intermission between the first and second round of the contest. Wade testified Panitch said, "This shit is rigged and it's fucking bullshit" and that Panitch and Hanson went into the restroom. As they left the restroom Panitch pushed a dish rack onto the floor.

Wade distributed "goodie [gift] bags" after the bikini contest in the photo area where she observed Panitch, Rochelle, and Hanson, off to the side, talking. Wade heard Hanson ask Marketing Coordinator Noble, "Pam, do you feel good that you cheated? Do you feel good that you won first place because you cheated?" Wade testified Panitch started yelling at Noble, calling her a "bitch" and invading her personal space. Wade left to find General Manager Vidauri. When Wade returned she said Regional Director Peterson was putting his arms out to create space between Panitch, Hanson, and Noble saying this had to stop. Wade testified Panitch told her "Fuck this shit. No, I don't want a goodie bag" but Hanson took one. Panitch

[3] During the events here Ms. Strohman was known as Ms. Wade. I have, for ease of understanding, referred to her here as Ms. Wade.

and Hanson then went into the restaurant. Wade continued to hand out "goodie bags" but Regional Director Peterson asked her to go inside the restaurant "and speak to the girls and ask them to remain calm."

Wade first spoke with Hanson saying Regional Director Peterson had asked her to tell them to calm down. According to Wade, Hanson asked why she was not talking to Panitch. Wade said she would speak with Panitch and told Hanson it wasn't worth losing her job over. Wade testified Hanson told her, "they can't touch her, they can't fire her, that she didn't do anything wrong." Wade said restaurant guests, including Hanson's boyfriend, were in the area.

Wade testified that Panitch "came over and started yelling in my ear, saying . . . I know that she's your fucking friend, but fuck that bitch. It was rigged. This is fucking bullshit." Wade asked Panitch to calm down. Panitch slid a chair toward Wade. Wade testified she then went toward Panitch to usher her out of the building. Wade said Panitch pushed her back and she (Wade) "grabbed her, like wrapped my arms around her and started pushing her toward the exit of the building." Wade said Panitch left the restaurant with Hanson behind her. Wade reported the events to Regional Director Peterson and General Manager Vidauri. Wade told them she would not be comfortable working with Panitch and Hanson. General Manager Vidauri escorted Wade to her car and she left. Wade never heard Hanson use curse words that evening nor, curse at Noble, and, she never reported such to management. Wade did tell management Panitch yelled expletives at Noble.

The April 22 bikini contest at the Ontario location was the first such contest General Manager Vidauri ever worked. He testified that prior to the bikini contest neither Panitch nor Hanson spoke with him about the contest being rigged or fixed, but that about 60 percent of the staff did complain or mention their concerns to him. Vidauri determined the complaints lacked validity. Vidauri testified neither Panitch nor Hanson talked to him, on the day of the contest, about it being rigged.

Vidauri testified he told the Hooter Girls at a jumpstart meeting there would not be any cheating at his store and he did not want to hear anymore about it. Vidauri, however, said he repeated this at jumpstarts every day for 2 weeks and he was sure Hanson was present for at least one such meeting. Vidauri said complaints persisted. Vidauri said he selected the celebrity judges.

General Manger Vidauri testified neither Hanson nor Panitch talked with him on the day of the contest about not participating in the contest.

After the bikini contest ended, General Manager Vidauri retrieved "goodie bags" from Marketing Coordinator Noble's car for distribution. When he approached the area of the changing tent he noticed Panitch and Hanson waving their hands and talking to Noble. Vidauri testified he heard Panitch call Noble "a fucking bitch" but did not hear what Hanson may have said because, "he was too far away to hear that." Vidauri, however, never at any time the entire evening of the bikini contest, heard Hanson use any curse words. Vidauri heard Regional Director Peterson tell Panitch and Hanson to calm down. According to Vidauri, Panitch was saying, "this fucking bullshit . . . she cheated" and words of that nature. Vidauri said Peterson, Panitch, and Hanson walked rapidly to the back entrance to the restaurant. Peterson told key employee Wade to go inside the restaurant and talk to Panitch and Hanson about cooling off.

Vidauri thereafter was called into the restaurant and from about 20 feet away he heard Panitch screaming and yelling as she was being escorted by security out of the front door. He testified Panitch was "saying the same thing," "she cheated," "she's a fucking, I don't know . . . that kind of stuff." Vidauri testified Hanson was about 3 feet behind Panitch not saying or doing anything. General Manager Vidauri said he, at one point, got next to Panitch and Hanson and told them they needed to stop. Panitch told Vidauri, "she's a fucking bitch, she cheated." Vidauri told Panitch if she did not stop he was going to call the police. Vidauri testified when he went to Hanson she asked him how he felt about letting someone win that cheated. Vidauri told her she needed to leave. Vidauri testified Hanson said, "I didn't do nothing wrong, and there's nothing you can do about it." Vidauri again stated if they did not leave he would call the police.

Vidauri thereafter did call the police. Vidauri also checked on Noble who he described as upset and crying. Vidauri told Noble to calm down that everything would be okay. Vidauri then escorted key employee Wade to her car. Wade asked why this all happened and stated she wanted to go home, and, did not wish to return to work the next day if "these girls" are going to be there.

General Manager Vidauri and Regional Director Peterson decided to inform Vice President of Human Resource Herrmann about the contest and did so at around 12:30 a.m. that evening. Vidauri said he contacted Herrmann because, "It was bigger than in my genre with what was going to happen with the whole situation" and "the police" had arrived. Vidauri briefly explained to Herrmann what had happened. Herrmann instructed Vidauri to ensure everyone got home safely and they would talk about the situation the next day. Vidauri then spoke with a responding police officer telling him, "everything was good, everybody left, he said okay."

The next day, April 23, Vice President of Human Resources Herrmann asked General Manager Vidauri to prepare a statement of what happened and make sure statements were taken from all managers and employees regarding the situation. Vidauri asked Herrmann, "What we were going to do with the situation?" Herrmann wanted to determine what happened. Vidauri told her he did not feel safe having Panitch and Hanson working at the restaurant. Statements were taken and forwarded to Herrmann. Herrmann thereafter notified General Manager Vidauri she had decided to fire both Panitch and Hanson.

Regional Director Peterson testified he was present at the Ontario restaurant for the bikini contest to make sure things ran smoothly. Peterson could not recall any employee talking with him about the swimsuit competition or judging prior to the actual day of the contest. Peterson explained right before the contest started Charging Party Hanson had a brief and "very polite" conversation with him concerning the judges for the contest. Peterson testified that Hanson told him Marketing Coordinator Noble had a friend as a judge which she thought was unfair. Peterson said Panitch also expressed her concerns in a cordial and calm manner as well. Peterson told Panitch and

Hanson he would review the judging to see if he felt it was somehow inappropriate. Peterson testified the contest went well and nothing occurred that raised concerns for him as regional director. Immediately after the competition and the winners had been announced, Peterson followed the winners to the photo shoot area to keep customers from getting into the area. At that time Peterson heard behind him "some screaming" and "you fucking cunt, you fucking bitch, you fucking cheat." Peterson saw Panitch within inches of Marketing Coordinator Noble's face verbally bashing her. Peterson attempted to come between the two. Peterson did not know where Hanson was nor did he hear her say anything. Peterson specifically testified he did not hear Hanson curse at Noble nor did he witness any misconduct by Hanson at anytime the entire night of the bikini contest. Peterson asked Panitch to leave the area and she went into the restaurant. Peterson asked key employee Wade to go inside and see if everything was okay.

Peterson testified that a couple of minutes later he heard "yelling and screaming" and observed Panitch heading toward the changing tent behind the restaurant. Peterson approached Panitch and told her she had to get her car and leave. Peterson said Hanson "came over" to where he and Panitch were. Peterson could not recall Hanson saying anything, but Panitch was still calling Noble a "fucking cheat," "fucking cunt," and asking how it felt to win "by fucking cheating." Peterson said Hanson "was calm in talking to me." Peterson said he walked Panitch and Hanson to a car and they left the area. Peterson then went inside the restaurant to find out what happened. General Manager Vidauri told Peterson that Panitch threw a chair at key employee Wade. Wade said she wasn't going to put up with this and was going to quit. Peterson testified General Manager Vidauri told him Hanson was "instigating the situation getting everything worked up" and Panitch was just acting out what Hanson was saying.

Michael Gill, currently assistant manager at Hooters Restaurant in Costa Mesa, California, was on April 22, the owner of a two-person security company providing security for the Ontario bikini contest. Gill said he and his security helper, Robert Hatcher, kept the peace ensuring no customers approached the stage or messed with the Hooter Girls competing in the contest. More specifically Gill guided the contestants to and from the changing tent that was behind the restaurant. Gill also assisted each contestant on to, and off from, the stage or from "where they walk the catwalk." No security concerns were reported to Gill during the competition. Gill thereafter stationed himself outback where the photographer was and near the changing tent. Gill saw two females come into that area and heard the two say; "fuck you, bitch, you fucked the judges, I thought we were friends. . . ." Gill said both were talking but he did not know who said exactly what. Gill stated Regional Director Peterson started talking to the two and escorted them to the middle of the parking lot. Gill later asked Peterson who the two were for his report. Gill also talked with General Manager Vidauri about what had happened. Gill could not say which of the two, that he later learned were Panitch and Hanson, used the curse words he heard. Specifically, Gill could not say Hanson spoke any of the curse words.

Vice President of Human Resources Herrmann learned of the April 22 bikini contest incident in a text message from General Manager Vidauri on April 23. Herrmann telephoned Vidauri who instructed her Marketing Coordinator Noble had won the bikini contest and that Hooter Girls Panitch and Hanson had gotten into a verbal altercation with Noble and local police had been called and the two Hooter Girls had been escorted out of the building. Herrmann instructed General Manager Vidauri to suspend Panitch and Hanson and conduct an investigation.

Herrmann telephoned Regional Director Peterson who told her "the contest had been a mess." Herrmann told Peterson she had already instructed General Manager Vidauri to suspend the two Hooter Girls pending an investigation of the incident.

Herrmann went to the Ontario location on April 24, and spoke with Marketing Coordinator Noble whom she observed to still be upset. Noble told Herrmann both Panitch and Hanson accused her of cheating in winning the swimsuit contest and she did not want to work again with either of them. Herrmann testified General Manager Vidauri also told her he did not feel he could continue to work with Panitch and Hanson. Herrmann reviewed all statements gathered in the investigation and determined to discharge Panitch. Herrmann telephoned Panitch informing her she was terminated. Herrmann asked Panitch why she acted the way she did. Panitch told her they all felt Noble had rigged the contest with her best friend as a judge. Herrmann said Panitch identified "all" as she and Hanson. Herrmann told Panitch "you and Alexis [Hanson] went and verbally attacked Pamela [Noble]." According to Herrmann, Panitch replied, "Well, of course we did. We were pissed off and somebody needed to do it."

Herrmann then telephoned Hanson whom, she was 80 percent sure, she would terminate. Hanson told Herrmann the contest was rigged, unfair, and she hadn't wanted to participate. Herrmann told Hanson there was a right way and a wrong way for them to have responded and told Hanson they had cursed Noble. Hanson denied cursing. Herrmann told Hanson she had "multiple witness statements that said [she] did curse." Herrmann testified Hanson replied; 'Well, I may have, but I'm not the one that got physical. Chanelle was the one that got physical." Herrmann told Hanson she was discharged.

Herrmann testified, on direct examination, she based Hanson's termination on Hanson's cursing, that two of her coworkers and her manager did not feel comfortable continuing to work with her, and, on social tweets she had posted. On cross-examination, Herrmann acknowledged she had said elsewhere, under oath, she did not rely on Hanson's social tweets in firing her. Herrmann was uncertain exactly what curse words Hanson had used but she believed Hanson had used the words "fuck" and "bitch." On cross-examination Herrmann said neither Marketing Coordinator Noble nor key employee Wade specifically told her Hanson used the word "fuck" but did say she used the word "bitch." Herrmann concluded the curse words Hanson used, whatever those words were, was enough, standing alone, to discharge Hanson and she did so. Herrmann specifically acknowledged on cross-examination, the only reason she decided to terminate Hanson was "her cursing at a coworker . . . in front of guest."

### *B. Legal Principles, Credibility Determinations, Analysis, Discussion and Conclusions*

#### 1. Legal principles

It is helpful to review certain guidance of the Board and courts regarding concerted activity to include, under what circumstances, it will or will not be protected under the Act. Section 7 of the Act guarantees employees the right to engage in concerted activity for the purpose of collective bargaining or other mutual aid or protection. Section 8(a)(1) of the Act makes it an unfair labor practice "for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7." For an employee's activity to be "concerted" the employee must be engaged with or on the authority of other employees and not solely on behalf of the employee him/herself. *Meyers Industries (Myers I),* 268 NLRB 493 (1984), and *Meyers Industries (Meyers II),* 281 NLRB 882 (1986). The statute requires the activities under consideration be "concerted" before they can be "protected." *Bethany Medical Center*, 328 NLRB 1094, 1101 (1999). As the Board observed in *Meyers I "*Indeed, Section 7 does not use the term 'protected concerted activities' but only concerted activity." It goes, without saying, the Act does not protect all concerted activity. In *Meyers Industries (Meyers II)*, 281 NLRB 882 (1986), enfd. sub. nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), the Board made it clear that under the proper circumstances a single employee could engage in concerted activity within the meaning of Section 7 of the Act. The question of whether an employee has engaged in concerted activity is a factual one based on the totality of the record evidence. See, e.g., *EWinc v. NLRB*, 861 F.2d 353 (2d Cir.1988). The Board has found an individual employee's activities to be concerted when they grew out of prior group activity. *Every Women's Place*, 282 NLRB 413 (1986). An employee's activity will be concerted when he or she acts formally or informally on behalf of the group. *Oakes Machine Corp.,* 288 NLRB 456 (1988). Concerted activity has been found where an individual solicits other employees to engage in concerted or group action even where such solicitations are rejected. *El Gran Combo,* 284 NLRB 1115 (1987), enfd. 853 F.2d 996 (1st Cir. 1988). It is clear the Act protects discussions between two or more employees concerning terms and conditions of employment. In a group meeting context, a concerted objective may be inferred from the circumstances. *Whittaker Corp.,* 289 NLRB 933, 934 (1988), citing *Jeannette Corp. v. NLRB,* 532 F.2d 916, 919 (3d Cir. 1976). The Board has long held, however, that for conversations between employees to be found protected concerted activity, they must look toward group activity and mere griping is not protected. See *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683 (3d Cir. 1964). Once the activity is found to be protected concerted activity an 8(a)(1) violation will be found if, in addition, the employer knew of the concerted nature of the employee's activity, the concerted activity was protected by the Act and the adverse employment action at issue (e.g., discharge) was motivated by the employee's protected concerted activity.

If an employee is discharged for alleged misconduct in the course of engaging in protected activity the applicable standard for determining whether the discharge was unlawful is that set forth in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964). The Court explained:

> [Section] 8(a)(1) [of the Act] is violated if it shown that the discharged employee was at the time engaged in protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact guilty of that misconduct.

The employer then has the burden of showing it held an honest belief that the discharged employee engaged in the misconduct. If the employer meets its burden, the burden shifts to the government to show the employee did not, in fact, engage in this asserted misconduct. If the government meets its burden that the employee did not engage in the asserted misconduct the discharge violates Section 8(a)(1) of the Act. See *Roadway Express, Inc.,* 355 NLRB 197, 204, 215 (2010), enfd. 427 Fed. Appx. 838 (11th Cir. 2011).

#### 2. Credibility resolutions

It is necessary to review the testimony and make certain credibility resolutions. In deciding whether employees, Hanson in particular, engaged in concerted activity prior to the bikini contest as well as on the day of the contest (April 22); and, if so, was it protected conduct, requires credibility determinations.

In making my credibility resolutions I was impacted by impressions I formed while watching the witnesses as they testified. The impressions I gather were based on a combination of the witnesses' mannerisms, how they spoke, and their overall bearing on the witness stand. I applied my observations as one, among other factors, in deciding whether witnesses' testimonies impressed me as candid, fair, and believable. I note crediting certain testimony will automatically discredit testimony of other witnesses without having to so state. Although I have not commented on every bit of testimony, nor resolved every possible credibility conflit, I have considered all the testimony and made necessary credibility resolutions.

It is essential to address the credibility of Charging Party Hanson. Some observations: Hanson sat on the forward edge of the witness chair, spoke directly to the person questioning her and responded in a clear, articulate, and calm manner. She appeared moved by a strong and eager desire to testify and to do so truthfully. She never shied away or recoiled from answering any questions on direct or cross-examinations. Her testimony demonstrated she had observed, and was directly familiar with, and remembered in detail, the events of her testimony. Simply stated she knew what she was testifying about and expressed herself in a fair and candid manner. Hanson's

demeanor was superior.[4] I credit her testimony rather than certain opposing witnesses.[5]

I find it helpful, if not essential, to expound upon my assessment of Panitch's testimony. I note, Panitch had filed charges with the Board regarding her own termination, but, the Board's Regional office dismissed her case—which dismissal she did not appeal. The outcome of the case here will not impact her dismissed charge with the Board. Panitch had nothing personally, regarding her discharge, to gain or lose by her testimony. Panitch readily acknowledged her command of a range of profanities and exercised the opportunity to express such related to events surrounding her and Hanson's discharge. Panitch's demeanor, while testifying, convinced me she was there to tell the truth whether it cast her in a favorable light or not. I credit her testimony.

3. Discussion, analysis, and conclusions

It is alleged that about April 20, Charging Party Hanson concertedly complained to the Company regarding wages, hours, and working conditions of the Company's employees by complaining to Regional Director Peterson about the disparagement of certain of the Company's employees, and conditions surrounding an upcoming competition involving the employees.

It is undisputed that in April, General Manager Vidauri, along with Bar Manager Ramirez, and key employees Noble and Wade conducted a bartenders meeting at which Panitch, among others, was present. Panitch immediately text messaged Hanson her concerns about the meeting and they met for lunch later that day to discuss those concerns. Panitch and Hanson discussed the fact five "Hooter Girls" had derogatory comments made about them by management. Comments were made that one Hooter Girl was getting fat; another was "stupid" and "a dumb blond"; another's singing career was going nowhere; another "scrunched her hair like a Mexican"; and yet another had an attitude problem and still another was a diva. Hanson spoke with three coworkers, namely, Rochelle, Delroja, and Panitch, about the comments made at the bartender's meeting. Hanson and Delroja complained their names were brought up and they were not present. Delroja said she would telephone Vice President of Human Relations Herrmann about their complaints. Panitch telephoned Regional Director Peterson and told him all about the bartender meeting, which Peterson seemed to already know about. Regional Director Peterson testified he had heard from Hooter Girl Rochelle concerning the meeting and was told what she had been called at the bartenders meeting. Peterson promised to take care of the matter. Hanson also spoke with Regional Director Peterson about concerns of unprofessional conduct on the part of managers at the April bartenders meeting.

It is clear from above, Hanson, Panitch, and other Hooter Girls concertedly discussed what they considered unprofessional comments by managers at the bartenders meeting. Their concerns directly involved working conditions; namely, a respectful and professional working environment. It is clear management knew of Hanson's, Panitch's, and other Hooter Girls concerns related to the bartenders meeting. Hanson and Panitch both spoke with Regional Director Peterson about their concerns. General Manager Vidauri acknowledged Regional Manager Peterson told him there had been complaints from Hooter Girls regarding comments made at the meeting and specifically comments Vidauri had made about some of the Hooter Girls. Vidauri and Bar Manager Ramirez were disciplined for their comments.

After Panitch observed Marketing Coordinator Noble win, in April, at two other Hooter restaurant locations with her (Noble's) best friend Lina as a judge, Panitch raised concerns about that with Hanson. Panitch and Hanson concluded it was unfair to the contestants at Hooters of Ontario for Noble to have her best friend as a judge at contests and then win the contests. Hanson spoke not only with Panitch but with coworkers Delroja, Rochelle, and Jessy Wiles about unfairness and possible rigging of the contests. The coworkers were unhappy about the situation with Wiles complaining "it was going to be rigged" that they "had to participate in something that we were not being paid for" and had to "purchase things for basically a rigged competition." These Hooter Girls concluded they did not want to participate in the contest but were concerned they would be fired if they did not. Hanson raised their concerns with Regional Director Peterson before the day of the contest at the Hooters of Ontario. Peterson, in their telephone conversation, asked Hanson if she was participating in the bikini contest. She told him she was but was not looking forward to it because, "we were forced to do it, we are not being paid and that it was rigged." Peterson told Hanson he was looking into the competition being rigged and would handle it.

Panitch also spoke with Regional Director Peterson, before the day of the bikini contest, that it was unfair for Marketing Coordinator Noble to be in the competitions with her best friend Lina as a judge. Peterson wanted to know if Panitch could prove Lina was Noble's friend or best friend, and if so, he would not have her as a judge. Panitch told Peterson she could send him a screenshot from her cell phone of an Instagram photograph showing Lina with Noble with a caption that stated they were best friends for life.

Hanson raised the concerns about fairness in judging the bikini contest at a jumpstart meeting in April with General Manager Vidauri. Hanson, in the presence of other coworkers and managers, expressed concern they were being forced to participate in the contest without being paid and that the contest was rigged just like the other contests Noble had won with her friend as a judge. General Manager Vidauri explained it was all coming from corporate not him. While Vidauri testified neither Panitch nor Hanson spoke with him about the contest being rigged or fixed he acknowledged 60 percent of the staff mentioned or raised concerns the contest was rigged. I specifically do not credit Vidauri's testimony that Hanson never raised the concerns with him. The concerns persisted. General Man-

[4] Although I have set forth a combination of mannerisms, manner of speaking, and overall bearing that triggered my inclination to accept Hanson's testimony as truthful; I however note, courts do not require fact finders to itemize a witness' characteristic or mannerisms when making a demeanor-based credibly resolution. See *Bloomington-Normal Seating Co .v. NLRB*, 357 F.3d 692, 695 (7th Cir. 2004).

[5] I note it is the weight of the credible evidence, not the numerical superiority of witnesses, which is controlling. See *Riley-Beaird, Inc.*, 259 NLRB 1339, 1367 fn.115 (1982).

ager Vidauri addressed those concerns every day for 2 weeks at the jumpstart meetings prior to the work shifts starting. Vidauri was certain Hanson was present at least at one of the jumpstart meetings at which the concerns about the contest being rigged were discussed. I am fully persuaded Hanson raised her concerns with Vidauri at a jumpstart meeting.

It is clear from the above that many Hooter girls discussed their concerns with each other concerning the bikini contest being rigged. Specifically Hanson and Panitch discussed these concerns with various coworkers and the concerns were raised with groups of employees at jumpstart meetings. Hanson specifically raised such concerns at a jumpstart meeting. General Manager Vidauri had concerns raised with him from 60 percent of the work force. Regional Manager Peterson was fully aware many employees had concerns about the contest. This is clearly concerted activity and was activity protected by the Act as well. The concerns raised by the employees related to wages, hours, and other terms and conditions of employment. The employees were concerned they were being forced to participate in the bikini contest without pay and were incurring out-of-pocket expenses for a contest they were concerned was rigged. Additionally, employees had the potential to win cash as well as other benefits if they could compete fairly at Ontario and the potential to advance to the regional and national contests. I need not, and do not, address whether the contest was actually rigged, nor, do I address the fairness or wisdom of allowing Marketing Coordinator Noble to participate in the contests. I need only conclude employees, including Hanson, thought the contest was rigged and discussed such among themselves and with management. I need only find it was a concern of the employees involving a working condition and it was discussed among the employees and raised with management.

I turn next to whether employees, Hanson in particular, engaged in concerted activity protected by the Act on the evening of the bikini contest at the Ontario location. Hanson and the other bikini contestants were directed by Marketing Coordinator Noble to be at the restaurant on April 22 at 8:30 p.m., and advised the contest would commence at 10:30 p.m. Hanson arrived around 8 p.m. and she, Panitch and the other contestants participated in the costume portion of the contest first. Hanson and Panitch observed that Marketing Coordinator Noble's best friend Lina as well as Noble's boyfriend were contest judges. Panitch observed Lina "whispering" to the other judges. Hanson and Panitch spoke with Regional Director Peterson between the costume and bikini portions of the contest. Panitch asked Peterson if he knew Lina was still going to be a judge. Peterson did not. Hanson asked Regional Director Peterson if he knew who was going to win. Peterson shook his head and laughed. Panitch told Peterson she was unhappy because Peterson had said he would deal with that matter and had not, and, they were still forced to participate in a rigged competition. Peterson told Panitch he knew, and, it would be okay and comforted her.

After the three winners had been selected and announced, Marketing Coordinator Noble had won first place. Hanson and Panitch, along with Rochelle, congratulated the second and third place winners. Hanson stated to Noble; "Congratulations, Pam on cheating." Although Noble asked what, Hanson did not respond, nor did she curse Noble or raise her voice. Regional Director Peterson testified he did not hear Hanson use curse words toward Noble nor did Hanson engage in *any* misconduct at *any* time that evening. General Manager Vidauri never heard Hanson use any curse words that evening. Key employee Wade never heard Hanson use any curse words at all that evening and never told anyone that she heard curse words by Hanson. Security company owner and current Assistant Manager, Gill, of Hooters Restaurant of Costa Mesa, California, heard cursing but could not say if Hanson spoke any curse words that evening.

Hanson and Panitch were continuing their concerted activity, protected by the Act, concerning wages and working conditions, when they addressed with Regional Director Peterson, at the contest, their continued concerns about Noble, having her best friend and boyfriend as judges at the contest.

I next outline and discuss the credited comments, events, and actions involving Charging Party Hanson that took place after the contest ended and until she left the Hooters of Ontario facility perhaps in the early morning hours of April 23.

Hanson, as set forth elsewhere here, commented to Marketing Coordinator Noble after the bikini portion of the contest, "congratulations, Pam, on cheating" but said nothing else. Hanson described Panitch and Noble as "yelling at each other" in a "heated exchange between both girls" and "curse words exchanged." Hanson and coworker Rochelle told Panitch, "this was not the time or the place for this" and took Panitch inside the restaurant. Hanson spoke with her (Hanson's) boyfriend who was also inside the restaurant. Key employee Wade approached Hanson telling Hanson to leave then or be terminated. Hanson explained to Wade she had not done anything and the conversation with Noble, outside the restaurant, had ended. Hanson also told Wade she had no right to threaten to take away her job that she had done nothing.

Hanson observed actions, and overheard an exchange, between key employee Wade and Panitch where Wade "bear hugged" Panitch attempting to remove Panitch from the restaurant. Panitch responded cursing at Wade. Hanson moved away from the Panitch–Wade exchange and actions because she did not wish anyone to think she was involved in those actions and that exchange.

Hanson then left the restaurant along with coworker Rochelle. She observed Regional Director Peterson, General Manager Vidauri, and Market Coordinator Noble as well as Noble's boyfriend in the parking lot. Peterson approached Hanson asking that she not say anything to Noble. Hanson told Peterson she had not and would not say anything to Noble explaining everything that had gone on involved Panitch. Hanson apologized for Panitch's actions and comments that evening. Peterson thanked Hanson and acknowledged the whole thing could have been avoided and it was probably his fault. Peterson also acknowledged Hanson was calm talking with him that entire evening. Hanson thereafter left the premises, unescorted by security, and never saw security interact with Panitch that evening. Although Hanson observed Noble as Hanson left the restaurant parking lot they never spoke. I specifically do not credit Marketing Coordinator Noble's testimony that when she

was in the restaurant parking lot after the contest, Hanson and Panitch came out of the restaurant "yelling more obscenities at me when security got in the way and basically pulled them away." I note Regional Director Peterson saw no misconduct by Hanson that night. General Manger Vidauri heard no curse words from Hanson that evening. Key employee Wade did not hear Hanson use any curse words that evening nor did she ever tell anyone she heard Hanson use curse words that evening. Security Guard Gill could not say Hanson spoke any of the curse words he heard that evening.

I note Panitch acknowledged that when she left the restaurant, unescorted, she observed Noble in the parking lot as Panitch passed Noble's car and yelled profanities at Noble telling her she did not deserve to win, and calling her a "cheater" and a "cunt." Panitch placed Regional Director Peterson along with Bar Manager Ramirez in the area but stated Hanson was not there nor when Panitch drove away.

Hanson was scheduled to work on April 23, but was notified by General Manager Vidauri not to bother coming to work. She was suspended for what had happened the night before. Hanson stated she had not done anything wrong the night before and asked if her job was at risk. Vidauri told Hanson it was.

On April 26, Vice President of Human Resources Herrmann telephoned Hanson informing her she was being discharged. Hanson asked why and was told "for cursing at Pamela Noble the night of the bikini contest."[6] When Hanson told Herrmann she never cursed at Noble, Herrmann then told Hanson she was "being terminated for your negative social media posts." I specifically do not credit Herrmann's testimony that Hanson told her she may have cursed. I am persuaded Hanson would not have consistently denied cursing or that many Company officials would have acknowledged and stated they never heard her curse and then admit to Herrmann she may have cursed. Hanson told Herrmann she had been a good employee for the Company and did not understand why she was being terminated without the Company ever hearing her side of the story. Herrmann told Hanson she knew she had always been a good employee and would be eligible for rehire later on.

Vice President of Human Resources Herrmann also notified Hanson in writing on April 26 that she was terminated for a verbal altercation with employees on April 22 after the Ontario swim suit competition, as well as posting disparaging comments about coworkers and managers on Social Media all of which violated certain Employee Handbook rules.[7] In her letter, Herrmann listed the rules violated as; acts of violence, threats of violence, dishonesty toward guest[s] or fellow employees of Hooters; insubordination to a manager or lack of respect and cooperation with fellow employees or guest[s]; off-duty conduct which negatively affects, or would tend to negatively affect, the employees ability to perform his or her job, the Company's reputation, or smooth operation, goodwill or profitability of the Company's business; and any other action or activity which Hooters reasonably believes represents a threat to the smooth operation, goodwill, or profitability of the business.

Did the Company violate the Act when it suspended and discharged Hanson? The evidence establishes the Company did. First, as set forth above, it is clear Hanson engaged in concerted activity protected by the Act. Second, it is just as clear the Company knew of Hanson's and others concerted protected activity. Hanson individually spoke with Regional Director Peterson and General Manager Vidauri about the concerns and Hanson also raised the concerns at a jumpstart meeting with coworkers and General Manager Vidauri. Vidauri acknowledged 60 percent of the staff raised concerns about the contest being rigged and he spoke about it every day for 2 weeks but the concerns persisted. Company management knew its employees concerns were about working conditions and possible additional wages if the employees could participate in a fair contest. Third, it is clear Hanson complained in a telephone conversation with Regional Director Peterson about managers' comments at the bartender meeting, and about the selection of judges for the bikini contest as well as the fact the outcome of the contest might be rigged. Hanson complained openly at a jumpstart meeting with other employees that the contest was unfair and might be rigged. The evidence indicates the Company knew it could rid itself of Panitch[8] and simply sought to lump Hanson's discharge in the mix and rid itself of both complaining employees. I find it clear Hanson's discharge was motivated by her protected concerted activity. Herrmann, in writing, gave several reasons for discharging Hanson; however, at trial she shifted and testified the sole reason for Hanson's discharge was that she cursed at Marketing Coordinator Noble. Herrmann was simply looking for any reason to terminate Hanson. The credited evidence establishes Hanson's only statement to Noble was "congratulations, Pam on cheating." Hanson did not curse at Noble.

As noted elsewhere, when the credited evidence establishes, an employer has discharged an employee for conduct during the course of protected activity, as here, the burden shifts to the employer to prove it acted with an honest belief the employee engaged in misconduct. When the employer has established such a good-faith belief, the burden shifts back to the government and if the government proves the asserted misconduct did not, in fact, occur, the discharge will be found to violate Section 8(a)(1). I am persuaded the Company did not establish a good-faith belief because many of its witnesses testified Hanson did not curse at Noble or anyone. A thorough investigation by the Company would have demonstrated such to the Company. Assuming arguendo, the Company did establish a good-faith honest belief Hanson engaged in misconduct the govern-

[6] Vice President of Human Resources Herrmann acknowledged, on cross-examination, she was uncertain what curse words Hanson used but stated that whatever words Hanson used were enough, standing alone, to discharge Hanson and that she did so for that reason. More specifically Herrmann acknowledged, on cross-examination, the only reason she decided to terminate Hanson was "Hanson's cursing at a coworker . . . in front of guest[s]."

[7] On cross-examination Herrmann, however, acknowledged she had stated under oath she did not rely on Hanson's social tweets in firing Hanson.

[8] Panitch, by her admitted actions (cursing and related conduct) afforded the Company an opportunity to rid itself of an employee that discussed with other employees actions of managers that resulted in two managers being disciplined.

ment, by credible evidence established the misconduct did not, in fact, occur. In summary, I find the Company violated Section 8(a)(1) of the Act when it suspended and thereafter discharged its employee Hanson.

*C. The Arbitration Agreement and Related Documents*

1. Arbitration agreement

It is admitted Hooters Employee Handbook contains the following "Hooters' arbitration policy (GC Exh. 18 p. 54) which reads as follows:

> Resolution matters, including charges of employment discrimination or harassment, may only be obtained by requesting arbitration under Hooters Agreement to Arbitrate. You will be required to sign an Agreement to Arbitrate as a condition of your employment with Hooters.

It is admitted that at all times material here the Company maintained agreement to arbitrate documents containing the following provisions:

> This Agreement requires you to arbitrate any legal dispute related to your application for employment, the application or interview process, your employment, or the termination of your employment with Hooters of Ontario, LLC[.]
>
> By signing this Agreement you and the Company each agree that all Claims between you and the Company shall be exclusively decided by arbitration[.]
>
> . . . .
>
> As used above, "claims" mean all disputes arising out of or related to your application for employment, the application and recruitment process, the interview process, the formation of the employment relationship, your employment by the Company, or your separation from employment with the Company. The term "Claims" includes, but is not limited to, any claim whether arising under federal, state, or local law, under a statute such as Title VII of the Civil Rights Act of 1964, under a rule, under a regulation or under the common law, including, but not limited ANY (sic) CLAIM OF DISCRIMINATION, SEXUAL OR OTHER TYPE OF HARASSMENT, RETALIATION, WRONGFUL DISCHARGE, ANY CLAIM FOR WAGES, COSTS, INTEREST, ATTORNEYS' FEES OR PENALTIES. "Claim" does not include any dispute that cannot be arbitrated as a matter of law.
>
> YOU AND THE COMPANY AGREE THAT EACH MAY BRING AND PURSUE CLAIMS AGAINST THE OTHER ONLY IN YOUR/ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF, CLASS MEMBER OR REPRESENTATIVE IN ANY PURPORTED CLASS, REPRESENTATIVE OR COLLECTIVE PROCEEDING. YOU AND THE COMPANY ACKNOWLEDGE AND AGREE THAT AT ALL TIMES YOU HAVE HAD AN AGREEMENT TO ARBITRATE WITH THE COMPANY AND HAVE UNDERSTOOD THAT THE AGREEMENT WAS AN AGREEMENT TO BRING AND PURSUE CLAIMS AGAINST THE OTHER ONLY IN YOUR/ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF, CLASS MEMBER OR REPRESENTATIVE IN ANY PURPORTED CLASS, REPRESENTATIVE OR COLLECTIVE PROCEEDING.
>
> (Emphasis in original.)

It is admitted that at all times material here the Company maintained an acknowledgement of arbitration agreement.

It is admitted that at all times material here the Company maintained an acknowledgement of execution of arbitration document, among others, containing the following provisions:

> I have freely and voluntarily agreed to bring and pursue claims only in my individual capacity and not as a plaintiff, class member or representative in any purported class, representative or collective proceeding.
>
> At all times I have had an agreement to arbitrate with the Company, I have always understood that the Company and I had agreed to only bring claims against each other in our individual capacities and that we had freely and voluntarily agreed not to bring or pursue claims in any purported class, representative or collective proceeding.

It is admitted Charging Party Hanson signed the Company's arbitration agreement; agreement to arbitrate, acknowledgement of receipt of arbitration agreement, and, acknowledgement of arbitration agreement on February 7, 2011.

2. Brief statement of the parties' position

The Government asserts the Company's mandatory agreement to arbitrate, precludes employees from filing joint, class, or collective action claims addressing wages, hours, or other working conditions in all forums arbitral and judicial and that *D. R. Horton,* 357 NLRB No. 184 (2012), is controlling here, and pursuant to *D. R. Horton Inc.,* the Company's arbitration agreement violates Section 8(a)(1) of the Act.

The Company contends its arbitration agreement and related policies are not unlawful because recent Supreme Court precedent, binding here, compels the conclusion that arbitration agreements containing class action waivers are enforceable and do not violate the Act.

3. Discussion, analysis, and conclusions

Simply stated the issue here is whether the Company's arbitration agreement and related documents contain restrictive provisions violating Section 8(a)(1) of the Act.

In evaluating whether a rule applied to all employees, as a condition of continued employment, including the mandatory arbitration agreement and related documents at issue here, violates Section 8(a)(1) of the Act, the Board, as noted in *D. R. Horton Inc.*, at pp. 4–6, applies its test set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), citing *U-Haul Co. of California,* 347 NLRB 375, 377 (2006), enfd. 255 Fed. Appx. 527 (D.C. Cir. 2007). Pursuant to *Lutheran Heritage* the inquiry, or test to be applied, is whether the rule explicitly restricts activities protected by Section 7 of the Act. If so, the rule is unlawful. If it does not explicitly restrict protected activity, the finding of a violation is dependent on a showing of

one of the following: (1) employees would reasonably construe the rule to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights.

The Board concluded in *D. R. Horton* that as a condition of employment "employers may not compel employees to waive their NLRA right to collectively pursue litigation of employment claims in all forums arbitral and judicial." 357 NLRB No. 184, slip op. at p. 12 (2012). The arbitration agreement here, by its terms, restricts employees, as a condition of their employment, from acting concertedly by pursuing class arbitral and judicial litigation of employment claims, I find the arbitration agreement here is facially unlawful. The Board explained in *D. R. Horton, Inc.,* supra at 10 "The right to engage in collective action . . . is the core substantive right protected by the NLRA and is the foundation on which the Act and Federal labor policy rest."

Turning now to the Company contention it may not be found to have violated the Act by maintaining its arbitration agreement and related documents based on recent Supreme Court precedent, binding here, that compels the conclusion that arbitration agreements' containing class action waivers are enforceable and do not violate the Act. The Company notes all Federal Circuit Courts of Appeals, asked to address this issue, have declined to enforce the *D. R. Horton Inc.* decision invalidating arbitration agreements containing class waivers and asks I also reject the Board's substantive analysis in *D. R. Horton,* supra.

First, the Company expands its request that I reject the Board's substantive analysis in *D. R. Horton Inc.,* supra. Noting that three Federal Circuit Courts of Appeal in, namely, *Owen v. Bristol Care Inc*., 702 F.3d 1050, 1052–1055 (8th Cir. 2013); *Richards v. Ernest & Young,* 734 F.3d 871, 873–874 (9th Cir. 2013); and, the direct appeal of *D. R. Horton; D. R. Horton v. NLRB,* 737 F.3d 344 (5th Cir. 2013), have reviewed the Board's *D. R. Horton Inc.* decision, and all three have rejected the Board's substantive analysis. I, however, am bound by Board precedent unless and until the Supreme Court or the Board directs otherwise. *Iowa Beef Packers, Inc.,* 144 NLRB 615, 616 (1963). Neither has done so thus *D. R. Horton Inc.* is the applicable law here that I follow.

Second, the Company urges I reject *D. R. Horton Inc.*, supra, and rely on certain specific Supreme Court decisions applying the mandate that Federal law, namely the Federal Arbitration Act (FAA), favors arbitration and that class waivers in agreements to arbitrate executed by employees do not violate the Act. In support of this argument or contention the Company points, in part, to the Supreme Court's decisions in *AT&T Mobility, LLC v. Concepcion*, 131 S.Ct. 1740 (2011); *American Express v. Italian Colors Restaurants,* 133 S.Ct. 2304 (2013); and, *CompuCredit v. Greenwood*, 132 S.Ct. 665 (2012). I address below the three above-cited cases and find those cases do not compel that I reject the Board's *D. R. Horton Inc.* decision based on the cited Supreme Court decisions.

The Board in *D. R. Horton* considered the Supreme Court's holding in *AT&T Mobility LLC* and concluded that decision does not require a conclusion different from its holding in *D. R. Horton Inc.* Accordingly, I reject the Company's contention *AT&T Mobility LLC* controls and must be applied here. I apply here the Board's rational as set forth in *D. R. Horton Inc.* as explained below:

> A policy associated with the FAA and arguable in tension with the policies of the NLRA was explained by the Supreme Court in *AT&T Mobility v. Concepcion,* supra at 1748: The "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." The "switch from bilateral to class arbitration," the Court stated, "sacrifices the principal advantage of arbitration—its informality." Id. at 1750. But the weight of this countervailing consideration was considerably greater in the context of *AT&T Mobility* than it is here for several reasons. *AT&T Mobility* involved the claim that a class-action waiver in an arbitration clause of any contract of adhesion in the State of California was unconscionable. Here, in contrast, only agreements between employers and their own employees are at stake. As the Court pointed out in *AT&T Mobility*, such contracts of adhesion in the retail and services industries might cover "tens of thousands of potential claimants." Id. at 1752. The average number of employees employed by a single employer, in contrast, is 20 [footnote omitted] and most classwide employment litigation, like the case at issue here, involves only a specific subset of an employer's employees. A classwide arbitration is thus far less cumbersome and more akin to an individual arbitration proceeding along each of the dimensions considered by the Court in *AT&T Mobility*—speed, cost, informality, and risk—when the class is so limited in size. 131 S.Ct. at 1751–1752. Moreover, the holding in this case covers only one type of contract, that between an employer and its covered employees, in contrast to the broad rule adopted by the California Supreme Court at issue in *AT&T Mobility.* Accordingly, any intrusion on the policies underlying the FAA is similarly limited.

Thus, whether we consider the policies underlying the two statutes as part of the balancing test required to determine if a term of a contract is against public policy and thus properly considered invalid under Section 2 of the FAA, or a part of the accommodation analysis required by *Southern Steamship, Morton,* and other Supreme Court precedent, our conclusion is the same: holding that an employer violates the NLRA by requiring employees, as a condition of employment, to waive their right to pursue collective legal redress in both judicial and arbitral forums accommodates the policies underlying both the NLRA and the FAA to the greatest extent possible.

Next, I turn to the *American Express Co. v. Italian Colors Restaurant,* supra, a case, which was decided after *D. R. Horton,* to determine if, as the Company contends, the decision compels a finding that the class waiver in the agreement to arbitrate here does not violate the Act.

*American Express Co. v. Italian Colors Restaurant* involved merchants who contracted with American Express to accept American Express cards at their businesses and in their agreement with American Express agreed to arbitrate disputes arising between the merchant and American Express and further precluded any claims from being arbitrated as a class action. The merchants, nevertheless, filed a class action lawsuit against

American Express contending their agreement with American Express violated Federal antitrust statutes. The merchants contended waiving class arbitration made the agreement with American Express invalid and unenforceable because the cost of individually arbitrating a Federal statutory claim would exceed any potential recovery. In response to the merchants lawsuit, American Express moved to enforce the arbitration agreement terms calling for individually arbitrating claims pursuant to the provisions of the FAA. The Supreme Court rejected the merchants' position holding arbitration is a matter of contractual agreement between the parties and that the FAA precludes the courts from invalidating a contractual waiver of class arbitration simply because the cost of individually arbitrating a Federal statutory claim exceeds any potential recovery.

Next I turn to *CompuCredit Corp v. Greenwood*, supra, involved actions brought by consumers against the marketer of credit cards and the Federal Credit Repair Organization Act (CROA), to determine if, as the Company contends, the decision compels a finding that the waiver here does not violate the Act. The Court held CROA provisions requiring credit repair organizations disclose to consumers the right to sue over violations of CROA and prohibiting waiver of that right nonetheless did not preclude enforcement of an arbitration agreement the parties had also executed. The Supreme Court held the FAA requires that the parties' arbitration agreement be enforced according to its terms. The court specifically concluded that even when the claims at issue are Federal statutory claims, the FAA's mandate cannot be overridden unless "overridden by a contrary congressional command."

The two above Supreme Court cases address consumer rights and contract language, and, in my opinion, have absolutely nothing to do with unilaterally imposed arbitration agreements in the context of employee–employer relationships. The cases do not discuss how, if at all, the FAA may be applied to alter, by private arbitration agreement, the core substantive rights protected by the NLRA which are the foundation on which the NLRA and all Federal labor law rests. It goes without saying the core issue before me, on this portion of the case, is whether the Company may, by private arbitration agreement imposed on its employees, restrict the right of its employees to engage in concerted or class activities recognized and protected by Section 7 of the Act. I have elsewhere here concluded the Company cannot lawfully do so and nothing in the two subsequent Supreme Court decisions compels a different conclusion than I make.

The Company further notes that most recently, Board Administrative Law Judge Keltner W. Locke issued his decision in *Haynes Building Services, LLP,* JD(ATL)03-014 (February 7, 2014) in which Judge Locke recommended the Board dismiss allegations *Haynes Building Services'* arbitration agreement violated the Act. Judge Locke's decision is without authority here as it is an intermediate decision not yet ruled upon by the Board and may not be considered as precedent.

In summary, the agreement to arbitrate and related documents clearly inhibits and interferes with employees' Section 7 rights in that it requires employees to waive their right to engage in concerted activity for mutual aid and protection by prohibiting class or collective action in any forum and as such violates Section 8(a)(1) of the Act.

Additionally, I find the language of the Company's arbitration agreement would reasonably be read by employees to prohibit the filing of unfair labor practice charges with the Board. Accordingly, I find the policy, for that reason alone, also violates Section 8(a)(1) of the Act. See *U-Haul Co. of California,* 347 NLRB 375, 377–378 (2006).

### *D. Employee Handbook Rules*

It is admitted that at all times material here the Company has maintained the following rules in its Employee Handbook and it is alleged it has thereby been interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act. The rules in issue are:

> (a) Remember: NEVER discuss tips with other employees or guests. Employees who do so are subject to discipline up to and including termination.
> (b) Insubordination to a manager or lack of respect and cooperation with fellow employees or guests [might result in discipline up to, and including immediate termination.]
> (c) Disrespect to our guests including discussing tips, profanity or negative comments or actions [might result in discipline up to, and including immediate termination.]
> (d) The unauthorized dispersal of sensitive Company operating materials or information to any unauthorized person or party [might result in discipline up to, and including immediate termination.] This includes, but is not limited to, recipes, policies, procedures, financial information, manuals or any other information in part or in whole as contained in any Company records.
> (e) Any other action or activity which Hooters reasonably believes represents a threat to the smooth operation, goodwill or profitability of its business [might result in discipline up to, and including immediate termination.]
> (f) Any off-duty conduct which negatively affects, or would tend to negatively affect, the employee's ability to perform his or her job, the Company's reputation, or the smooth operation, goodwill or profitability of the Company's business [might result in discipline up to, and including immediate termination.]
> (g) Employees shall not discuss the Company's business or legal affairs with anyone outside of the Company. Information concerning claims or lawsuits brought by the Company or against the Company shall be treated as confidential. Employees shall not discuss matters related in any way to litigation or claims. Any employee who violates this rule shall be subject to discipline up to and including termination of employment.
> (h) Information published on your social networking sites should comply with the company's confidentiality and disclosure of proprietary information policies. This also applies to comments posted on other blogs, forums, and social networking sites.
> (i) Be respectful to the Company, other employees, customers, partners, and competitors. Refrain from posting offensive language or pictures that can be viewed by co-workers and clients. Refrain from posting negative comments about Hoot-

> ers or co-workers. In all cases, NEVER publish any information regarding a co-worker or customer.

I address each of the above rules in the same order as set forth above.

First, in determining whether the maintenance of a work rule violates Section 8(a)(1) of the Act the Board analyzes the rule according to the following framework set forth in *Crowne Plaza Hotel,* 352 NLRB 382, 383 (2008), quoting from *Lutheran Heritage Village-Livonia,* 343 NLRB 646 (2004).

> [A]n employer violates Section 8(a)(1) when it maintains a work rule that reasonably tends to chill employees in the exercise of their Section 7 rights. *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998). In determining whether a challenged rule is unlawful, the Board must, however, give the rule a reasonable reading. It must refrain from reading particular phrases in isolation, and it must not presume improper interference with employee rights. *Id* at 825, 827. Consistent with the foregoing, our inquiry into whether the maintenance of a challenged rule is unlawful begins with the issue of whether the rule *explicitly* restricts activities protected by Section 7. If it does, we will find the rule unlawful.
>
> If the rule does not explicitly restrict activity protected by Section 7, the violation is dependent upon a showing of one of the following: (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights. *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004). Where a rule is ambiguous regarding its application to Section 7 activity and no examples or violative conduct or limitation language is set forth that would clarify to employees the rule does not restrict Section 7 rights such a rule is unlawful under the Act.

The Board noted in *Flex Frac Logestics, LLC*, 358 NLRB No. 127, slip op. at p. 2 (2012):

> Board law is settled that ambiguous employer rules—rules that reasonably could be read to have a coercive meaning—are construed against the employer. This principle follows from the Act's goal of preventing employees from being chilled in the exercise of their Section 7 rights—whether or not that is the intent of the employer—instead of waiting until that chill is manifest, when the Board must undertake the difficult task of dispelling it.

1. Discussing tips

The Company's policy forbidding employees from discussing tips with each other explicitly restricts activities protected by Section 7 of the Act and thereby violates Section 8(a)(1) of the Act. Discussing tips between employees is essentially discussing wages. See, e.g., *Wynn Las Vegas, LLC,* 358 NLRB No. 80, slip op. at p. 3 (2012). Nothing is more basic "terms and conditions" of employment than wages. *Parexel International, LLC*, 356 NLRB 516, 518 (2011). The portion of this rule that forbids employees from discussing tips with guests is unlawfully over broad. The rule precludes employees from exercising their right to discuss their terms and conditions of employment, such as wages, with nonemployees. See generally *Mastec Advanced Technologies,* 357 NLRB No. 17 (2011).

2. Insubordination by employees

The Company's insubordination rule is impermissible. In *University Medical Center*, 335 NLRB 1318, 1322 (2001), the Board prohibited a rule, applying the *Lafayette* standard, in an employee handbook prohibiting "insubordination, refusing to follow directions, obey legitimate requests or orders, or other disrespectful condition towards a service integrator, service coordinator, or other individual." Id. The Board held the rule was overly broad because it prohibited all disrespectful conduct towards others and "[d]efining due respect, in the context of a union activity, seems inherently subjective." Id. Further, potential employee advocates could reasonably surmise that members of their target audience would screen them from expressing views not welcomed or agreed with. Id. at 1323. Thus, the rule would have a chilling effect on employees in the exercise of their Section 7 rights. Similarly, here, the Company's rule prohibiting 'insubordination to a manager or lack of respect and cooperation with fellow employees or guest [might result in discipline up to, and including immediate termination]" is as broad as the "disrespectful conduct" clause in *Community Hospitals of Central California* in that it does not go on to define what "insubordination," "lack of respect," or "cooperation" means and thus are subjective. These broad terms could have the same chilling effect the Board was concerned with in *Community Hospitals.* There is also no limiting language here like in *Lafayette*, which held permissible the rule "[b]eing uncooperative with supervisors, employees, guest[s] and/or regulatory agencies or otherwise engaging in conduct that does not support the Lafayette Park Hotel's goals and objectives." The rule limited the conduct as to the company's "goals and objectives." And thus was permissible. There are no such limiting terms here, thus the rule is unlawful.

3. Disrespect to guests

This rule on disrespect is unlawfully over broad and unqualified.[9] The prohibitions against "profanity or negative comments or actions" are also over broad in that no examples or clarifications are provided. The rule reasonably tends to chill employee exercise of Section 7 rights and violates Section 8(a)(1) of the Act. See *Claremont Resort & Spa,* 344 NLRB 832, 836 (2005), citing *Lafayette Park Hotel,* supra.

4. Unauthorized dispersal of sensitive company materials

This nondisclosure or nondispersal rule is unlawfully overbroad because employees would reasonably believe they are prohibited from discussing wages or other terms and conditions of employment with nonemployees, such as, for example, union representatives—an activity clearly protected by Section 7 of the Act. See *Flex Frac Logistics, LLC,* 358 NLRB No. 127 (2012), citing *Hyundai American Shipping Agency Inc.,* 357 NLRB No. 80, slip op. at 12 (2011) (finding rule unlawful that prohibited "[a]ny unauthorized disclosure from an employee's

[9] The portion of the rule concerning not discussing tips with customers has been addressed above in "Discussing Tips" and will not be restated here.

personnel file"); *IRIS U.S.A. Inc*., 336 NLRB 1013, 1013 fn. 1, 1015, 1018 (2001) (finding rule unlawful that stated all information about employees is strictly "confidential" and defined "personnel records" as confidential). Additionally, as noted by counsel for the Government, nothing about the rule limits or qualifies the prohibition on disclosing "policies, procedures, and manuals" to exclude wages thus reinforcing the likely inference the rule prescribes wage discussions with outsiders.

5. Conduct affecting the Company's smooth operation, goodwill, or profitability of it business

As discussed below this rule is overbroad and restricts rights protected by the Act. In *Costco Wholesale Corp*., the Board found the following paragraph unlawful because employees would reasonably construe the rule as regulating and inhibiting Section 7 conduct.

> Any communication transmitted, stored or displayed electronically must comply with the policies outlined in the Costco Employee Agreement. Employees should be aware that statements posted electronically (such as [to] online message boards or discussion groups) that damage the Company, defame any individual or damage any person's reputation, or violate the policies outlined in the Costco Employee Agreement may be subject to discipline, up to and including termination of employment. 358 NLRB No. 106 (2012).

The Board found statements that: "damage the company, defame any individual or damage any person's reputation" clearly encompasses protests that respond to respondent's treatment of its employees. Id. There is also nothing in the company's rule that suggests that protected communications are excluded. Id. The Board held that employees could reasonably conclude that the rule required them to not partake in protected communications. Id.

Here, the Company has an arguably broader rule than the rule in *Costco Wholesale Corp.* The rule here states: "[a]ny other action or activity which Hooters reasonably believes represents a threat to the smooth operation, goodwill, or profitability of its business [might result in discipline up to, and including immediate termination.]" As in *Costco Wholesale Corp.,* supra, there is nothing to suggest that protected communications or activities are excluded as the rule says "any other action or activity." Though the Company limits the text to what it reasonably believes; *employees* could reasonably conclude the rule prohibits protected activities and communications. See *Southern Maryland Hospital*, 293 NLRB 1209, 122 (1989), enfd. in relevant part 916 F.2d 932, 940 (4th Cir. 1990) (rule prohibiting "derogatory attacks on . . . hospital representative[s] found unlawful); *Claremount Resort Spa,* 344 NLRB 832 (2005) (rule prohibiting "negative conversations about associates and/or managers" found unlawful); *Beverly Health & Rehabilitation Services*, 332 NLRB 347, 348 (2000), enfd. 297 F.3d 468 (6th Cir. 2002). Thus this rule in the Company's handbook is unlawful.

6. Off-duty conduct

This rule is overly broad and invalid essentially for the reasons stated immediately above in number five. More specifically off-duty conduct such as discussing working conditions with fellow employees, third party persons such as employees of other employers, and union representatives could be construed as violating this rule. Thus employees could reasonably conclude the overbroad language in this rule encompassed Section 7 activity. The rule is invalid.

7. Discussing the Company's business or legal affairs outside the company

This rule is overbroad and invalid. Prohibiting employees from discussing legal affairs including claims or lawsuits brought by the Company or against the Company or in any way discussing matters related in any way to such litigation interferes with employee rights under the Act in that employees would reasonably construe the rule language to prohibit or limit their exercise of rights guaranteed by Section 7 of the Act. For example, it would preclude discussing terms and conditions of employment related to lawsuits addressing wage and hour issues, protected age issues, race discrimination issues, fair labor standard issues, California Labor Code issues, and even Board litigation issues with third parties such as union representatives.

8. Information on employee social networking sites

I find this rule invalid for the reasons explained hereinafter where I conclude the Company's confidential information agreement and its nondisclosure agreement are unlawful because employees' would construe that these two policies interfere with the employees ability to engage in activities protected by Section 7 of the Act.

9. Being respectful to the Company, employees, customers, partners and competitors; post no offensive language or pictures that can be viewed by coworkers and clients; post no negative comments about the Company or coworkers; and, never post any information regarding a coworker or customer

I find the "Being respectful to the Company," other employees, customers, partners, and competitors rule, in conjunction with the prohibition regarding posting negative comments about the Company or coworkers, as encompassing protected Section 7 activity, such as employees' statements made to coworkers, supervisors, and third parties, who deal with the Company, about terms and conditions of employment they object to and seek support from in improving their working conditions. Additionally there is nothing in the rule that would reasonably suggest to employees that employee communications protected by Section 7 of the Act are excluded from the rules reach. See *Knauz BMW,* 358 NLRB No. 164, slip op. at pp. 1–2 (2012); *Hills & Deals General Hospital,* 360 NLRB No. 70 (2014); and, *First Transit, Inc.,* 360 NLRB No. 72, slip op. at p. 3 (2014).

*E. Confidential Information and Nondisclosure Agreement*

It is admitted the Company maintains an agreement containing the following provisions:

> 1. Nature of the agreement and acknowledgement
>
> Employee acknowledges that:
>
> . . . .

> (b) In the course of Employee's employment, Employee has or may become personally acquainted with information about The Company's employees and their job duties, payroll or accounting records and practices, or the Company's personnel policies and practices, including all matters related to employees training, selection, discipline and/or discharge, which is not generally known to the public;
>
> (c) In the course of Employee's employment, Employee has or may become personally acquainted with compensation data, . . . (or) employee relations or EEO strategies . . . which are not generally known to the public.
>
> 2. Nondisclosure
>
> (a) Employee agrees to act as a trustee of the information described in Paragraph 1 of this Agreement which is not generally known to the public.
>
> (b) Employee further represents to The Company that, as an inducement to The Company to employ or continue to employ Employee, Employee would hold such information in trust and confidence for the use and benefit solely of The Company.
>
> (c) During Employee's employment by The Company, and for a period of two (2) years thereafter, Employee agrees that, without prior written permission from The Company's General Counsel, Employee shall not publish, communicate, divulge, or otherwise disclose such information to any person, firm, company, corporation, association, partnership, or other entity for any reason or purpose whatsoever, unless (1) such information has already become known to the public, or (2) Employee is required to disclose such information by legal process.
>
> (d) Notwithstanding Paragraph 2(c), Employee agrees that, without prior written permission from The Company's General Counsel, Employee shall at no time publish, communicate, divulge or otherwise disclose any information (a) concerning a matter which Employee knows or has reason to know is privileged . . . , or (b) concerning the reasons for or circumstances surrounding, or Employee's understanding of those reasons for or circumstances surrounding, personnel actions taken by The Company with regard to other Hooters employers, including the hiring, firing, promotion, transfer, demotion, or discipline of any other Hooters employee.

Here employees are prohibited from disclosure of any information pertaining to terms and conditions of employment of employees such as their job duties, payroll or accounting records and practices, personnel policies and practices including *all* matters related to employee training, selection, discipline and/or discharge, which is not generally known to the public. This nondisclosure rule is so broadly written employees would reasonably believe, if they did not clearly understand, they are prohibited from discussing wages and salary information, disciplinary and discharge policies and practices and other information they are entitled to discuss and share with coworkers and even with third parties that might be able to assist them with the terms and conditions of their employment. This is the type of information that may be shared with employees, unions, and even governmental agencies. The rule here has a clear chilling effect on employees in the exercise of their Section 7 rights. See *MCPc, Inc.,* 360 NLRB No. 39, slip op. at p. 1 (2014); *Hundai American Shipping Agency,* 357 NLRB No. 80, slip op. at p. 12 (2011); and *Flex Frac Logistics, LLC*, 358 NLRB No. 127, slip op. at p. 1.

CONCLUSIONS OF LAW

1. Hoot Winc, LLC is, and has been, an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Ontario Wings, LLC d/b/a Hooters of Ontario Mills is, and has been, an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3. Hoot Winc, LLC and Ontario Wings, LLC d/b/a Hooters of Ontario Mills are, and at all material times have been, joint employers of the employee of Ontario Wings, LLC d/b/a Hooters of Ontario Mills (hereafter I shall refer to the joint employers as the Company).

4. Key employee and marketing coordinator, Pamela Noble, and Key employee Alicia Wade, at all material times, have been agents of the Company within the meaning of Section 2(13) of the Act.

5. By suspending and then discharging Alexis Hanson because of her concerted activity of complaining to Company management regarding wages, hours, and working conditions of Company employees specifically about the disparagement of Company employees and conditions surrounding a competition involving employees, the Company has violated Section 8(a)(1) of the Act.

6 The Company, by restricting its employees' Section 7 rights, has violated Section 8(a)(1) of the Act by maintaining the following overly broad work rules:

(a) That prohibits employees from discussing tips with other employees or guest.

(b) That prohibits all insubordination to a manager or lack of respect and cooperation with fellow employees or guest.

(c) That prohibits employees from disrespecting guests by discussing tips with guest or making negative comments or actions to guests.

(d) That prohibits dispersal of sensitive Company operating materials including policies, procedures, financial information, and Company manuals.

(e) That prohibits any action or activity affecting the Company's smooth operation, good will, or profitability of its business.

(f) That prohibits off-duty conduct which would tend to negatively affect employees ability to perform their jobs or the smooth operation, good will, or profitability of the Company's business.

(g) That prohibits employees from discussing the Company's business or legal affairs with anyone outside the Company.

(h) That prohibits employees from publishing on their social networking sites any confidential or proprietary information of the Company.

(i) That prohibits employees from being disrespectful to the

Company, other employees, customers, partners, and competitors, posting no offensive language or pictures and no negative comments about the Company or coworkers or posting any information regarding a coworker or the Company.

7. The Company, by restricting its employees' Section 7 rights, has violated Section 8(a)(1) of the Act by maintaining an overly broad, confidential information and nondisclosure agreement rule, that prohibits employees from disclosure of any information pertaining to terms and conditions of employment of employees such as their job duties, payroll or accounting records and practices, personnel policies and practices including all matters related to employee training, selection, discipline and/or discharge which is not generally known to the public.

8. By maintaining its mandatory agreement to arbitrate and related documents, that requires employees to waive their right to maintain class or collective actions in all forums, judicial or arbitral, the Company has engaged in unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act and has violated Section 8(a)(1) of the Act.

9. By maintaining its mandatory agreement to arbitrate and related documents that would reasonably be read by employees to prohibit the filing of unfair labor practice charges with the National Labor Relations Board, the Company has engaged in unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act and has violated Section 8(a)(1) of the Act.

## REMEDY

Having found the Company has engaged in certain unfair labor practices, I shall recommend that it cease and desist therefrom and take certain affirmative actions designed to effectuate the policies of the Act.

Having found that the Company has violated Section 8(a)(1) by suspending and discharging Alexis Hanson, I recommend the Company be ordered to reinstate her to her former job, or if that job no longer exists, to a substantially equivalent job without prejudice to her seniority or other rights and privileges previously enjoyed, and make her whole for any lost wages and benefits as a result of her April 23 suspension and her April 26, 2013 discharge, with interest.

The backpay shall be computed as prescribed in *F. W. Woolworth Co.,* 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center,* 356 NLRB 6 (2010). Additionally, the Company is ordered to compensate Alexis Hanson for the adverse tax consequences, if any, of receiving a lump sum backpay award, and to file a report with the Social Security Administration allocating the backpay awards to the appropriate calendar quarters for Alexis Hanson. See *Latino Express, Inc.,* 359 NLRB No. 44 (2012). I also recommend the Company, within 14 days of the Board's Order, be ordered to remove from its files any reference to Hanson's suspension on April 23 and her discharge on April 26, 2013, and within 3 days thereafter notify Hanson in writing it has done so and that her suspension and discharge will not be used against her in any manner.

I also recommend the Company be ordered to rescind, modify, or revise its agreement to arbitrate, and related documents, to clearly inform its employees the agreement does not constitute a waiver in all forums of their right to maintain employment-related class or collective actions and to clearly inform its employees that the agreement does not prohibit the filing of unfair labor practices with the National Labor Relations Board, and notify its employees the agreement to arbitrate and related documents have been rescinded, modified, or revised and provide a copy of the modified or revised agreements to all employees.

Having also found certain rules in the Company's Employee Handbook infringes on its employees' Section 7 rights, I recommend the Company be ordered to rescind the following rules fully described elsewhere in this decision addressing; (1) discussing tips; (2) insubordination by employees; (3) disrespect to guests; (4) unauthorized dispersal of sensitive Company materials; (5) conduct affecting the Company's smooth operation, goodwill, or profitability of it business; (6) off-duty conduct; (7) discussing the Company's business or legal affairs outside the Company; (8) information on employee social networking sites; and (9) being respectful to the Company, employees, customers, partners, and competitions, post no offensive language or picture that can be viewed by coworkers and clients; and post no negative comments about the Company or coworkers and never post any information regarding a coworker or customer; and notify its employees in writing that it has rescinded these rules.

I also recommend the Company be ordered to rescind its confidential information and nondisclosure agreement.

On these finding of fact and conclusions of law and on the entire record, I issue the following recommended[10]

## ORDER

The Company, Hoot Winc, LLC and Ontario Wings, LLC d/b/a Hooters of Ontario Mills, Joint Employers, their officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Suspending, discharging, or otherwise discriminating against employees for engaging in concerted activity protected by the Act.

(b) Maintaining its mandatory agreement to arbitrate, and related documents, that requires employees to waive their right to maintain class or collective actions in all forums; arbitral and judicial; and maintaining language in the agreement that would reasonably be read by employees to prohibit the filing of unfair labor practice charges with the National Labor Relations Board.

(c) Maintaining an overly broad rule that prohibits employees from discussing tips with other employees or guests.

(d) Maintaining an overly broad rule that prohibits all insubordinations by employees to a manager or lack of respect and cooperation with fellow employees or guests.

(e) Maintaining an overly broad rule that prohibits employees from disrespecting guests by discussing tips with guests or

[10] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of all the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

making negative comments or actions to guests.

(f) Maintaining an overly broad rule that prohibits employee's dispersal of sensitive Company operating materials including policies, procedures, financial information, and Company manuals.

(g) Maintaining an overly broad rule that prohibits employees from any action or activity affecting the Company's smooth operation, goodwill, or profitability of its business.

(h) Maintaining an overly broad rule that prohibits employees' off-duty conduct which would tend to negatively affect employees ability to perform their jobs or the smooth operation, goodwill, or profitability of the Company's business.

(i) Maintaining an overly broad rule that prohibits employees from discussing the Company's business or legal affairs with anyone outside the Company.

(j) Maintaining an overly broad rule that prohibits employees from being disrespectful to the Company, other employees, customers, partners, and competitors, posting no offensive language or pictures and no negative comments about the Company or coworkers or the Company.

(k) Maintaining an overly broad rule in its confidential information and nondisclosure agreement that prohibits employees from disclosure of any information pertaining to terms and conditions of employees such as their job duties, payroll or accounting records and practices, personnel policies and practices including all matters related to employee training, selection, discipline and/or discharge which is not generally known to the public.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of the Board's Order, offer Alexis Hanson full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(b) Make Alexis Hanson whole for any loss of earnings and other benefits suffered as a result of the discrimination against her, in the manner set forth in the remedy section of this decision.

(c) Within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful suspension and discharge of Alexis Hanson, and within 3 days thereafter, notify her in writing that this has been done and that her suspension and discharge will not be used against her in any way.

(d) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of the records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(e) Within 14 days of the Board's Order rescind or revise the agreement to arbitrate, and related documents, that requires employees to waive their right to maintain class or collective action in all forums, whether arbitral or judicial, and language that would reasonably be read by employees to prohibit the filing of unfair labor practice with the National Labor Relations Board.

(f) Advise all current employees in writing that the agreement to arbitrate and related documents have been revised or rescinded and that employees are no longer prohibited from bringing and participating in class actions against the Company nor, are they prohibited from filing charges with the National Labor Relations Board.

(g) Within 14 days of the Board's Order rescind or revise the confidential information and nondisclosure agreement that prohibits employees from disclosure of any information pertaining to terms and conditions of employees such as their job duties, payroll or accounting records and practices, personnel policies and practices including all matters related to employees training, selection, discipline and/or discharge which is not generally known to the public.

(h) Advise all current employees that the confidential information and nondisclosure agreement has been rescinded or revised and that they are not prohibited from disclosure of any information pertaining to terms and conditions of employees such as their job duties, payroll or accounting records and practices, personnel policies and practices including all matters related to employees training, selection, discipline and/or discharge which is not generally known to the public.

(i) Within 14 days of the Board's Order rescind or revise the rules in the Employee Handbook listed in 1(c), (d), (e), (f), (g), (h), (i), and (j) of this Order.

(j) Furnish all current employees with inserts for the Employee Handbook that in (1) advises that the unlawful rules (listed in 1(c), (d), (e), (f), (g), (h), (i), and (j) of this Order) have been rescinded, or (2) provide the language of lawful rules; or publish and distribute a revised Employee Handbook that (1) does not contain the unlawful rules, or (2) provides language of lawful rules.

(k) Within 14 days after service by the Region, post at its facility in Ontario, California, copies of the attached notice marked "Appendix."[11] Copies of the notice, on forms provided by the Regional Director for Region 31 after being signed by the Company's authorized representative, shall be posted by the Company and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Company to ensure that the notices are not altered, defaced, or covered by any other material. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Company customarily communicates with its employees by such means. In the event that, during the pendency of these proceedings, the Company has gone out of business or closed the facility involved in these proceedings, the Company shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Company at any time since

[11] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board.

April 23, 2013.

(l) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Company has taken to comply.

Dated, Washington, D.C. May 19, 2014

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT suspend or discharge you because of your protected activity of concertedly raising with Company management your concerns regarding wages, hours, and working conditions specifically your concerns about disparagement of employees and conditions surrounding a competition involving employees.

WE WILL NOT maintain or enforce our agreement to arbitrate and related documents that requires employees to waive their right to maintain class or collective actions in all forums; arbitral and judicial; and, language in the agreement that would reasonably be read by employees to prohibit the filing of unfair labor practice charges with the National Labor Relations Board.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees from discussing tips with other employees or guests.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits all insubordination by employees to a manager or lack of respect and cooperation with fellow employees or guests.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees from disrespecting guests by discussing tips with guests or making negative comments or actions to guests.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees' dispersal of sensitive Company operating materials including policies, procedures, financial information, and Company manuals.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees from any action or activity affecting the Company's smooth operation, goodwill, or profitability of its business.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees' off-duty conduct which would tend to negatively affect employees ability to perform their jobs or the smooth operation, goodwill, or profitability of the Company's business.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees from discussing the Company's business or legal affairs with anyone outside the Company.

WE WILL NOT maintain or enforce a provision in our Employee Handbook that prohibits employees from being disrespectful to the Company, other employees, customers, partners, and competitors, posting no offensive language or pictures and no negative comments about the Company or coworkers of the Company.

WE WILL NOT maintain or enforce a provision of our confidential information and nondisclosure agreement that prohibits employees from disclosing any information pertaining to terms and conditions of employees such as their job duties, payroll or accounting records and practices, personnel policies and practices including all matters related to employee training, selection, discipline and/or discharge which is not generally known to the public.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of rights guaranteed you by Federal labor law.

WE WILL, within 14 days from the date of the Board's Order, offer Alexis Hanson full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Alexis Hanson whole for any loss of earnings and other benefits resulting from her discharge, less any net interim earnings, plus interest.

WE WILL compensate Alexis Hanson for the adverse tax consequences if any, of receiving a lump sum backpay award, and WE WILL, file a report with the Social Security Administration allocating the backpay award to the appropriate calendar quarters.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful suspension and discharge of Alexis Hanson, and WE WILL, within 3 days thereafter, notify her in writing that this has been done and that the discharge will not be used against her in any way.

WE WILL revise or rescind our agreement to arbitrate, and related documents, that requires employees to waive their right to maintain class or collective actions in all forums; arbitral and judicial; and, maintaining language in the agreement that would reasonably be read by employees to prohibit the filing of unfair labor practice charges with the National Labor Relations Board.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employees from discussing tips with other employees or guests.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits all insubordination by employees to a manager or lack of respect and cooperation with fellow employees or guests.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employees from disrespecting guests

by discussing tips with guests or making negative comments or actions to guests.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employee's dispersal of sensitive Company operating materials including policies, procedures, financial information, and Company manuals.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employees from any action or activity affecting the Company's smooth operation, goodwill, or profitability of its business.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employees' off-duty conduct which would tend to negatively affect employees ability to perform their jobs or the smooth operation, goodwill, or profitability of the Company's business.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employees from discussing the Company's business or legal affairs with anyone outside the Company.

WE WILL revise or rescind the provision in our Employee Handbook that prohibits employees from being disrespectful to the Company, other employees, customers, partners, and competitions, posting no offensive language or pictures and no negative comments about the Company or coworkers or the Company.

WE WILL revise or rescind the provision in our confidential information and nondisclosure agreement that prohibits employees from disclosure of any information pertaining to terms and conditions of employees such as their job duties, payroll, or accounting records and practices, personnel policies and practices including all matters related to employee training, selection, discipline and/or discharge which is not generally known to the public.

HOOT WINC, LLC AND ONTARIO WINGS, LLC D/B/A HOOTERS OF ONTARIO MILLS,

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/31-CA-104872 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570, or by calling (202) 273–1940.